1   Samuel R. Maizel (SBN 189301)
    samuel.maizel@dentons.com
2   Tania M. Moyron (SBN 235736)
    tania.moyron@dentons.com
3   Gary W. Marsh (pro hac pending)
    gary.marsh@dentons.com
4   DENTONS US LLP
    601 South Figueroa Street, Suite 2500
5   Los Angeles, California  90017-5704
    Telephone:    (213) 623-9300
6   Facsimile:    (213) 623-9924

7   Proposed Attorneys for the Chapter 11 Debtor
    and Debtor In Possession

8

## UNITED STATES BANKRUPTCY COURT

9

## CENTRAL DISTRICT OF CALIFORNIA - RIVERSIDE DIVISION

10

| In re: | Case No. 19-11920-SC |
|---|---|
| | |
| AIR FORCE VILLAGE WEST, INC. d/b/a ALTAVITA VILLAGE, | Chapter 11 Case |
| | Hon. Scott C. Clarkson |
| Debtor and Debtor in Possession. | **EMERGENCY MOTION OF DEBTOR FOR INTERIM AND FINAL ORDERS (A) AUTHORIZING THE DEBTOR TO OBTAIN POST PETITION FINANCING, (B) AUTHORIZING THE DEBTOR TO USE CASH COLLATERAL, AND (C) GRANTING ADEQUATE PROTECTION TO PREPETITION LENDERS PURSUANT TO 11 U.S.C. §§ 105, 363, 364, 1107 AND 1108; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** |

[Filed Pursuant to LBR 2081-1(a)(9) and 9075-1(a);
Declaration Of Bill Pace In Support Of Debtor's
First Day Motions Filed Concurrently Herewith]]

## EMERGENCY HEARING:

Date:  March 14, 2019
Time:  10:00 a.m.
Place:  Courtroom 5C
        411 West Fourth Street
        Santa Ana, CA 92701

*Video Courtroom*:
Date:  March 14, 2019
Time:  10:00 a.m.
Place:  Video Hearing Room 126
        3420 Twelfth Street
        Video Hearing Room 126
        Riverside, CA 92501

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA  90017-5704
(213) 623-9300

i

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................ iv

EMERGENCY MOTION ........................................................................... 1

SUMMARY OF REQUESTED RELIEF ..................................................... 2

ADDITIONAL INFORMATION ................................................................ 3

BANKRUPTCY RULE 4001 STATEMENT ............................................... 4

MEMORANDUM OF POINTS AND AUTHORITIES .............................. 14

I.      JURISDICTION ........................................................................... 14

II.     STATEMENT OF FACTS ............................................................. 14

        A.      General Background........................................................ 14

        B.      Background Relevant to Motion ..................................... 15

        C.      Current Circumstances and Access to Cash.................... 20

III.    DISCLOSURE PURSUANT TO BANKRUPTCY RULE 4001 AND
        COMPLIANCE WITH LBR 4001-2 ............................................. 23

IV.     RELIEF REQUESTED .................................................................. 32

V.      BASIS FOR RELIEF .................................................................... 33

        A.      The Debtor's Need for Financing and Use of Cash Collateral ................. 33

        B.      The Debtor's Entry into the DIP Facility Is Authorized Under § 364 ....... 35

                (1)    The Debtor is Unable to Obtain Unsecured or Junior
                       Secured Credit ................................................... 37

                (2)    The Prepetition Lenders' Interests Are Adequately Protected....... 37

                (3)    The DIP Facility Is Fair, Reasonable, and in the Best
                       Interests of the Estate ...................................... 38

        C.      The Use of Cash Collateral Is Appropriate Under the Current
                Circumstances and Should Be Authorized under §§ 363(c)(2) and (e) ..... 41

        D.      The Proposed Adequate Protection for the Prepetition Lenders Is
                Appropriate under §§ 105, 361(d), and 363(e). ............................ 42

VI.     REQUEST FOR AN INTERIM AND FINAL HEARING ................... 45

VII.    THE NEED FOR IMMEDIATE RELIEF PENDING A FINAL HEARING....... 45

VIII.   WAIVER OF BANKRUPTCY RULES 6004(a) AND (h) ................... 45

IX.     NOTICE ...................................................................................... 45

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

ii

110339826\V-7

X.    CONCLUSION ................................................................................................ 46

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

110339826\V-7

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Ames Dep't Stores. Inc.*,
    115 B.R. 34 (Bankr. S.D.N.Y. 1990) ....................................................................36

*Anchor Sav. Bank FSB v. Sky Valley. Inc.*,
    99 B.R. 117 (N.D. Ga. 1989) .......................................................................36, 37

*In re Aqua Assocs.*,
    123 B.R. 192 (Bankr. E.D. Pa. 1991)............................................................35, 37

*Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.)*,
    789 F.2d 1085 (4th Cir. 1986).......................................................................36, 43

*In re Columbia Gas Sys., Inc.*,
    Nos. 91-803, 91-804, 1992 WL 79323 (Bankr. D. Del. Feb. 18, 1992) ..................42

*In re Continental Airlines*,
    91 F.3d 553 (3d Cir. 1996) (*en banc*) ...............................................................41

*In re Crouse Group. Inc.*,
    71 B.R. 544 (Bankr. E.D. Pa. 1987)...................................................................35

*In re Defender Drug Stores. Inc.*,
    126 B.R. 76 (Bankr. D. Ariz. 1991), *aff'd.*, 145 B.R. 312 (B.A.P. 9th Cir.
    1992) ..............................................................................................34, 35

*In re Dynaco Corp.*,
    162 B.R. 389 (Bankr. D.N.H. 1993) ...............................................................40, 42

*In re Macombs Properties VI, Ltd.*,
    88 B.R. 261 (Bankr. C.D. Cal. 1988)...................................................................42

*In re Mellor*,
    734 F.2d 1396 (9th Cir 1984)...........................................................................41

*In re N.J. Affordable Homes Corp.*,
    No. 05-60442 (DHS), 2006 WL 2128624 (Bankr. D.N.J. June 29, 2006)..............42

*In re O'Connor*,
    808 F.2d 1393 (10th Cir. 1987).....................................................................42, 43

*In re Oak Glen R-Vee*,
    8 B.R. 213 ( Bankr. C.D. Cal 1981).....................................................................40

110339826\V-7

*Owens-Corning Fiberglas Corp. v. Ctr. Wholesale, Inc.* (*In re Ctr. Wholesale. Inc.*),
759 F.2d 1440 (9th Cir. 1985)...........................................................................................43

*Richmond Leasing Co. v. Capital Bank. N.A.*,
762 F.2d 1303 (5th Cir. 1985)...........................................................................................39

*In re Satcon Tech. Corp.*,
No. 12-12869 (KG), 2012 WL 6091160 (Bankr. D. Del. Dec. 7, 2012) ...................42

*In re Simasko Prod. Co.*,
47 B.R. 444 (Bankr. D. Colo. 1985) ...............................................................................39

*In re Sky Valley, Inc.*,
100 B.R. 107,113 (Bankr. N.D. Ga. 1998).....................................................................36

*In re Stein*,
19 B.R. 458 (Bankr. E.D. Pa. 1982)............................................................................40, 43

*In re Swedeland Dev. Grp., Inc.*,
16 F.3d 552 (3d Cir. 1994)................................................................................................42

*Trans World Airlines. Inc. v. Travellers Int'l AG.* (*In re Trans World Airlines, Inc.*),
163 B.R. 964 (Bankr. D. Del. 1994) ...............................................................................38

*In re Tuscon Industrial Partners*,
129 B.R. 614 (9th Cir. BAP 1991) ..................................................................................40

*UMB Bank, N.A., et al., v. Air Force Village West, Inc. dba Altavita Village et al.*,
Case No. RIC 1724503 ......................................................................................................16

*Unsecured Creditors' Comm. v. First Nat'l Bank & Trust Co. of Escanaba* (*In re Ellingsen MacLean Oil Co.*),
834 F.2d 59 (6th Cir. 1987). *cert. denied*, 488 U.S. 817 (1988)..............................35

*In re Wrecelesham Grange*, Inc.
221 B.R. 978 (Bankr. M.D. Flo. 1997) ..........................................................................43

**Statutes**

11 U.S.C.
§§ *101 et seq.* ......................................................................................................................1
§ 105.......................................................................................................................... *passim*
§ 105(a) ..............................................................................................................................1, 40
§ 326.................................................................................................................................22, 43
§ 328.................................................................................................................................22, 43
§ 330.................................................................................................................................22, 43
§ 331.................................................................................................................................22, 43

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

v

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

§ 361 ....................................................................................................................... *passim*
§ 361(3) ........................................................................................................................... 37
§ 362 ....................................................................................................................... *passim*
§ 362(d)(1) ........................................................................................................................ 41
§ 363 ................................................................................................................ 1, 15, 22, 31
§ 363(a) ................................................................................................................... 5, 17, 24
§ 363(c) ......................................................................................................................... 5, 24
§ 363(c)(2) ................................................................................................................... 32, 40
§ 363(e) ............................................................................................................. 32, 40, 41, 42
§ 364 ....................................................................................................................... *passim*
§ 364 ............................................................................................................................... 35
§ 364(a) ........................................................................................................................... 36
§ 364(b) ........................................................................................................................... 36
§ 364(c) .................................................................................................................... *passim*
§ 364(c)(1) .............................................................................................................. *passim*
§ 364(c)(2) ....................................................................................................................... 32
§ 364(c)(3) ....................................................................................................................... 32
§ 364(c)-(d)(1) ................................................................................................................. 35
§ 364(d) ................................................................................................................... *passim*
§ 364(d)(1) .............................................................................................................. *passim*
§ 502(d) ..................................................................................................................... 22, 37
§ 503(a) ........................................................................................................................... 43
§ 503(b) ................................................................................................................. 22, 34, 43
§ 503(b)(1) ....................................................................................................................... 34
§ 506(c) .................................................................................................................... *passim*
§ 507 ................................................................................................................................. 1
§ 507(a) ..................................................................................................................... 22, 43
§ 507(b) ................................................................................................................. 22, 34, 43
§ 544 ....................................................................................................................... 22, 31, 37
§ 545 ....................................................................................................................... 22, 31, 37
§ 546 ............................................................................................................................... 22
§ 546(c) ........................................................................................................................... 43
§ 546(d) ........................................................................................................................... 43
§ 547 ....................................................................................................................... 22, 31, 37
§ 548 ....................................................................................................................... 22, 31, 37
§ 549 ....................................................................................................................... 22, 31, 37
§ 550 ........................................................................................................................... 22, 37
§ 552 ............................................................................................................................... 43
§ 552(b) ........................................................................................................................... 17
§ 553(b) ........................................................................................................................... 31
§ 723(a) ........................................................................................................................... 31
§ 726 ........................................................................................................................... 22, 43
§ 1107 ......................................................................................................................... 1, 14
§ 1108 ......................................................................................................................... 1, 14
§ 1113 ......................................................................................................................... 22, 43
§ 1114 ......................................................................................................................... 22, 43
§§ sections 101 *et seq*. ...................................................................................................... 1

110339826\V-7

28 U.S.C.
    § 157................................................................................................................................14
    § 157(b)(2).......................................................................................................................14
    § 1334..............................................................................................................................14
    § 1408..............................................................................................................................14
    § 1409..............................................................................................................................14
    § 1930(a)......................................................................................................................7, 26

Cal. Health & Safety Code § 1793.15.....................................................................................19

**Rules and Regulations**

Cal. L.B.R.
    4001-2................................................................................................................................1
    9075-1(a)(6)........................................................................................................................3

Fed. R. Bankr. P.
    2002..............................................................................................................................1, 3
    2002................................................................................................................................45
    4001...........................................................................................................................4, 23
    4001..................................................................................................................................1
    4001(b).............................................................................................................................44
    4001(b)(2).........................................................................................................................44
    4001(b)(2).........................................................................................................................44
    4001 (c)(1)(B)(i)-(xi).........................................................................................................31
    6004................................................................................................................................32
    6004(a).............................................................................................................................44
    6004(h).............................................................................................................................44
    9014..................................................................................................................................1

**Other Authorities**

2 Collier on Bankruptcy ¶ 361.01[1] at 361–66 (15th ed. 1993)..............................................42

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

110339826\V-7

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

# EMERGENCY MOTION

The Debtor in the above-captioned chapter 11 bankruptcy case (the "Chapter 11 Case"), files this *Emergency Motion for an Interim Order (A) Authorizing the Debtor to Obtain Post Petition Financing, (B) Authorizing the Debtor to use Cash Collateral, and (C) Granting Adequate Protection to Prepetition Lenders Pursuant to 11 U.S.C. §§ 105, 363, 364, 1107 and 1108; Memorandum of Points and Authorities in Support Thereof*; (the "Motion") on an emergency basis, pursuant to 11 U.S.C. §§ 105(a), 361, 362, 363, 364 and 507 of title 11 of the United States Code, sections 101 *et seq.*, Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure, and Rule 4001-2 of the Local Bankruptcy Rules of the United States Bankruptcy Court for the Central District of California [1] for entry of an interim order (substantially in the form attached hereto as **Exhibit "1"** the "Interim Order"), and a final order (the "Final Order" and together with the Interim Order, the "DIP Orders") (i) authorizing the Debtor to enter into a senior secured, superpriority debtor in possession financing facility (as amended, modified or otherwise in effect from time to time, the "DIP Facility"), with Lapis Advisers, LP ("Lapis") and KBC Bank NV ("KBC", and collectively with Lapis, (the "DIP Lenders"), in an (a) interim amount not to exceed $400,000 and only as needed to avoid immediate and irreparable harm, and (b) after a final hearing, an aggregate principal amount of up to $4,250,000.00 (plus that portion of interest thereon that converts to additional principal in accordance with the DIP Loan Documents) (as defined below)) (the "New Money Commitment") and any loan thereunder, the "New Money DIP Loans" and a dollar-for-dollar roll-up of the outstanding obligations owed to each Prepetition Lender (defined below) arising under the Working Capital Agreement (defined below), including principal and accrued interest thereon (the "Roll-Up Loans" and together with the New Money DIP Loans, the "DIP Loans"), substantially on the terms set forth in the *Priming Superpriority Debtor In Possession Credit Agreement* (as amended, supplemented, or otherwise modified and in effect from time to time, the

---

[1]  All references to "sections" herein are to sections of the Bankruptcy Code, 11 U.S.C. §§ *101 et seq.*, as amended. All references to the "Bankruptcy Rules" are to provisions of the Federal Rules of Bankruptcy Procedures. All references to "LBR" are to the Local Bankruptcy Rules for the United States Bankruptcy Court for the Central District of California.

110339826\V-7

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

"DIP Credit Agreement,"[2] which is attached hereto as **Exhibit "2"**, and together with all other agreements, documents, notes, certificates, and instruments executed and/or delivered with, to or in favor of the DIP Lender, the "DIP Financing Agreements"), and (c) granting the DIP Liens and the DIP Superpriority Claim (in each case, as defined below); (ii) authorizing the interim use of Cash Collateral (as defined below) on the terms set forth in the Interim Order; (iii) granting "adequate protection" to the holders of certain COPs (defined below) issued by the Debtor in 1999 and to KBC on account of an irrevocable letter of credit and related reimbursement agreement and other documents (collectively, the "Letter of Credit") issued by KBC to secure repayment of certain ABAG Finance Authority for Nonprofit Corporations Variable Rate Demand Bonds, Series 2005 (the "Bonds") issued by the Debtor in 2005 (further described below) in the form of Replacement Liens, each as defined below, among other adequate protections as further described below; (iv) modifying the automatic stay as imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms of the DIP Facility and the DIP Orders; and (v) scheduling an interim hearing to approve the proposed Interim Order and a final hearing with respect to the relief requested herein (the "Final Hearing").

## SUMMARY OF REQUESTED RELIEF

This Motion is necessary to avoid immediate and irreparable harm because the bulk of the Debtor's assets, including its income, is subject to prepetition perfected liens. The COPs Trustee (defined below) asserts that the Debtor's repayment obligations under the COPs are secured by a security interest in substantially all of the Debtor's assets, including Altavita Village and the revenues derived from its operations. Similarly, KBC asserts that that the Debtor's repayment obligations under the Letter of Credit are secured by a security interest in substantially all of the Debtor's assets, including Altavita Village and the revenues derived from its operations.

The Debtor has continually lost money since before its Prepetition Lenders (defined below) commenced the receivership action. The Debtor has sought alternative DIP financing from a number of traditional distressed credit lenders, but its efforts have been unsuccessful. The

---

[2] Capitalized terms used but not defined herein shall have the meanings given to them in the DIP Credit Agreement or the Interim Order.

2

1    DIP Lenders were the only parties willing to provide a DIP loan to the Debtor.

2        In further support of the Motion, the Debtor relies upon and refers this Court to the

3    Declaration of Bill Pace in Support of the First Day Motions (the "Pace Declaration"), filed

4    concurrently herewith.

5                            **ADDITIONAL INFORMATION**

6        The Motion is based on the Notice of Emergency Motions that will be filed and served

7    after obtaining a hearing date for the Debtor's "First Day Motions," the attached Memorandum of

8    Points and Authorities, the Pace Declaration filed concurrently herewith, the arguments of

9    counsel and other admissible evidence properly brought before the Court at or before the hearing

10   on this Motion.    In addition, the Debtor requests that the Court take judicial notice of all

11   documents filed with the Court in this Chapter 11 Case.

12       Counsel to the Debtor will serve this Motion, the attached Memorandum of Points and

13   Authorities, the Pace Declaration and the Notice of First-Day Motions on:  (i) the Office of the

14   United States Trustee for the Central District of California; (ii) the Prepetition Lenders and their

15   counsel and any other secured parties; (iii) the DIP Lenders and their counsel; (iv) the Debtor's

16   twenty (20) largest general unsecured creditors; (v) and all parties requesting notice pursuant to

17   Bankruptcy Rule 2002.    To the extent necessary, the Debtor requests that the Court waive

18   compliance with LBR 9075-1(a)(6) and approve service (in addition to the means of services set

19   forth in such LBR) by overnight delivery.  Among other things, the Notice of Emergency Motions

20   will provide that any opposition or objection to the Motion may be presented at any time before

21   or at the hearing regarding the Motion, but that failure to timely object may be deemed by the

22   Court to constitute consent to the relief requested herein.

23       In the event that the Court grants the relief requested by the Motion, the Debtor shall

24   provide notice of the entry of the order granting such relief upon each of the foregoing parties and

25   any other parties in interest as the Court directs.  The Debtor submits that such notice is sufficient

26   and that no other or further notice be given.

27

28

DENTONS US LLP
601 South Figueroa Street, Suite 2500
Los Angeles, California 90017-5704
(213) 623-9300

### BANKRUPTCY RULE 4001 STATEMENT

In accordance with Bankruptcy Rule 4001, the following sets forth a concise summary of material terms of the proposed DIP Facility and the DIP Orders:[3]

| | |
|---|---|
| SECURED CREDITORS:<br>BR 4001(c)(1)(B)<br>LBR 4001-2 | UMB Bank, N.A., as successor to U.S. Bank Trust National Association (the "COPs Trustee"), serves as trustee for repayment of the approximately $40 million to holders of certain Certificates of Participation (the "COPs") issued by the Debtor in 1999.<br><br>KBC Bank NV ("KBC") on account of a letter of credit (the "Letter of Credit") and related documents issued by KBC for the account of the Debtor to secure repayment of certain ABAG Finance Authority for Nonprofit Corporations Variable Rate Demand Bonds, Series 2005 (the "Bonds") issued for the benefit of the Debtor in 2005. Following a draw under the Letter of Credit, the Bonds are presently held by U.S. Bank, National Association, as Trustee ("US Bank") as "Bank Bonds." |
| BORROWERS:<br>BR 4001(c)(1)(B)<br>LBR 4001-2 | Air Force Village West, Inc., a California not for profit corporation, doing business as Altavita Village |
| GUARANTORS:<br>BR 4001(c)(1)(B)<br>LBR 4001-2 | None |
| DIP LENDERS:<br>BR 4001(c)(1)(B)<br>LBR 4001-2 | Lapis Advisers, LP, ("Lapis") and KBC Bank NV ("KBC" and together with Lapis, the "DIP Lenders"). |
| DIP FACILITY:<br>BR 4001(c)(1)(B)<br>LBR 4001-2 | A multi-draw term loan facility (the "DIP Facility") comprised of:<br>(a) New Money DIP Loans in the aggregate principal amount of up to $4,250,000.00, plus that portion of interest thereon that converts to additional principal in accordance with the DIP Loan Documents, (as defined below), (the "New Money Commitment" and loans thereunder, the "New Money DIP Loans") to be advanced in accordance with the Budget and the terms of the DIP Loan Documents, as defined herein; and<br><br>(b) Roll-Up DIP Loans: Subject to entry of the final Order, as defined below, a dollar-for-dollar roll-up of the |

---

[3] This summary is not intended to limit the terms of the DIP Facility, including in respect of any use of Cash Collateral, in each case as set forth in the DIP Credit Agreement, the Interim Order and the Final Order. Reference should be made to the Interim Order, the DIP Credit Agreement and the Final Order for the full terms thereof.

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

110339826\V-7

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

| | |
|---|---|
| | outstanding obligations owed to each Prepetition Lender arising under or in connection with the Working Capital Facility, including outstanding principal and accrued interest thereon (the "<u>Roll-Up Loans</u>" and, together with the New Money DIP Loans, the "<u>DIP Loans</u>"). |
| <u>AVAILABILITY</u>:<br>BR 4001(c)(1)(B)<br>LBR 4001-2 | Commencing on the date of the Bankruptcy Court's entry of interim and final orders, in form and substance satisfactory to the DIP Lenders in their sole discretion (the "<u>Orders</u>") approving the DIP Facility, New Money DIP Loans shall be available to the Debtor in an amount up to the lesser of the New Money Commitment and the amount of borrowings contemplated by the Orders, in either case in accordance with the Budget (as defined below).  The proceeds of the New Money DIP Loans shall be disbursed to the Debtor's existing main operating account (the "<u>DIP Funding Account</u>") in the name of the Debtor.  The DIP Funding Account shall constitute part of the Collateral.<br><br>Commencing on the date of the Bankruptcy Court's entry of the final Order, in form and substance satisfactory to the DIP Lenders in their sole discretion, approving, among other things, the Roll-Up Loans, the Roll-Up Loans shall deemed made to the Debtor to refinance the outstanding obligations under the Working Capital Facility.<br><br>Subject to the terms hereof, the amount of the New Money Commitment may be borrowed in multiple advances, and at intervals, consistent with the Budget, to be set forth in the definitive documents relating to the DIP Facility, all of which shall be in form and substance satisfactory to the DIP Lenders in their sole discretion  (collectively, the "<u>DIP Loan Documents</u>").<br><br>On terms and conditions acceptable to the DIP Lenders and the Prepetition Lenders in their sole discretion, the Orders shall expressly contemplate and authorize the use of any "cash collateral" (as defined in Bankruptcy Code section 363(a) but limited to cash received by the Debtor in the ordinary course of operations of its business) securing the repayment of obligations under the Prepetition Credit Agreements, pursuant to Bankruptcy Code section 363(c). |
| <u>MATURITY DATE</u>:<br>BR 4001(c)(1)(B)<br>LBR 4001-2 | All obligations outstanding under or in respect of the DIP Facility shall be repaid in full on the date (the "<u>Maturity Date</u>") that is the earliest to occur of:  (a) September 9, 2019, (b) April 19, 2019, if the Final Order has not been entered by the Bankruptcy Court as of such date, (c) the closing date (the |

5

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

| | |
|---|---|
| | "Closing Date") of any sale, (d) the day on which the DIP Agent and the DIP Lenders accelerate the DIP Obligations (or the DIP Obligations automatically and immediately accelerate) or the DIP Obligations otherwise become immediately due and payable pursuant to the terms of the DIP Loan Documents, or (e) the confirmation of a plan of reorganization or liquidation for the Debtor in the Case. |
| USE OF PROCEEDS: BR 4001(b)(1)(B)(ii), -(b)(1)(B)(iii), -(b)(1)(B)(iv) LBR 4001-2 | The proceeds of the DIP Facility will be used, in accordance with the Budget, to provide working capital and for other general corporate purposes of the Debtor during the administration of the Case, including the payment of administrative claims allowed in the Case. No portion of the DIP Facility, the Cash Collateral or the Carve-Out (as defined below) shall be used in connection with asserting any claims or causes of action against the DIP Secured Parties or the Prepetition Lenders, or their respective affiliates, subsidiaries, directors, shareholders, employees, advisors, agents or sub-agents, including formal discovery proceedings in anticipation thereof, or challenging any lien thereof; provided, however, that any committee of unsecured creditors appointed in the Case shall have sixty (60) days from and after the appointment of such committee to investigate the claims and liens of the Prepetition Lenders, with an amount available to investigate such claims not to exceed $25,000. |
| BUDGET: BR 4001(b)(1)(B)(ii) LBR 4001-2 | "Budget" shall mean the rolling consolidated 13-week cash flow and financial projections of the Debtor covering the period beginning on March 16, 2019 and itemizing on a weekly basis all uses, and anticipated uses, of the DIP Facility, revenues projected to be received and all expenditures proposed to be made during such period, which shall at all times be in form and substance reasonably satisfactory to the DIP Lenders. Prior to the Petition Date, the Debtor shall provide to the DIP Lenders an initial Budget for the period beginning on March 16, 2019. After entry of the interim Order, the Debtor shall provide to the DIP Lenders, as soon as available but no later than 5:00 PM Pacific Time on each Friday, a Budget variance and reconciliation report setting forth: (i) a comparative reconciliation, on a line-by-line basis, of actual cash receipts and disbursements against the cash receipts and disbursements forecast in the Budget, and the percentage variance thereof, for (A) the weekly period ended on (and including) the immediately preceding Sunday and (B) the cumulative period to date; (ii) a written explanation of such variances; and (iii) projections for the following 13 weeks, including a rolling cash receipts and disbursements forecast for such period. Other than to the extent otherwise permitted in the DIP Loan Documents, the Debtor shall not make or commit to make any payments other than those identified in the Budget. On the last business day of any week: (i) payments for such cumulative |

6

110339826\V-7

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

| | |
|---|---|
| | period to date shall not exceed 15% (so long as Tom Plumb of Cordes & Company, LLC, or another employee or representative thereof satisfactory to the DIP Lenders, remains responsible for the Budget and reporting thereon) or 10% (if Tom Plumb or another employee or representative of Cordes & Company, LLC, is not so engaged) of the respective amounts, measured as to each line item in the Budget, set forth for such cumulative period to date in the Budget; and (ii) receipts for such cumulative period to date shall not be less than 90% of the amounts, on an aggregate basis, set forth for such cumulative period to date in the Budget. |
| <u>INTEREST RATE:</u><br>BR 4001(c)(1)(B)<br>LBR 4001-2 | Each DIP Loan (including each NM Loan and Roll-Up Loan) shall bear interest on the unpaid principal amount thereof from the date made through repayment (whether by acceleration or otherwise) on the unpaid principal amount thereof at a rate per annum equal to ten percent (10.00%). Accrued interest on each DIP loan shall be paid in full on each Interest Payment Date as follows: (i) thirty percent (30%) of the accrued interest amount shall be paid in cash, and (ii) seventy percent (70%) of the accrued interest amount shall, in lieu of being paid in cash on such Interest Payment Date, be capitalized and added to the principal amount outstanding under the DIP Loans and shall bear interest from such Interest Payment Date at the same rate as the original principal amount of the DIP Loans and shall be treated as principal of the DIP Loans for all purposes. |
| <u>FEES:</u><br>BR 4001(b)(1)(B)(ii),<br>-(c)(1)(B)<br><br>LBR 4001-2 | The Debtor agree to pay to the DIP Lenders, (i) an exit fee equal to three percent (3%) of the New Money Commitment, payable on the Maturity Date and (ii) a commitment fee equal to half a percent (0.50%) of the average daily unused amount of the New Money Commitment for the period from and including the Petition Date to, but not including, the Maturity Date, which shall be payable on the Maturity Date. The unused amount of the New Money Commitment for any day shall be equal to the New Money Commitment less the aggregate principal amount of all of the New Money Loans then outstanding on such day. |
| <u>CARVE OUT:</u><br>BR 4001(c)(1)(B)<br>LBR 4001-2 | The DIP Obligations shall be subject to a carve-out (the "<u>Carve Out</u>") comprising: (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930(a), and (ii) (a) fees and expenses projected in the Budget and incurred by the Debtor's professionals or the professionals of any official committee of unsecured creditors or other professionals appointed in the Case prior to delivery of notice of an Event of Default and allowed by the Bankruptcy Court (the "<u>Carve Out Notice</u>"), and (b) after delivery of a Carve-Out Notice, an amount not exceeding $250,000 in the aggregate to pay any fees or expenses incurred by the Debtor's professionals or the professionals of any official committee of unsecured creditors appointed in the Case, provided that nothing herein shall be construed to impair the ability of any party to object to the |

7

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

| | |
|---|---|
| | fees, expenses, reimbursement or compensation described above.  No portion of the Carve Out, any cash collateral or proceeds of the DIP Facility may be used for the payment of the fees and expenses of any person incurred challenging, or in relation to the challenge of, any of the DIP Lenders' or Prepetition Lenders' liens or claims, or the initiation or prosecution of any claim or action against any of the DIP Lenders or Prepetition Lenders in any capacity, except there shall be available $25,000 to investigate any such potential challenges. |
| **DIP LIENS:** BR 4001(c)(1)(B)(i), -(c)(1)(B)(vii), -(c)(1)(B)(x) LBR 4001-2 | The DIP Facility shall be secured by certain liens (the "<u>DIP Liens</u>"), which shall be granted in the DIP Credit Documents and approved by the Bankruptcy Court in the DIP Orders, on all now owned or hereafter acquired assets and property of the Debtor and proceeds thereof (including, without limitation, all cash, cash equivalents, accounts, payment intangibles, promissory notes, consignments, commercial tort claims, tax refunds, inventory, goods, chattel paper, documents, deposit accounts, documents, instruments, investment property, letter-of-credit rights, general intangibles, contracts, contract rights, all causes of action and proceeds thereof, computer hardware and software, motor vehicles, intellectual property, real and personal property, plant and equipment of the Debtor (collectively, the "<u>DIP Collateral</u>") (provided, however, that the DIP Collateral shall not include either the Trustee-Held Funds, the proceeds of any Chapter 5 actions or any sums on deposit in the Debtor's resident escrow account)  subject only to: (i) the prepetition liens of certain equipment lessors (if such liens limited only to the equipment secured thereby and proceeds thereof), and (ii) the prepetition liens of the California Department of Social Services (the "<u>CDSS Liens</u>") on approximately sixty-eight (68) acres of undeveloped real property immediately adjacent to the Debtor's facility to the extent that, in accordance with that certain letter agreement, dated August 9, 2018, between the California Department of Social Services and certain of the Prepetition Lenders, such CDSS Liens would be senior to the liens of the Prepetition Lenders securing the Working Capital Facility. The DIP Liens shall, pursuant to § 364(d)(1) of the Bankruptcy Code, be valid, perfected, superpriority priming liens on the DIP Collateral. Except with respect to the Carve Out, neither the DIP Liens nor the liens held by the Prepetition Lenders shall be subject to surcharge under § 506(c) or any other provision of the Bankruptcy Code. |
| **ADEQUATE PROTECTION:** BR 4001(b)(1)(B)(iv), -(c)(1)(B)(i), -(c)(1)(B)(ii), | The Prepetition Lenders will receive customary adequate protection in exchange for their consent to the Debtor's use of "cash collateral" subject to the Budget and for the priming of their liens by the liens securing the DIP Facility. |

8

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

| | |
|---|---|
| -(d)(1)(A)(i)<br><br>LBR 4001-2 | |
| PRIORITY:<br>BR 4001(c)(1)(B)(i),<br>-(c)(1)(B)(ii)<br><br>LBR 4001-2 | The DIP Obligations shall, pursuant to § 364(c)(1) of the Bankruptcy Code, be entitled to superpriority administrative expense claim status in the Chapter 11 Case (the "<u>DIP Superpriority Claim</u>"), which DIP Superpriority Claim in respect of the DIP Facility shall have priority over any and all claims against the Debtor. |
| AFFIRMATIVE AND<br>NEGATIVE<br>COVENANTS:<br>BR 4001(c)(1)(B)<br>LBR 4001-2 | The DIP Loan Documents include such affirmative and negative covenants as are usual and customary for financings of this kind and that are reasonably acceptable to the DIP Lenders, including, without limitation, compliance with: (a) the Budget, as described above (and subject to the variances contemplated above); and (b) certain temporal milestones related to the contemplated marketing and sale of all or substantially all of the Debtor's assets (the "<u>Sale Milestones</u>"). |
| REPRESENTATIONS<br>AND WARRANTIES:<br>BR 4001(c)(1)(B)<br>LBR 4001-2 | The DIP Loan Documents include such representations and warranties as are usual and customary for financings of this kind and that are reasonably acceptable to the DIP Lenders, including without limitation: due organization; requisite power and authority; qualification; due authorization, execution, delivery and enforceability of the DIP Loan Documents; no conflicts; no material adverse change (excluding any material adverse change resulting from or in connection with the commencement of the Case and the events leading up to the Case; no restricted junior payments; absence of material litigation (excluding the Case, the receivership action and the pending resident litigation); payment of taxes; title to properties; Investment Company Act and margin stock matters; ERISA and other employee matters; absence of brokers or finders fees; compliance with laws; continued effectiveness of orders of the Bankruptcy Court, including the Orders, as applicable; full disclosure and accuracy of Budget; and Patriot Act and other related matters. |
| EVENTS OF DEFAULT:<br>BR 4001(c)(1)(B)<br>LBR 4001-2 | The DIP Loan Documents include events of default that are usual and customary for financings of this kind and that are reasonably acceptable to the DIP Lenders (each an "<u>Event of Default</u>"), including, without limitation, the following:<br>(a) The final Order, in form and substance satisfactory to the DIP Lenders, shall not have been entered by the Bankruptcy Court as a final order by April 24, 2019;<br><br>(b) the Case shall be dismissed or converted to a case under chapter 7 of the Bankruptcy Code; a trustee, receiver, interim receiver or receiver and manager shall be appointed in the Case, or a responsible officer or an |

9

examiner with enlarged powers shall be appointed in the Case; or any super-priority administrative expense claim or lien (other than the Carve-Out and as otherwise provided herein ) that is *pari passu* with or senior to the claims, charges or liens of the DIP Lenders shall have arisen or be authorized or allowed;

(c) the Debtor shall make any payment (whether by way of adequate protection or otherwise) of principal or interest or otherwise on account of any prepetition indebtedness or payables, other than:  (i) payments authorized by the Bankruptcy Court in respect of "first day" or other orders entered upon pleadings in form and substance reasonably satisfactory to the DIP Lenders (including, without limitation, payments of prepetition obligations to employees and payroll taxes, insurance payments, utility deposits, critical vendor payments, sales and use taxes and similar taxes, each to the extent approved by order of the Bankruptcy Court); and (ii) payments of franchise (and similar) taxes incurred prior to the Petition Date necessary to maintain the Debtor's existence and qualification or good standing in its jurisdiction of formation and any other jurisdictions in which it conducts business;

(d) the Bankruptcy Court shall enter an order granting relief from the automatic stay to any creditor or party in interest:  (i) to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any material assets of the Debtor; or (ii) to permit other actions that would have a material adverse effect on the Debtor or its estate or the DIP Secured Parties' rights and remedies under the DIP Loan Documents (including the enforceability thereof in accordance with their terms), provided that the DIP Lenders shall provide 5 business days' notice to the Debtor's counsel and counsel to any unsecured creditors committee unless the Event of Default is due to the failure to make any principal payment when due, dismissal of the case or conversion to a Chapter 7 proceeding, in which no such notice is required;

(e) an order shall be entered reversing, amending, supplementing, staying, vacating or otherwise modifying the Order, or the Borrower shall apply for the entry of such an order, without the prior written consent of the DIP Lenders;

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

10

110339826\V-7

DENTONS US LLP
601 South Figueroa Street, Suite 2500
Los Angeles, California 90017-5704
(213) 623-9300

| | |
|---|---|
| | (f) the Debtor shall fail to meet or comply with any of the Sale Milestones;<br><br>(g) any DIP Loan Document shall cease to be effective or shall be contested by Debtor or any of their affiliates;<br><br>(h) the Debtor shall fail to comply in any respect with the Orders;<br><br>(i) the Debtor shall fail to comply with any of the affirmative covenants, or take any action in violation of any of the negative covenants, set forth in the DIP Loan Documents; and<br><br>(j) such other usual and customary Events of Default as may be reasonably requested by the DIP Lenders and are typical for this type of financing. |
| <u>CONDITIONS PRECEDENT</u>:<br>BR 4001(c)(1)(B), -<br>LBR 4001-2 | The obligation of the DIP Lenders to make any DIP Loans will be subject to customary closing conditions for this type of financing in form and substance satisfactory to the DIP Lenders, including: (i) the entry of an Interim Order; and (ii) the execution and delivery of the DIP Loan Documents. |
| <u>CONDITIONS TO EACH EXTENSION OF CREDIT</u>:<br>BR 4001(c)(1)(B)<br>LBR 4001-2 | The conditions to all borrowings will include requirements relating to prior written notice of borrowing, the accuracy of representations and warranties, and the absence of any default or Event of Default, and will otherwise be customary and appropriate for this type of financing. |
| <u>INDEMNIFICATION AND RELEASE</u>:<br>BR 4001(c)(1)(B)(viii),<br>-(c)(1)(B)(ix)<br>LBR 4001-2 | The Debtor shall indemnify, pay and hold harmless the DIP Agent and the DIP Lenders and their affiliates (and their respective directors, officers, employees and agents) against any loss, liability, cost or expense incurred in respect of the financing contemplated hereby or the use or the proposed use of proceeds thereof (except to the extent resulting from the gross negligence or willful misconduct of the indemnified party). |
| <u>LIFT OF AUTOMATIC STAY</u>:<br>BR 4001 (c)(1)(B)(iv)<br>LBR 4001-2 | The automatic stay provisions of section 362 of the Bankruptcy Code are vacated and modified to the extent necessary to permit: (a) the DIP Lenders and Prepetition Lenders to exercise all their respective rights and remedies under the DIP Loan Documents and the Prepetition Credit Agreements upon the occurrence or during the continuation of an Event of Default (as defined in the DIP Loan Documents) or the Maturity Date, but only after the provision of five Business Days' written notice by the DIP Lenders or Prepetition Lenders (as applicable) to the Debtor, any unsecured creditors' committee, the Prepetition Lenders/DIP Lenders (as applicable), the U.S. Trustee, and their respective counsel of the intended exercise of such rights or remedies; and (b) the Prepetition Lenders to (i) receive any payments or |

11

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

| | | |
|---|---|---|
| | | distributions made by the Debtor to the Prepetition Lenders, (ii) apply, allocate or make payments from any of the funds or accounts maintained by the Trustees (including, without limitation, the Trustee-Held Funds) in accordance with the terms of the 1999 Documents and the Bond Documents, and (iii) take any other action authorized by this Interim Order. The Debtor's right to use Cash Collateral shall terminate automatically and immediately upon the issuance of such a written notice. |
| | PLAN FILING DEADLINE: BR 4001(c)(1)(B)(vi)<br><br>LBR 4001-2 | Plan and Disclosure Statement must be filled with 180 days of the petition date. |
| | RELEASE, WAIVER, OR LIMITATION OF ANY RIGHT UNDER § 506(C): BR 4001(c)(1)(B)(x)<br><br>LBR 4001-2 | As a material inducement to the DIP Lenders to agree to provide the DIP Facility, and in exchange for the DIP Agent and DIP Lenders' willingness to provide the DIP Facility and their agreement to subordinate their liens and superpriority clients to the Carve Out to the extent set forth herein, upon entry of the Final Order, no costs or expenses of administration which have been or may be incurred in connection with the preservation, protection, or enhancement of realization by the DIP Agent or DIP Lenders or the Prepetition Lenders upon the Collateral, shall be charged against any of the DIP Agents, the DIP Lenders, the DIP Obligations, the Prepetition Lenders or the Collateral pursuant to sections 105 or 506(c) of the Bankruptcy Code or otherwise without the prior express written consent of the DIP Agent, in its sole discretion.<br><br>The DIP Loan Documents and the Interim Order and Final Order provide for a full, absolute, plenary and unconditional release of each of the DIP Lenders and the Prepetition Lenders and their respective affiliates of any and all claims, causes of action or other rights related to the Debtor, whether arising prior to or after the Petition Date. |

12

110339826\V-7

1    WHEREFORE, the Debtor respectfully requests entry of an order:

2    (i) granting the relief requested herein; and

3    (ii) granting the Debtor such other and further relief as the Court deems just and proper.

4

5    Dated:  March 11, 2019                    **DENTONS US LLP**
       SAMUEL R. MAIZEL
6                                              TANIA M. MOYRON
       GARY W. MARSH

7

8                                              By_____*/s/ Samuel R. Maizel*_____
                                                   Samuel R. Maizel
9
                                              Proposed Attorneys for the Chapter 11 Debtor
10                                             and Debtor In Possession

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

13

110339826\V-7

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.
### JURISDICTION

1.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  The venue of this Chapter 11 Case is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

### II.
### STATEMENT OF FACTS

#### A.    General Background

2.    On March 10, 2019 ("Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  Since the commencement of this Chapter 11 Case, the Debtor has been operating its business as a debtor in possession pursuant to §§ 1107 and 1108.  No request for the appointment of a trustee or examiner has been made in the Chapter 11 Case, and no committees have been appointed or designated.

3.    The Debtor is a non-profit corporation organized under the laws of the State of California that owns and operates a full-service continuing care retirement community ("CCRC") located in Riverside, California known as Altavita Village.  Altavita Village is home to 361 residents, many of whom are dependent on the Debtor for their day to day personal and medical care.

4.    A CCRC, sometimes known as a life-care community, is a type of retirement community where a continuum of aging care needs—from independent living, assisted living, and skilled nursing care—can all be met within the community.  The Debtor, therefore, offers, for example, a multitude of independent living accommodations in one campus, which include single-family detached or attached homes or apartments, but also operates assisted living for residents who need support with activities of daily living, memory care for residents who are affected by Alzheimer's disease and dementia, and skilled nursing facilities for residents who require professional medical care, as well as providing rehabilitative care and respite care.  Residents generally move into the independent living portion of a CCRC when they are

110339826\V-7

healthy and then are transferred among assisted living, skilled nursing, or back to independent living as their needs change.  Upon moving into a CCRC, a resident can spend the rest of his or her life there, moving between levels of care as appropriate.

5.      Residents do not buy the real property, but rather enter into a continuing care contract (the "Resident Contract") that provides certain enumerated rights and benefits in exchange for a one-time entrance fee and an ongoing monthly service fee.  The monthly service fee covers meals, transportation, housekeeping, maintenance of the interior and exterior of the residences, landscape maintenance, and emergency nursing services, among other things.

6.      The Debtor has agreed to promptly begin a process to sell its assets at an auction or auctions under § 363 of the Bankruptcy Code, each sale to occur through use of "stalking horse" bidder or a private sale subject to approval by the Court.

7.      Additional background facts on the Debtor, including an overview of the Debtor's business, information on the Debtor's capital structure, and events leading up to this Chapter 11 Case, are contained in the Pace Declaration filed in support of the First Day Motions, contemporaneously filed herewith.

**B.      Background Relevant to Motion**

8.      As explained in the Pace Declaration, the Debtor has consistently lost money for several years due to, among other things, declining occupancy.   Originally known as Air Force Village West, Altavita Village was restricted solely for occupancy by retired military officers and their spouses.  The CCRC thrived due to its close proximity to March Air Force Base as well as high demand from retiring World War II veterans.   Faced with decreasing occupancy and revenues after March Air Force Base downsized to a reserve base, the restrictions regarding prior military or civil service were relaxed and "Air Force Village West" was rebranded as "Altavita Village" in 2015.  The community is now open to both military and non-military retirees.

9.      In November 2016, Eskaton was hired to market and manage Altavita Village, which was previously self-managed with use of marketing and sales consultants.   Eskaton

15

1    revitalized the marketing process, and the average monthly independent living move-ins

2    increased significantly.

3        10.    In March 2017, Altavita Village went into payment default with respect to certain

4    financial obligations to its Prepetition Lenders, which resulted in a potential sale of the Debtor.

5    Negative publicity surrounding this sale in the Fall of 2017 dramatically affected the positive

6    marketing momentum established by Eskaton in the rental of units to prospective residents.

7        11.    On December 29, 2017, the Prepetition Lenders commenced a civil action in the

8    Superior Court of the State of California, Riverside Division, styled *UMB Bank, N.A., et al., v. Air*

9    *Force Village West, Inc. dba Altavita Village et al.*, Case No. RIC 1724503, seeking, among other

10    things, the appointment of a receiver for the Debtor and its assets (the "Receivership Action").

11    On February 5, 2018, the Court entered an order appointing Bellann Raile of Cordes & Company

12    LLC as the receiver (the "Receiver") for substantially all of the Debtor's assets.    In the

13    Receivership Action, the Prepetition Lenders, the Receiver, and the Debtor were engaged in a

14    protracted and unsuccessful sale process.

15        12.    While the Debtor believes that the 2015 rebranding of Altavita Village and its

16    opening to non-military retirees will result in a significant increase in occupancy that will put

17    Altavita Village on stable economic footing in the future, the Debtor's current occupancy levels

18    coupled with its high level of indebtedness have left the Debtor unable to meet is financial

19    obligations as they come due.    Failing to sell its assets via the Receivership Action and in

20    financial distress, the Debtor filed this Chapter 11 Case in order to preserve and maximize the

21    value its assets and ensure continued quality care to the Residents.    The combined effect of these

22    financial issues has resulted in a consistent decline in operating cash balances absent additional

23    financing.

24        13.    In addition, the Debtor has immediate needs for access to debtor in possession

25    financing. The Debtor has substantial trade payables consistent with the operations of a large

26    CCRC that receives substantial trade support in the form of traditional credit terms.    While the

27    length of terms has begun to shorten as the trade balances grow, the Debtor should have access to

28

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

16

1    normal or near normal unsecured credit terms provided that the Debtor has access to substantial

2    liquidity in the form of postpetition term loan financing.

3        14.    Currently, the Debtor requires the use of cash proceeds of accounts and receivables

4    that comprises the collateral of the existing Prepetition Lenders securing the prepetition debt

5    within the meaning of section 363(a) of the Bankruptcy Code (the "Cash Collateral"),[4] and the

6    proceeds of the proposed DIP Facility to fund day-to-day operations and maintain and preserve

7    the value of the Debtor's business (including the prepetition collateral), pending the Debtor's sale

8    of all or substantially all its assets for the benefit of the Debtor's estate and creditors, including

9    the Prepetition Lenders.  The availability to the Debtor of sufficient working capital and liquidity

10    to finance its operations is vital to its ability to maintain such operations and is necessary for the

11    preservation of the value of the estate as a whole, pending the contemplated sale.

12        15.    The Debtor's prepetition indebtedness and credit facilities (the "Prepetition Credit

13    Facilities") can be summarized as follows:

14        (a)    On June 1, 1999, the Riverside County Public Financing Authority (the

15    "Authority") issued its Riverside County, California, Public Financing Authority Certificates of

16    Participation (Air Force Village West, Inc.), Series 1999, in the original principal amount of

17    $62,790,000 (the "COPs"), the proceeds of which were loaned to the Debtor.  The COPs were

18    issued pursuant to that certain Trust Agreement, dated as of June 1, 1999, between the Debtor, the

19    Authority and U.S. Bank Trust National Association (as amended, revised, and supplemented, the

20    "Trust Agreement").    UMB Bank, N.A. (the "COPs Trustee") succeeded U.S. Bank Trust

21    National Association as trustee under the Trust Agreement.  The Debtor owes approximately $40

22    million to holders of the COPs issued by the Debtor in 1999;

23        (b)    As security for the payment of the obligations evidenced by the COPs, the

24    Debtor pledged its gross revenues, as well as substantially all of the Debtor's personal property,

25

---

26    [4]  Section 363(a) defines "cash collateral" as: "cash, negotiable instruments, documents of title, securities, deposit

27    accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an
interest and includes the proceeds, products, offspring, rents, or profits of property . . . subject to a security interest as
provided in section 552(b) of this title, whether existing before or after the commencement of a case under this title."

28    11 U.S.C. § 363(a).

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

17

to the COPs Trustee, and the COPs Trustee properly perfected its lien on these assets.    In addition, as further security for the payment of the obligations evidenced by the COPs, the Debtor executed and delivered to the Authority, as beneficiary, a Deed of Trust, Security Agreement and Fixture Filing dated as of June 1, 1999 (as amended and supplemented, the "Deed of Trust" and, together with the Trust Agreement, the "1999 Documents").    The Authority in turn assigned its rights under the Deed of Trust and the other 1999 Documents to the COPs Trustee for the benefit of the holders of the COPs.    The Deed of Trust encumbers substantially all of the real property of the Debtor, other than approximately sixty-eight (68) acres of vacant land adjacent to the Debtor's facility (the "Vacant Land").    The Deed of Trust was duly recorded in the Official Records of the County of Riverside;

(c)    On April 1, 2005, ABAG Finance Authority for Nonprofit Corporations ("ABAG") issued the Bonds in the original principal amount of $23,000,000, the proceeds of which were loaned to the Debtor.    The Bonds were issued pursuant to an Indenture, dated as of April 1, 2005 (the "Indenture"), between ABAG and U.S. Bank National Association, as trustee (the "Bond Trustee," and together with the COPs Trustee, the "Trustees");

(d)    In order to provide credit and liquidity support for the Bonds, on April 1, 2005, the Debtor and KBC entered into that certain Reimbursement Agreement, Credit and Security Agreement (the "Reimbursement Agreement"), pursuant to which KBC agreed to issue the irrevocable Letter of Credit in the amount of $23,289,863.01, upon which the Bond Trustee, in its capacity of trustee of the Bonds, was authorized to draw in order to pay principal and interest on the Bonds to the extent the Debtor failed to make such payments. As a result of certain defaults under the Reimbursement Agreement and the Letter of Credit, on March 2, 2017, KBC provided notice to the Bond Trustee to call the Bonds for mandatory tender pursuant to the Indenture.    The entire outstanding amount of the Letter of Credit was drawn when the Bonds were tendered, and the Bonds became "Bank Bonds" as defined in the Indenture, held by the Bond Trustee for the account of KBC;

(e)    As security for its obligations under the Reimbursement Agreement, the Debtor executed and delivered a Second Supplement and Modification of Deed of Trust, Security

18

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

110339826\V-7

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

Agreement and Fixture Filing dated as of April 1, 2005 to KBC (the "Modification of Deed of Trust" and, together with the Indenture and the Reimbursement Agreement, the "2005 Documents"), which supplemented the Deed of Trust and, *inter alia*, granted KBC a first priority, security interest in, lien on and mortgage against substantially all of the assets of the Debtor, other than the Vacant Land, that is *pari passu* with the security interest, lien and mortgage of the COPs Trustee under the Deed of Trust.  Pursuant to an intercreditor agreement dated as of April 1, 2005, the COPs Trustee is the sole beneficiary under the Deed of Trust, as modified, and, as such, acts, and holds all security granted, transferred, pledged and assigned under the Deed of Trust, for the equal and ratable benefit of the holders of the COPs and KBC;

(f)    On August 28, 2018, the Receiver and the DIP Lenders entered into that certain Receivership Certificate Lending Agreement (the "Working Capital Agreement" and together with the 1999 Document and the 2005 Documents, the "Prepetition Credit Agreements"), pursuant to which the DIP Lenders advanced certain funds to the Receiver for the benefit of the Debtor and in support of its operations;

(g)    Amounts due under the Working Capital Agreement are secured, pursuant to the terms thereof and of a Deed of Trust, Security Agreement, and Assignment of Rents, dated August, 27, 2018 (the "Second Deed of Trust"), by substantially all of the real and personal property of the Debtor, including the Vacant Land, subject only to the terms of that certain letter agreement regarding the Vacant Land, dated August 9, 2018 (the "Letter Agreement"), between the DIP Lenders, the COPs Trustee and the California Department of Social Services ("CDSS"). The CDSS has a lien against the Vacant Land pursuant to California Health & Safety Code § 1793.15 for the Debtor's obligations thereunder, the priority of which is determined by the terms of the Letter Agreement.  The Second Deed of Trust was duly recorded in the Official Records of the County of Riverside.

16.    The following amounts are due and owing under the Pre-Petition Credit Facilities as of March 8, 2019:

(a)    Under the 1999 Documents, $40,105,000.00 in principal and $3,051,773.01 in interest, plus accrued fees;

19

(b)     Under the 2005 Documents, $18,035,507.08 in principal and $3,070,095.15 in interest, plus accrued fees;

(c)     Under the Working Capital Agreement, $2,674,600.30 in principal and $8,419.40 in interest, plus accrued fees.  The COPs Trustee asserts that the Debtor's repayment obligations under the COPs are secured by a security interest in substantially all of the Debtor's assets, including Altavita Village and the revenues derived from its operations.

17.     In addition to the approximately $40 million owed to the COPs Trustee, the Debtor owes approximately $21 million to KBC on account of the Letter of Credit, issued by KBC to secure repayment of the Bonds issued by the Debtor in 2005. In March 2017, the Bond Trustee drew down on the Letter of Credit to pay the Bonds, and the Debtor is obligated to repay to KBC certain amounts relating thereto in the approximate amount of $21 million.  KBC asserts that the Debtor's repayment obligations under the Letter of Credit are secured by a security interest in substantially all of the Debtor's assets, including Altavita Village and the revenues derived from its operations.

18.     In addition to the approximately $66 million in alleged secured indebtedness owed to the COPs Trustee and KBC (together, the "Prepetition Lenders"), the Debtor has approximately $500,000 in unsecured obligations owed to various vendors and service providers and is holding approximately $3,089,924.00 in deposits owed to residents in an escrow account and the Debtor owes residents entrance fee amounts totaling $7,138,113.00.

## C.   Current Circumstances and Access to Cash

19.     As explained above, virtually all the Debtor's assets, including its income, are subject to prepetition security interests.  As of the filing date, the Debtor expects to have less than $366,549 of cash on hand, excluding the cash held in escrow for the resident contracts.  However, the Debtor expects to spend approximately $1,802,400.00 during the first four weeks of this Chapter 11 Case and operating cash losses for the same four weeks are expected to exceed $200,000.  As a result, in order to survive the initial stages of this Chapter 11 Case and beyond, the Debtor must obtain access to prepetition cash collateral by stipulation or order of this Court.

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

20.     As a result of the above circumstances, the Debtor seeks authority during the interim period, and pursuant to the terms of the Interim Order, to use Cash Collateral.  The Debtor further seeks authority to borrow up to $400,000 under the proposed DIP Facility during the interim period, and up to an additional $3,850,000 following entry of the Final Order (in each case, plus that portion of interest thereon that converts to additional principal in accordance with the DIP Loan Documents).

21.     The terms of the DIP Facility are the result of a significant market exploration by the Debtor and its professionals.  In 2018, the Debtor and its professionals began to search alternative transactions including new investors.  In March 2019, the Debtor and its professionals expanded its efforts to include possible debtor in possession financing ("DIP Financing").  The Debtor and its professionals have reached out to over ten (10) potential DIP financing parties. The Debtor has also consulted with the Prepetition Lenders to gauge their interest in postpetition financing and consent to the use of their Cash Collateral.  None of the parties contacted were willing to provide DIP financing other than the Prepetition Lenders.  A summary of principal terms expressly agreed by the Prepetition Lenders, DIP Lenders and DIP Agent is and described below under Section III.

22.     As discussed more fully below, the Debtor proposes to secure its obligation under the DIP Facility by, among other things, granting to the DIP Lenders under the DIP Facility valid, enforceable, non-avoidable, and automatically perfected senior security interests in and first priority priming liens on, substantially all of the Debtor's assets, with certain exceptions and, in each case, subject to the "Carve Out," as defined and described more fully below pursuant to section 364(c) and 364(d) of the Bankruptcy Code, subject only to the prepetition liens and security interests of certain equipment lessors as set forth in the DIP Loan Documents, and to the lien of the CDSS on the Vacant Land, to the extent, if any, such lien has not been subordinated pursuant to that certain letter agreement, dated August 9, 2018, between CDSS and certain of the Prepetition Lenders.

23.     The DIP Facility and the DIP Orders also provide the DIP Lenders with allowed superpriority administrative expense claims pursuant to section 364(c)(1) of the Bankruptcy

110339826\V-7

1    Code, having priority (other than as to the proceeds of causes of action arising under sections

2    502(d), 544, 545, 547, 548, 549, and 550 of the Bankruptcy Code or any sums on deposit in the

3    Debtor's resident escrow account) over any and all administrative expenses of a kind specified in

4    sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113, and 1114 of the

5    Bankruptcy Code, subject only to the Carve Out.

6        24.    The DIP Credit Agreement and the DIP Orders provide for, among other things,

7    agreed budgetary constraints on the use of Cash Collateral and the proceeds of the DIP Facility.

8    The proceeds of the DIP Facility will provide liquidity for up to 6.5 months to fund this Chapter

9    11 Case.

10        25.    The Prepetition Lenders are provided adequate protection in the form of, among

11    other things, replacement security interests in and liens on substantially all of the Debtor's assets

12    and property (with certain exclusions) and superpriority claims (in each case, in accordance with

13    their relative priorities, and junior and subject to the liens and superpriority claims granted to the

14    DIP Lender).  If the Debtor is unable to obtain approval of the DIP Facility, and the use of Cash

15    Collateral, its ability to effectuate a sale of its assets will be jeopardized, substantially reducing

16    recoveries to all creditors.  Entry of the Interim Order and, after the requisite notice and the Final

17    Hearing, the Final Order is therefore (a) critical to the Debtor's ability to preserve and maximize

18    the value of its assets in a sale of substantially all of its assets under section 363, (b) in the best

19    interests of the Debtor and its estate, and (c) necessary to avoid irreparable harm to the Debtor, its

20    creditors and its assets, business, goodwill, reputation and employees.  Furthermore, access to the

21    Cash Collateral and the proceeds under the DIP Facility is necessary to avoid immediate and

22    irreparable harm to the value of the Debtor's assets pending the sales.  The Debtor therefore,

23    respectfully requests that this Motion be granted.

24

25

26

27

28

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

22

110339826\V-7

**III.**

**DISCLOSURE PURSUANT TO BANKRUPTCY RULE 4001
AND COMPLIANCE WITH LBR 4001-2**

26.    In accordance with Bankruptcy Rule 4001, the following sets forth a concise summary of material terms of the proposed DIP Facility and the DIP Orders:[5]

| | |
|---|---|
| SECURED CREDITORS:<br>BR 4001(c)(1)(B)<br>LBR 4001-2 | UMB Bank, N.A., as successor to U.S. Bank Trust National Association (the "COPs Trustee"), serves as trustee for repayment of the approximately $40 million to holders of certain Certificates of Participation (the "COPs") issued by the Debtor in 1999.<br><br>KBC Bank NV ("KBC") on account of a letter of credit (the "Letter of Credit") and related documents issued by KBC for the account of the Debtor to secure repayment of certain ABAG Finance Authority for Nonprofit Corporations Variable Rate Demand Bonds, Series 2005 (the "Bonds") issued for the benefit of the Debtor in 2005.  Following a draw under the Letter of Credit, the Bonds are presently held by U.S. Bank, National Association, as Trustee ("US Bank") as "Bank Bonds." |
| BORROWERS:<br>BR 4001(c)(1)(B)<br>LBR 4001-2 | Air Force Village West, Inc., a California not for profit corporation, doing business as Altavita Village |
| GUARANTORS:<br>BR 4001(c)(1)(B)<br>LBR 4001-2 | None |
| DIP LENDERS:<br>BR 4001(c)(1)(B)<br>LBR 4001-2 | Lapis Advisers, LP, ("Lapis") and KBC Bank NV ("KBC" and together with Lapis, the "DIP Lenders"). |
| DIP FACILITY:<br>BR 4001(c)(1)(B)<br>LBR 4001-2 | A multi-draw term loan facility (the "DIP Facility") comprised of:<br>(a) New Money DIP Loans in the aggregate principal amount of up to $4,250,000.00, plus that portion of interest thereon that converts to additional principal in accordance with the DIP Loan Documents, (as defined below), (the "New Money Commitment" and loans thereunder, the "New Money DIP Loans") to be advanced in accordance with the Budget and the terms of the DIP Loan |

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

---

[5] This summary is not intended to limit the terms of the DIP Facility, including in respect of any use of Cash Collateral, in each case as set forth in the DIP Credit Agreement, the Interim Order and the Final Order.  Reference should be made to the Interim Order, the DIP Credit Agreement and the Final Order for the full terms thereof.

110339826\V-7

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

| | | |
|---|---|---|
| | | Documents, as defined herein; and |
| | | (b) Roll-Up DIP Loans: Subject to entry of the final Order, as defined below, a dollar-for-dollar roll-up of the outstanding obligations owed to each Prepetition Lender arising under or in connection with the Working Capital Facility, including outstanding principal and accrued interest thereon (the "<u>Roll-Up Loans</u>" and, together with the New Money DIP Loans, the "<u>DIP Loans</u>"). |
| <u>AVAILABILITY</u>:<br>BR 4001(c)(1)(B)<br>LBR 4001-2 | | Commencing on the date of the Bankruptcy Court's entry of interim and final orders, in form and substance satisfactory to the DIP Lenders in their sole discretion (the "<u>Orders</u>") approving the DIP Facility, New Money DIP Loans shall be available to the Debtor in an amount up to the lesser of the New Money Commitment and the amount of borrowings contemplated by the Orders, in either case in accordance with the Budget (as defined below).  The proceeds of the New Money DIP Loans shall be disbursed to the Debtor's existing main operating account (the "<u>DIP Funding Account</u>") in the name of the Debtor.   The DIP Funding Account shall constitute part of the Collateral.<br><br>Commencing on the date of the Bankruptcy Court's entry of the final Order, in form and substance satisfactory to the DIP Lenders in their sole discretion, approving, among other things, the Roll-Up Loans, the Roll-Up Loans shall deemed made to the Debtor to refinance the outstanding obligations under the Working Capital Facility.<br><br>Subject to the terms hereof, the amount of the New Money Commitment may be borrowed in multiple advances, and at intervals, consistent with the Budget, to be set forth in the definitive documents relating to the DIP Facility, all of which shall be in form and substance satisfactory to the DIP Lenders in their sole discretion  (collectively, the "<u>DIP Loan Documents</u>").<br><br>On terms and conditions acceptable to the DIP Lenders and the Prepetition Lenders in their sole discretion, the Orders shall expressly contemplate and authorize the use of any "cash collateral" (as defined in Bankruptcy Code section 363(a) but limited to cash received by the Debtor in the ordinary course of operations of its business) securing the repayment of obligations under the Prepetition Credit Agreements, pursuant to Bankruptcy Code section 363(c). |

110339826\V-7

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

| | |
|---|---|
| **MATURITY DATE:**<br>BR 4001(c)(1)(B)<br>LBR 4001-2 | All obligations outstanding under or in respect of the DIP Facility shall be repaid in full on the date (the "Maturity Date") that is the earliest to occur of: (a) September 9, 2019, (b) April 19, 2019, if the Final Order has not been entered by the Bankruptcy Court as of such date, (c) the closing date (the "Closing Date") of any sale, (d) the day on which the DIP Agent and the DIP Lenders accelerate the DIP Obligations (or the DIP Obligations automatically and immediately accelerate) or the DIP Obligations otherwise become immediately due and payable pursuant to the terms of the DIP Loan Documents, or (e) the confirmation of a plan of reorganization or liquidation for the Debtor in the Case. |
| **USE OF PROCEEDS:**<br>BR 4001(b)(1)(B)(ii),<br>-(b)(1)(B)(iii), -(b)(1)(B)(iv)<br><br>LBR 4001-2 | The proceeds of the DIP Facility will be used, in accordance with the Budget, to provide working capital and for other general corporate purposes of the Debtor during the administration of the Case, including the payment of administrative claims allowed in the Case.<br><br>No portion of the DIP Facility, the Cash Collateral or the Carve-Out (as defined below) shall be used in connection with asserting any claims or causes of action against the DIP Secured Parties or the Prepetition Lenders, or their respective affiliates, subsidiaries, directors, shareholders, employees, advisors, agents or sub-agents, including formal discovery proceedings in anticipation thereof, or challenging any lien thereof; provided, however, that any committee of unsecured creditors appointed in the Case shall have sixty (60) days from and after the appointment of such committee to investigate the claims and liens of the Prepetition Lenders, with an amount available to investigate such claims not to exceed $25,000. |
| **BUDGET:**<br>BR 4001(b)(1)(B)(ii)<br>LBR 4001-2 | "Budget" shall mean the rolling consolidated 13-week cash flow and financial projections of the Debtor covering the period beginning on March 16, 2019 and itemizing on a weekly basis all uses, and anticipated uses, of the DIP Facility, revenues projected to be received and all expenditures proposed to be made during such period, which shall at all times be in form and substance reasonably satisfactory to the DIP Lenders. A copy of the Budget is attached hereto as **Exhibit "3"**.<br><br>Prior to the Petition Date, the Debtor shall provide to the DIP Lenders an initial Budget for the period beginning on March 16, 2019. After entry of the interim Order, the Debtor shall provide to the DIP Lenders, as soon as available but no later than 5:00 PM Pacific Time on each Friday, a Budget variance and reconciliation report setting forth: (i) a comparative reconciliation, on a line-by-line basis, of actual cash receipts and disbursements against the cash receipts and disbursements forecast in the Budget, and the percentage variance thereof, for (A) the weekly period ended on (and including) the immediately preceding Sunday and (B) the cumulative period to date; (ii) a written explanation of such variances; and (iii) projections for the following 13 weeks, including a rolling |

25

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

|  | cash receipts and disbursements forecast for such period. |
|---|---|
|  | Other than to the extent otherwise permitted in the DIP Loan Documents, the Debtor shall not make or commit to make any payments other than those identified in the Budget. On the last business day of any week: (i) payments for such cumulative period to date shall not exceed 15% (so long as Tom Plumb of Cordes & Company, LLC, or another employee or representative thereof satisfactory to the DIP Lenders, remains responsible for the Budget and reporting thereon) or 10% (if Tom Plumb or another employee or representative of Cordes & Company, LLC, is not so engaged) of the respective amounts, measured as to each line item in the Budget, set forth for such cumulative period to date in the Budget; and (ii) receipts for such cumulative period to date shall not be less than 90% of the amounts, on an aggregate basis, set forth for such cumulative period to date in the Budget. |
| **INTEREST RATE:**<br>BR 4001(c)(1)(B)<br>LBR 4001-2 | Each DIP Loan (including each NM Loan and Roll-Up Loan) shall bear interest on the unpaid principal amount thereof from the date made through repayment (whether by acceleration or otherwise) on the unpaid principal amount thereof at a rate per annum equal to ten percent (10.00%). Accrued interest on each DIP loan shall be paid in full on each Interest Payment Date as follows: (i) thirty percent (30%) of the accrued interest amount shall be paid in cash, and (ii) seventy percent (70%) of the accrued interest amount shall, in lieu of being paid in cash on such Interest Payment Date, be capitalized and added to the principal amount outstanding under the DIP Loans and shall bear interest from such Interest Payment Date at the same rate as the original principal amount of the DIP Loans and shall be treated as principal of the DIP Loans for all purposes. |
| **FEES:**<br>BR 4001(b)(1)(B)(ii),<br>-(c)(1)(B)<br><br>LBR 4001-2 | The Debtor agree to pay to the DIP Lenders, (i) an exit fee equal to three percent (3%) of the New Money Commitment, payable on the Maturity Date and (ii) a commitment fee equal to half a percent (0.50%) of the average daily unused amount of the New Money Commitment for the period from and including the Petition Date to, but not including, the Maturity Date, which shall be payable on the Maturity Date. The unused amount of the New Money Commitment for any day shall be equal to the New Money Commitment less the aggregate principal amount of all of the New Money Loans then outstanding on such day. |
| **CARVE OUT:**<br>BR 4001(c)(1)(B)<br>LBR 4001-2 | The DIP Obligations shall be subject to a carve-out (the "Carve Out") comprising: (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930(a), and (ii) (a) fees and expenses projected in the Budget and incurred by the Debtor's professionals or the professionals of any official committee of unsecured creditors or other professionals appointed in the Case prior to delivery of notice of an Event of Default and allowed by the Bankruptcy Court (the "Carve Out |

110339826\V-7

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

| | |
|---|---|
| | Notice"), and (b) after delivery of a Carve-Out Notice, an amount not exceeding $250,000 in the aggregate to pay any fees or expenses incurred by the Debtor's professionals or the professionals of any official committee of unsecured creditors appointed in the Case, provided that nothing herein shall be construed to impair the ability of any party to object to the fees, expenses, reimbursement or compensation described above.  No portion of the Carve Out, any cash collateral or proceeds of the DIP Facility may be used for the payment of the fees and expenses of any person incurred challenging, or in relation to the challenge of, any of the DIP Lenders' or Prepetition Lenders' liens or claims, or the initiation or prosecution of any claim or action against any of the DIP Lenders or Prepetition Lenders in any capacity, except there shall be available $25,000 to investigate any such potential challenges. |
| <u>DIP LIENS:</u><br>BR 4001(c)(1)(B)(i),<br>-(c)(1)(B)(vii), -(c)(1)(B)(x)<br><br>LBR 4001-2 | The DIP Facility shall be secured by certain liens (the "<u>DIP Liens</u>"), which shall be granted in the DIP Credit Documents and approved by the Bankruptcy Court in the DIP Orders, on all now owned or hereafter acquired assets and property of the Debtor and proceeds thereof (including, without limitation, all cash, cash equivalents, accounts, payment intangibles, promissory notes, consignments, commercial tort claims, tax refunds, inventory, goods, chattel paper, documents, deposit accounts, documents, instruments, investment property, letter-of-credit rights, general intangibles, contracts, contract rights, all causes of action and proceeds thereof, computer hardware and software, motor vehicles, intellectual property, real and personal property, plant and equipment of the Debtor (collectively, the "<u>DIP Collateral</u>") (provided, however, that the DIP Collateral shall not include either the Trustee-Held Funds, the proceeds of any Chapter 5 actions or any sums on deposit in the Debtor's resident escrow account), subject only to: (i) the prepetition liens of certain equipment lessors (if such liens limited only to the equipment secured thereby and proceeds thereof), and (ii) the prepetition liens of the California Department of Social Services (the "<u>CDSS Liens</u>") on approximately sixty-eight (68) acres of undeveloped real property immediately adjacent to the Debtor's facility to the extent that, in accordance with that certain letter agreement, dated August 9, 2018, between the California Department of Social Services and certain of the Prepetition Lenders, such CDSS Liens would be senior to the liens of the Prepetition Lenders securing the Working Capital Facility.<br><br>The DIP Liens shall, pursuant to § 364(d)(1) of the Bankruptcy Code, be valid, perfected, superpriority priming liens on the DIP Collateral.<br><br>Except with respect to the Carve Out, neither the DIP Liens nor the liens held by the Prepetition Lenders shall be subject to surcharge under § 506(c) or any other provision of the Bankruptcy Code. |

110339826\V-7

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

| | |
|---|---|
| **ADEQUATE PROTECTION**:<br>BR 4001(b)(1)(B)(iv),<br>-(c)(1)(B)(i),<br>-(c)(1)(B)(ii),<br>-(d)(1)(A)(i)<br><br>LBR 4001-2 | The Prepetition Lenders will receive customary adequate protection in exchange for their consent to the Debtor's use of "cash collateral" subject to the Budget and for the priming of their liens by the liens securing the DIP Facility. |
| **PRIORITY**:<br>BR 4001(c)(1)(B)(i),<br>-(c)(1)(B)(ii)<br><br>LBR 4001-2 | The DIP Obligations shall, pursuant to § 364(c)(1) of the Bankruptcy Code, be entitled to superpriority administrative expense claim status in the Chapter 11 Case (the "DIP Superpriority Claim"), which DIP Superpriority Claim in respect of the DIP Facility shall have priority over any and all claims against the Debtor. |
| **AFFIRMATIVE AND NEGATIVE COVENANTS**:<br>BR 4001(c)(1)(B)<br>LBR 4001-2 | The DIP Loan Documents include such affirmative and negative covenants as are usual and customary for financings of this kind and that are reasonably acceptable to the DIP Lenders, including, without limitation, compliance with: (a) the Budget, as described above (and subject to the variances contemplated above); and (b) certain temporal milestones related to the contemplated marketing and sale of all or substantially all of the Debtor's assets (the "Sale Milestones"). |
| **REPRESENTATIONS AND WARRANTIES**:<br>BR 4001(c)(1)(B)<br>LBR 4001-2 | The DIP Loan Documents include such representations and warranties as are usual and customary for financings of this kind and that are reasonably acceptable to the DIP Lenders, including without limitation: due organization; requisite power and authority; qualification; due authorization, execution, delivery and enforceability of the DIP Loan Documents; no conflicts; no material adverse change (excluding any material adverse change resulting from or in connection with the commencement of the Case and the events leading up to the Case; no restricted junior payments; absence of material litigation (excluding the Case, the receivership action and the pending resident litigation); payment of taxes; title to properties; Investment Company Act and margin stock matters; ERISA and other employee matters; absence of brokers or finders fees; compliance with laws; continued effectiveness of orders of the Bankruptcy Court, including the Orders, as applicable; full disclosure and accuracy of Budget; and Patriot Act and other related matters. |
| **EVENTS OF DEFAULT**:<br>BR 4001(c)(1)(B)<br>LBR 4001-2 | The DIP Loan Documents include events of default that are usual and customary for financings of this kind and that are reasonably acceptable to the DIP Lenders (each an "Event of Default"), including, without limitation, the following:<br>(k) The final Order, in form and substance satisfactory to the DIP Lenders, shall not have been entered by the Bankruptcy Court as a final order by April 24, 2019; |

110339826\V-7



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

(l) the Case shall be dismissed or converted to a case under chapter 7 of the Bankruptcy Code; a trustee, receiver, interim receiver or receiver and manager shall be appointed in the Case, or a responsible officer or an examiner with enlarged powers shall be appointed in the Case; or any super-priority administrative expense claim or lien (other than the Carve-Out and as otherwise provided herein ) that is *pari passu* with or senior to the claims, charges or liens of the DIP Lenders shall have arisen or be authorized or allowed;

(m) the Debtor shall make any payment (whether by way of adequate protection or otherwise) of principal or interest or otherwise on account of any prepetition indebtedness or payables, other than:    (i) payments authorized by the Bankruptcy Court in respect of "first day" or other orders entered upon pleadings in form and substance reasonably satisfactory to the DIP Lenders (including, without limitation, payments of prepetition obligations to employees and payroll taxes, insurance payments, utility deposits, critical vendor payments, sales and use taxes and similar taxes, each to the extent approved by order of the Bankruptcy Court); and (ii) payments of franchise (and similar) taxes incurred prior to the Petition Date necessary to maintain the Debtor's existence and qualification or good standing in its jurisdiction of formation and any other jurisdictions in which it conducts business;

(n) the Bankruptcy Court shall enter an order granting relief from the automatic stay to any creditor or party in interest:  (i) to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any material assets of the Debtor; or (ii) to permit other actions that would have a material adverse effect on the Debtor or its estate or the DIP Secured Parties' rights and remedies under the DIP Loan Documents (including the enforceability thereof in accordance with their terms);

(o) an order shall be entered reversing, amending, supplementing, staying, vacating or otherwise modifying the Order, or the Debtor shall apply for the entry of such an order, without the prior written consent of the DIP Lenders;

(p) the Debtor shall fail to meet or comply with any of the

110339826\V-7

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

| | |
|---|---|
| | Sale Milestones; |
| | (q) any DIP Loan Document shall cease to be effective or shall be contested by Debtor or any of their affiliates; |
| | (r) the Debtor shall fail to comply in any respect with the Orders; |
| | (s) the Debtor shall fail to comply with any of the affirmative covenants, or take any action in violation of any of the negative covenants, set forth in the DIP Loan Documents; and |
| | (t) such other usual and customary Events of Default as may be reasonably requested by the DIP Lenders and are typical for this type of financing. |
| <u>CONDITIONS PRECEDENT</u>: BR 4001(c)(1)(B), - LBR 4001-2 | The obligation of the DIP Lenders to make any DIP Loans will be subject to customary closing conditions for this type of financing in form and substance satisfactory to the DIP Lenders, including: (i) the entry of an Interim Order; and (ii) the execution and delivery of the DIP Loan Documents. |
| <u>CONDITIONS TO EACH EXTENSION OF CREDIT</u>: BR 4001(c)(1)(B) LBR 4001-2 | The conditions to all borrowings will include requirements relating to prior written notice of borrowing, the accuracy of representations and warranties, and the absence of any default or Event of Default, and will otherwise be customary and appropriate for this type of financing. |
| <u>INDEMNIFICATION AND RELEASE</u>: BR 4001(c)(1)(B)(viii), -(c)(1)(B)(ix) LBR 4001-2 | The Debtor shall indemnify, pay and hold harmless the DIP Agent and the DIP Lenders and their affiliates (and their respective directors, officers, employees and agents) against any loss, liability, cost or expense incurred in respect of the financing contemplated hereby or the use or the proposed use of proceeds thereof (except to the extent resulting from the gross negligence or willful misconduct of the indemnified party). |
| <u>LIFT OF AUTOMATIC STAY</u>: BR 4001 (c)(1)(B)(iv) LBR 4001-2 | The automatic stay provisions of section 362 of the Bankruptcy Code are vacated and modified to the extent necessary to permit: (a) the DIP Lenders and Prepetition Lenders to exercise all their respective rights and remedies under the DIP Loan Documents and the Prepetition Credit Agreements upon the occurrence or during the continuation of an Event of Default (as defined in the DIP Loan Documents) or the Maturity Date, but only after the provision of five Business Days' written notice by the DIP Lenders or Prepetition Lenders (as applicable) to the Debtor, any unsecured creditors' committee, the Prepetition Lenders/DIP Lenders (as applicable), the U.S. Trustee, and their respective counsel of the intended exercise of such rights or remedies; and (b) the Prepetition Lenders to (i) receive any payments or distributions made by the Debtor to the Prepetition Lenders, |

110339826\V-7

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

| | |
|---|---|
| | (ii) apply, allocate or make payments from any of the funds or accounts maintained by the Trustees (including, without limitation, the Trustee-Held Funds) in accordance with the terms of the 1999 Documents and the Bond Documents, and (iii) take any other action authorized by this Interim Order. The Debtor's right to use Cash Collateral shall terminate automatically and immediately upon the issuance of such a written notice. |
| **PLAN FILING DEADLINE:** BR 4001(c)(1)(B)(vi) LBR 4001-2 | Plan and Disclosure Statement must be filled with 180 days of the petition date. |
| **RELEASE, WAIVER, OR LIMITATION OF ANY RIGHT UNDER § 506(C):** BR 4001(c)(1)(B)(x) LBR 4001-2 | As a material inducement to the DIP Lenders to agree to provide the DIP Facility, and in exchange for the DIP Agent and DIP Lenders' willingness to provide the DIP Facility and their agreement to subordinate their liens and superpriority clients to the Carve Out to the extent set forth herein, upon entry of the Final Order, no costs or expenses of administration which have been or may be incurred in connection with the preservation, protection, or enhancement of realization by the DIP Agent or DIP Lenders or the Prepetition Lenders upon the Collateral, shall be charged against any of the DIP Agents, the DIP Lenders, the DIP Obligations, the Prepetition Lenders or the Collateral pursuant to sections 105 or 506(c) of the Bankruptcy Code or otherwise without the prior express written consent of the DIP Agent, in its sole discretion. The DIP Loan Documents and the Interim Order and Final Order provide for a full, absolute, plenary and unconditional release of each of the DIP Lenders and the Prepetition Lenders and their respective affiliates of any and all claims, causes of action or other rights related to the Debtor, whether arising prior to or after the Petition Date. |

27.    In addition, the provisions described in Bankruptcy Rule 4001 (c)(1)(B)(i)-(xi), to the extent applicable, are set out in the following sections of the DIP Credit Agreement and or the Interim Order:

- *Grant of a Priority Claim or Lien on Property of the Estate*:  Interim Order ¶¶ 14 and 15.

- *Waiver or Modification of Bankruptcy Code Provisions or Applicable Rules Relating to Automatic Stay*:  Interim Order ¶ 10.

- *Waiver or Modification of Applicability of Nonbankruptcy Law Relating to Perfection of Lien on Property of Estate or on Foreclosure or Other Enforcement of Lien*:  Interim Order ¶ 16.

110339826\V-7

- *Indemnification or Release of any Entity*:  DIP Credit Agreement ¶¶ 5 and 21.

- *Release, Waiver, or Limitation of any Right under § 506(c)*.  Interim Order ¶ 24.

- *Granting of a Lien on any Claim or Cause of Action Arising under §§ 544, 545, 547, 548, 549, 553(b), 723(a) or 724*(a):  None.

## IV.
## RELIEF REQUESTED

By this Motion, the Debtor seeks entry of the DIP Orders, *inter alia*:

(i)     under §§ 363, 364(c) and 364(d), authorizing the Debtor, as Borrower, to obtain senior secured superpriority priming debtor in possession financing under the terms and conditions of the DIP Credit Agreement and the other DIP Financing Agreements, consisting of a loan facility in an aggregate amount of $4,250,000 million (plus that portion of interest thereon that converts to additional principal in accordance with the DIP Loan Documents), from Lapis Advisers, LP and KBC Bank NV, as the DIP Lenders, including interim financing in the amount of $400,000, and authorizing the Debtor to enter into and comply in all respects with the DIP Financing Agreements, and approving the terms and conditions of the DIP Financing Agreements;

(ii)    under §§ 363 and 364, authorizing the Debtor to use the proceeds of the DIP Facility in a manner consistent with the terms and conditions of the DIP Financing Agreements, and in accordance with the Budget, (i) to fund this Chapter 11 Case, (ii) to pay fees and expenses associated with the DIP Facility, and (iii) for working capital and other corporate purposes of the Debtor;

(iii)   under §§ 364(c)(2), 364(c)(3) and 364(d), as security for the repayment of the borrowings and all other obligations arising under the DIP Financing Agreements, authorizing the Debtor to grant to the DIP Lenders (first priority priming, valid, perfected and enforceable liens, subject to certain exceptions, including the Carve Out, upon substantially all of the Debtor's property, as described below and in the DIP Orders, the DIP Credit Agreement and the other DIP Financing Agreements;

(iv)    under § 364(c)(1), granting in favor of the DIP Lenders a superpriority administrative expense claim (the "DIP Superpriority Claim") in respect of all Obligations under (and as defined in) the DIP Credit Agreement (the "DIP Obligations"), subject only to the payment of the Carve Out, and that only on entry of a final order;

(v)     under §§ 361, 363(c)(2) and 363(e), authorizing the use of Cash Collateral by the Debtor, in accordance with the Budget, and under the terms set forth in the DIP Orders;

(vi)    under §§ 361, 363(e) and 364(d)(1), authorizing the granting the Prepetition Lenders, of the Adequate Protection Liens and Adequate Protection Claims to the extent of any Diminution in Value of the Prepetition Lenders' interests in the Prepetition Collateral, and having the priorities set forth in the DIP Orders; as well

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

110339826\V-7

as additional adequate protection in the form of the payment of fees and expenses incurred by the Prepetition Lenders;

(vii)   under § 362, modifying the automatic stay to the extent necessary to implement and effectuate the terms and provisions of the DIP Orders, the DIP Credit Agreement and the other DIP Financing Agreements;

(viii)  scheduling the Final Hearing on the earliest date permitted under the Bankruptcy Rules and available in this Court after entry of the Interim Order to consider entry of the Final Order granting the relief requested in the Motion on a final basis, including final approval of the Debtor's use of Cash Collateral and entry into the DIP Credit Agreement, and approving the form of notice with respect to the Final Hearing;

(ix)    providing that, upon entry of the Final Order, no costs or expenses of administration which have been or may be incurred in connection with the preservation, protection, or enhancement of realization by the DIP Lenders or the Prepetition Lenders upon the Collateral, shall be charged against any of the DIP Lenders, the DIP Obligations, the Prepetition Lenders, or the Collateral pursuant to sections 105 or 506(c) of the Bankruptcy Code or otherwise without the prior express written consent of the DIP Agent, in its sole discretion; and

(x)     waiving any applicable stay (including under Bankruptcy Rule 6004) and providing for the immediate effectiveness of the DIP Orders.

## V.
## BASIS FOR RELIEF

### A.    The Debtor's Need for Financing and Use of Cash Collateral

As discussed more fully below, the provisions of the DIP Credit Agreement are all justified under the circumstances of this Chapter 11 Case. Prepetition, the Debtor was unable to obtain financing on more favorable terms from sources other than the DIP Lenders. The DIP Lenders have agreed to lend $4.25 million, but would not do so without the protections and priorities sought in this Motion. Without such financing, the Debtor's ability to provide continue normal operations and ultimately consummate the sale of all of its assets will be severely jeopardized. The Debtor thus respectfully submits that the facts and circumstances of this Chapter 11 Case demonstrates that the above-described provisions are necessary and appropriate and should be authorized and approved by this Court.

The Debtor requires sufficient liquidity during this Chapter 11 Case to fund working capital and general corporate requirements for essential, day-to-day operations to ensure the continued operation of its facility, maintain the quality of resident care, to pay employees and

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

110339826\V-7

1  vendors on a timely basis and to preserve and maintain the value of the Debtor's assets.  The

2  Debtor also needs additional cash to fund the sale process for the benefit of the estate and

3  creditors, including the Prepetition Lenders.  The financing requested herein is being requested

4  for up to 6.5 months or the duration of this Chapter 11 Case.  The Debtor believes this time frame

5  is the necessary period of time to facilitate the marketing and sale of its business.

6       Absent the relief requested from this Court, the Debtor will not have sufficient liquidity to

7  ensure uninterrupted business operations -- which could affect resident care -- and will suffer a

8  substantial loss of asset value to the detriment of all parties in interest. It is therefore critical that

9  the Debtor obtain the initial $400,000 of the DIP Facility in place on an interim basis in order to

10  ensure that the Debtor has enough cash to maintain resident care services and to maintain its

11  business operation.  It is also obviously critical that the Debtor be able to demonstrate to its staff,

12  vendors, and residents that the CCRC will continue to provide high quality care, and to function

13  without interruption and that the Debtor will continue to pay vendors in the ordinary course of

14  business.  Absent such a showing—and in the event of any interruption or delay in the business—

15  the Debtor's residents could suffer and staff could pursue opportunities with competitors, which

16  would cripple the Debtor's business.

17       In the absence of approval of the DIP Facility, the Debtor's residents, for whom time is of

18  the essence, would likely suffer and may need to seek services elsewhere.  The DIP Facility is

19  critical to the Debtor's ability to continue to provide resident care and services, and maintain

20  supportive business functions during the Chapter 11 Case.  Moreover, employees and residents

21  will expect the Debtor to have more than ample access to liquidity in order to continue resident

22  care services and other business operations.

23       Entry of the Interim Order is therefore (i) critical to the Debtor's ability to succeed in its

24  plan to transition ownership and control of the CCRC into stronger hands, freed from legacy

25  liabilities pursuant to the Bankruptcy Code, (ii) in the best interests of the residents, the Debtor

26  and its estate, and (iii) necessary to avoid irreparable harm to the Debtor, its residents, its

27  creditors, and its assets, business, goodwill, reputation and employees.

28

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

34

**B.      The Debtor's Entry into the DIP Facility Is Authorized Under § 364**

Section 364 gives bankruptcy courts the power to authorize post-petition financing for a chapter 11 debtor in possession.  *See In re Defender Drug Stores. Inc.*, 126 B.R. 76, 81 (Bankr. D. Ariz. 1991), *aff'd.*, 145 B.R. 312 (B.A.P. 9th Cir. 1992).

Bankruptcy courts have the power to authorize secured postpetition financing under § 364, which provides, in pertinent part, as follows:

> (c)      If the [Debtor in possession] is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt -
>
> (1)      with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;
>
> (2)      secured by a lien on property of the estate that is not otherwise subject to a lien; or
>
> (3)      secured by a junior lien on property of the estate that is subject to a lien.
>
> (d)(1)  The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if
>
> (A)      the [Debtor in possession] is unable to obtain such credit otherwise; and
>
> (B)      there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(c)-(d)(1).

"Having recognized the natural reluctance of lenders to extend credit to a company in bankruptcy, Congress designed [section] 364 to provide 'incentives to the creditor to extend post-petition credit.'" *Defender Drug Stores,* 126 B.R. at 81 (quoting *Unsecured Creditors' Comm. v. First Nat'l Bank & Trust Co. of Escanaba* (*In re Ellingsen MacLean Oil Co.*), 834 F.2d 59, 603 (6th Cir. 1987). *cert. denied*, 488 U.S. 817 (1988)).  The incentives enumerated in § 364 are not intended to be an exhaustive list of the inducements that a court may grant.  *Id.*  In fact, it is not

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

110339826\V-7

1   uncommon for a court to approve a lending arrangement containing terms that far exceed those

2   authorized by § 364. *Id.*

3       Generally, courts apply a three-part test to determine whether a Debtor in possession may

4   obtain credit under § 364(c). Under such test, the Debtor may incur postpetition financing under

5   the DIP Facility pursuant to § 364(c) if it demonstrates that (a) it cannot obtain credit

6   unencumbered or without superpriority status, (b) the DIP Facility is necessary to preserve the

7   assets of their estates, and (c) the terms of the DIP Facility are fair, reasonable and adequate given

8   the circumstances of the Debtor, as Borrower, and the proposed lenders. *See In re Crouse Group.*

9   *Inc.*, 71 B.R. 544, 549-50 (Bankr. E.D. Pa. 1987); *and In re Aqua Assocs.*, 123 B.R. 192, 195-96

10  (Bankr. E.D. Pa. 1991).

11      In addition, § 364(d)(1) authorizes a debtor in possession to incur superpriority senior

12  secured or "priming" liens if (a) the debtor is unable to obtain financing from another source, and

13  (b) the interests of the secured creditors whose liens are being primed by the postpetition

14  financing are adequately protected. 11 U.S.C. § 364(d)(1); *see also Aqua Assocs.*, 123 B.R. at

15  196. Additionally, consent to priming by the prepetition secured creditors obviates the need to

16  show adequate protection. *See Anchor Sav. Bank FSB v. Sky Valley. Inc.*, 99 B.R. 117, 122 (N.D.

17  Ga. 1989) ("[B]y tacitly consenting to the superpriority lien, those [undersecured] creditors

18  relieved the Debtors of having to demonstrate that they were adequately protected.").

19  Accordingly, the Debtor may incur "priming" liens under the DIP Facility if it is unable to obtain

20  unsecured or junior secured credit and either (i) the prepetition secured creditors have consented

21  or (ii) their interests in the collateral are adequately protected.

22      Against this statutory backdrop, courts will evaluate the facts and circumstances of a

23  debtor's case and accord significant weight to the necessity for obtaining the financing. *See, e.g.,*

24  *In re Ames Dep't Stores. Inc.*, 115 B.R. 34, 40-41 (Bankr. S.D.N.Y. 1990). Debtors in possession

25  are generally permitted to exercise their business judgment consistent with their fiduciary duties

26  when evaluating the necessity of proposed protections for a party extending credit under § 364.

27  *Id.* at 38.

28

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

36

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

**(1)    The Debtor is Unable to Obtain
Unsecured or Junior Secured Credit**

To show that the credit required is not obtainable on an unsecured basis, the Debtor need only demonstrate "by a good faith effort that credit was not available" without the protections afforded to potential lenders by § 364(c) or (d).  *Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see also Anchor Sav. Bank*, 99 B.R. at 120 n.4 (noting that the Debtors satisfied the requirement of § 364(d) by "approach[ing] all lenders reasonably likely to be willing to make a junior or unsecured loan"); *Ames*, 115 B.R. at 37-40 (Debtors in possession must show that it has made a reasonable effort to seek other sources of financing under §§ 364(a) and (b)).  Thus, "[the] statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *Snowshoe*, 789 F.2d at 1088; *see also In re Sky Valley, Inc.*, 100 B.R. 107,113 (Bankr. N.D. Ga. 1998) (finding that "it would be unrealistic and unnecessary to require [the Debtors] to conduct such an exhaustive search for financing" where the Debtors "suffers some financial stress and has little or no unencumbered property"), *aff'd sub nom., Anchor Sav. Bank*, 99 B.R. at 117.

As discussed above and in the Pace Declaration, the Debtor's assets are subject to the Prepetition Liens asserted by the Prepetition Lenders.  Because of the Debtor's prepetition debt, obtaining the financing needed as unsecured debt on an administrative priority basis, or as debt which would be secured solely by liens junior to the liens of the Prepetition Lenders, was not a viable option, especially from a third party who did not already have a financial interest in the Debtor to protect.  The Debtor thus concluded that adequate alternative financing terms more favorable than those to be provided by the DIP Lenders under the DIP Facility are currently unobtainable.

**(2)    The Prepetition Lenders' Interests Are Adequately Protected**

If the Debtor is unable to obtain credit under the provisions of § 364(c), the Debtor may obtain credit secured by a senior or equal lien on property of the estate that is already subject to a lien (*i.e.*, a priming lien).  *See* 11 U.S.C. § 364(d).  Such relief may be granted so long as there is adequate protection of any pre-existing secured creditor's interests in the property on which the

110339826\V-7

senior lien is supposed to be granted. *See id.; see also Aqua,* 123 B.R. at 196. Although the Bankruptcy Code does not explicitly define "adequate protection," § 361 of the Bankruptcy Code provides that it may take the form of (1) a cash payment or periodic cash payments to the extent that there is a decrease in the lien holder's property interest; (2) an additional or replacement lien to the extent that there is a decrease in the lien holder's property interest; or (3) other relief that will result in a secured party's realizing the indubitable equivalent of its property interest. *See* 11 U.S.C. § 361.

The Debtor believes that the measures of protection set forth in the DIP Facility and the Interim Order constitute adequate protection. In addition to replacement liens on substantially all assets of the Debtor (other than causes of action arising under sections 502(d), 544, 545, 547, 548, 549, and 550 of the Bankruptcy Code or any sums on deposit in the Debtor's resident escrow account), junior in priority only to the DIP Liens and any existing senior liens, and subject to the Carve Out, the Prepetition Lenders will receive superpriority administrative expense claims but subject to the DIP Superpriority Administrative Claim and the Carve Out. Moreover, the use of any DIP Facility proceeds shall be solely in accordance with the Budget. Accordingly, the DIP Facility not only maintains the value of the collateral in which the Prepetition Lenders are receiving replacement liens, it increases the collateral base and strengthens the value of the Debtor's business.

Finally, as mentioned above, consent may take the place of adequate protection under § 364(d)(1) of the Bankruptcy Code, and the Debtor have obtained the consent of the Prepetition Lenders to use the Cash Collateral, at least on an interim basis, and enter into the DIP Facility on the terms set forth in the DIP Orders.

### (3) The DIP Facility Is Fair, Reasonable, and in the Best Interests of the Estate

The Debtor believes that the terms and conditions of the DIP Facility are fair and reasonable. The DIP Facility is necessary to support the Debtor's ongoing operations pending the approval and closing of a sale, and will signal the Debtor's continued strength to compete in the marketplace for new residents. The DIP Facility will also ensure the continued high quality care

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

38

110339826\V-7

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

to the Debtor's existing residents and payments to critical suppliers. Furthermore, the Debtor, with the help of its professionals, undertook an effort to obtain the best available terms for debtors in possession financing. The DIP Lenders were the only parties willing to provide financing to the Debtor. Nonetheless, the Debtor believes that the interest rates and fees provided for in the DIP Credit Agreement are consistent with the existing market for debtor in possession loans of this nature. Accordingly, the Debtor believes that the proposed DIP Facility is the best financing available and well within the exercise of the Debtor's sound business judgment.

Bankruptcy courts consistently defer to a debtor's business judgment on most business decisions, including the decision to borrow money, unless such decision is arbitrary and capricious. *See Trans World Airlines. Inc. v. Travellers Int'l AG.* (*In re Trans World Airlines, Inc.*), 163 B.R. 964, 974 (Bankr. D. Del. 1994) (noting that an interim loan, receivables facility and asset-based facility were approved because they "reflect[cd] sound and prudent business judgment . . . [were] reasonable under the circumstances and in the best interests [of the Debtors] and its creditors"); *In re Simasko Prod. Co.*, 47 B.R. 444, 449 (Bankr. D. Colo. 1985) ("In exercising [the Debtors'] business judgment of conducting its drilling operations, it has found it necessary to obtain loans to make these endeavors possible."). In fact, "[m]ore exacting scrutiny [of the Debtors' business decisions] would slow the administration of the Debtors' estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank. N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985); *see also Simasko Prod.*, 47 B.R. at 449 ("Business judgments should be left to the board room and not to this Court." (quoting *In re Lifeguard Indus. Inc.*, 37 B.R. 3, 17 (Bankr. S.D. Ohio 1983)). Consistent with this authority, the Debtor respectfully submits that the Court should approve the Debtor's decision to accept and enter into the proposed DIP Facility.

Repayment of prepetition debt (often referred to as a "roll-up") is a common feature in debtor-in-possession financing, one which Courts routinely grant. *See In re American Apparel, Inc.*, No. 15-12055 (Bankr. D. Del. October 6, 2017) (approving on an interim basis the repayment in full of all outstanding obligations under the repetition revolving credit agreement);

39

1   *In re The Gybmoree Corp.*, No. 17- 32968 (Bankr. E.D. Va. June 12, 2017) (approving on an

2   interim basis the conversion and "roll up" of all outstanding prepetition revolving obligations and

3   $70 million of prepetition term loan obligations); *In re rue 21, inc.*, (No. 17-22045 (Bankr. W.D.

4   Pa. May 18, 2017) (approving on an interim basis the conversion and "roll-up" of all outstanding

5   prepetition revolving obligations and $100 million of prepetition term loans); *In re Aeropostale*,

6   Inc., No. 16-11275 (Bankr. S.D.N.Y. May 6, 2016) (approving on an interim basis the conversion

7   and "roll-up" of all outstanding prepetition revolving obligations).

8          The repayment of the Working Capital Facility is a sound exercise of the Debtor's

9   business judgment and is a material component of the structure of the DIP Facility and was

10  required by the DIP Lenders as a condition to their commitment to provide the postpetition

11  financing.  Again, the Debtor has made a concerted good faith effort to obtain credit on the most

12  favorable terms available.  The Debtor has sought debtor in possession financing from ten (10)

13  different parties, none of whom would agree to provide financing under the Debtor's current

14  circumstances.  Further, the Prepetition Lenders were unwilling to lend postpetition without some

15  assurance regarding their prepetition claims.  Absent the Prepetition Lenders' support, the

16  Debtors would be unlikely to survive as a going concern long enough to effectuate the sale of the

17  business.  Lastly, the amount to be rolled up here, approximately $2.7 million, is only a small

18  portion of the prepetition indebtedness.  As such, the DIP Facility described in this Motion, which

19  includes the roll up of the Working Capital Facility, is the only financing available to provide the

20  Debtor with the requisite liquidity.  Entry into this DIP Facility constitutes a proper exercise of

21  the Debtor's business judgment.

22         Against this backdrop, the Debtor carefully evaluated the proposed financing structure

23  from the DIP Lender, engaged in negotiations with the DIP Lenders regarding the proposed

24  terms, and eventually agreed to the DIP Lenders' proposal as the proposal best suited to the

25  Debtor's needs. The terms and conditions of the DIP Facility were negotiated by the parties (and

26  their legal and financial advisors) in good faith and at arms' length, and, as outlined above, were

27  instituted for the purpose of enabling the Debtor to meet ongoing operational expenses while in

28  chapter 11 and to preserve the going concern status of the Debtor as well as the value of the

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

40

1  Prepetition Collateral.  Accordingly, the DIP Lenders should be provided with the benefit and

2  protection of § 364(c), such that if any of the provisions of the DIP Facility are later modified,

3  vacated, stayed or terminated by subsequent order of this or any other Court, the DIP Lenders will

4  be fully protected with respect to any amounts previously disbursed.

5  **C.    The Use of Cash Collateral Is Appropriate Under the Current**

6  **Circumstances and Should Be Authorized under §§ 363(c)(2) and (e)**

7  Section 363(c)(2) sets forth the requirements for a debtor's proposed use of cash

8  collateral.  Specifically, § 363(c)(2) provides, in pertinent part:

9  The trustee may not use, sell, or lease cash collateral under
paragraph (1) of this subsection unless - (A) each entity that has an

10  interest in such cash collateral consents; or (B) the court, after
notice and a hearing, authorizes such use, sale, or lease in

11  accordance with the provisions of this section.

12  11 U.S.C. § 363(c)(2).  Additionally, § 105(a) provides that "[t]he court may issue any order,

13  process, or judgment that is necessary or appropriate to carry out the provisions of [the

14  Bankruptcy Code]."  11 U.S.C. § 105(a).

15  Further, § 363(e) provides that "on request of an entity that has an interest in property . . .

16  proposed to be used, sold or leased, by the trustee, the court, with or without a hearing, shall

17  prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of

18  such interest."  11 U.S.C. § 363(e).  As described below, the Debtor has proposed a reasonable

19  package of adequate protection for both Cash Collateral and their other assets securing the

20  Prepetition Credit Facilities.  Conditioning the Debtor's use of Cash Collateral in the manner

21  proposed is an entirely equitable arrangement designed to protect residents and the CCRC as an

22  operating business unit.

23  It is well settled that it is appropriate for a chapter 11 debtor to use cash collateral for a

24  reasonable period of time for the purpose of maintaining and operating its property.  *In re Oak*

25  *Glen R-Vee*, 8 B.R. 213, 216 ( Bankr. C.D. Cal 1981); *In re Tuscon Industrial Partners*, 129 B.R.

26  614 (9th Cir. BAP 1991).  Where, as here, the Debtor is operating a business, it is extremely

27  important that the access to cash collateral be allowed to facilitate the survival of the Debtor's

28  business as a going concern: "the purpose of Chapter 11 is to rehabilitate debtors and generally

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

41

110339826\V-7

1   access to cash collateral is necessary to operate a business." *In re Dynaco Corp.*, 162 B.R. 389

2   (Bankr. D.N.H. 1993) (quoting *In re Stein*, 19 B.R. 458, 459 (Bankr. E.D. Pa. 1982)).

3          The Court should authorize the Debtor's use of Cash Collateral, whether existing as of the

4   Petition Date or arising thereafter based on the conversion of existing non-cash collateral into

5   cash.  It is essential that the Debtor obtain authority to use Cash Collateral so that it may fund

6   payroll and other operating expenses, including the costs of administration of this Chapter 11

7   Case as currently, the Debtor has an insufficient amount of unencumbered cash to funds its

8   operations.

9          If the Debtor is permitted to use Cash Collateral to fund ongoing business operations and

10  administration of this Chapter 11 Case, the Debtor will preserve the value of its assets as a going

11  concern.  Thus, the Debtor can continue to operate and provide resident care, but only if it is

12  allowed to use Cash Collateral in the course of the day-to-day operations.  Without such use, the

13  detrimental result to the value of the estate will be rapid and ultimately disastrous, given the

14  nature of the Debtor's business.  Access to Cash Collateral is crucial to the Debtor's ability to

15  provide necessary resident care and services, and to avoid immediate and irreparable harm to the

16  value of the estate and the creditors, and ongoing business operations both before and after the

17  Final Hearing.

18         The Debtor respectfully submits that the proposed use of Cash Collateral, in conjunction

19  with the DIP Facility, is necessary for the Debtor to have sufficient liquidity during the chapter 11

20  process to preserve the value of its assets and property (including the Prepetition Collateral).

21  **D.     The Proposed Adequate Protection for the Prepetition**

22  **        Lenders Is Appropriate under §§ 105, 361(d), and 363(e).**

23         In considering whether to authorize use of cash collateral, a court generally must find that

24  the interests of the holder of the secured claim are adequately protected.  *See* 11 U.S.C. § 363(e).

25  § 362(d)(1) provides for adequate protection of interests in property due to the imposition of the

26  automatic stay, *In re Continental Airlines*, 91 F.3d 553, 556 (3d Cir. 1996) (*en banc*), and § 361

27  provides examples of possible forms of adequate protection, such as granting replacement liens

28  and administrative claims.  However, it is the courts that must decide what constitutes sufficient

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

42

110339826\V-7

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

1 adequate protection on a case-by-case basis. *In re Mellor,* 734 F.2d 1396, 1400 (9th Cir 1984); *In*

2 *re Macombs Properties VI, Ltd.,* 88 B.R. 261, 265 (Bankr. C.D. Cal. 1988).  *See also*, *In re*

3 *Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994); *In re Satcon Tech. Corp.*, No. 12-

4 12869 (KG), 2012 WL 6091160, at *6 (Bankr. D. Del. Dec. 7, 2012); *In re N.J. Affordable*

5 *Homes Corp.*, No. 05-60442 (DHS), 2006 WL 2128624, at *14 (Bankr. D.N.J. June 29, 2006); *In*

6 *re Columbia Gas Sys., Inc.,* Nos. 91-803, 91-804, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18,

7 1992); *In re Dynaco Corp.*, 162 B.R. 389, 394 (Bankr. D.N.H. 1993) (citing 2 Collier on

8 Bankruptcy ¶ 361.01[1] at 361–66 (15th ed. 1993)).

9     In determining the appropriateness of proffered adequate protection, courts have

10 frequently stressed the importance of a promoting a debtor's business reorganization.  *In re*

11 *O'Connor,* 808 F.2d 1393, 1398 (10th Cir. 1987).  § 363(e) provides that "on request of an entity

12 that has an interest in property proposed to be used, sold, or leased, by the trustee [or Debtors in

13 possession], the court, with or without a hearing, shall prohibit or condition such use, sale, or

14 lease as is necessary to provide adequate protection of such interest."  11 U.S.C. § 363(e).  The

15 Debtor's use of Cash Collateral is conditioned upon adequate protection being provided to the

16 Prepetition Lenders, as set forth in the proposed DIP Orders.

17     Here, the Debtor proposes to provide the Prepetition Lenders with adequate protection in

18 the form of replacement liens and super priority expenses of administration claims in exchange

19 for their consent to the terms of the DIP Loan Documents and the DIP Liens.  First, the Debtor

20 proposes to provide the Prepetition Lenders with junior replacement liens, to the extent of the

21 diminution of value of the interest of the Prepetition Lenders in the Prepetition Collateral.  The

22 Prepetition Lenders shall have, subject to the terms and conditions set forth below, pursuant to

23 sections 361, 363(e), and 364(d) additional and replacement security interests and Liens in the

24 DIP Collateral, (the "Prepetition Replacement Liens") which shall be junior only to the Carve Out

25 and the DIP Liens securing the DIP Obligations.

26     Second, to the extent of any diminution of value of the allowed interests of the Prepetition

27 Lenders in the Prepetition Collateral, the Prepetition Lenders shall have an allowed superpriority

28 administrative expense claim (the "Prepetition Superpriority Claim"), which shall have priority

110339826\V-7

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

1    (except with respect to (i) the DIP Liens, (ii) the DIP Superpriority Claim, and (iii) the Carve

2    Out), in the Chapter 11 Case under §§ 364(c)(1), 503(b), and 507(b) and otherwise over all

3    administrative expense claims and unsecured claims against the Debtors and their estates, now

4    existing or hereafter arising, of any kind or nature whatsoever including, without limitation,

5    administrative expenses of the kinds specified in or ordered pursuant to §§ 105, 326, 328, 330,

6    331, 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), 552, 726, 1113, and 1114, and, upon entry of

7    the Final Order, § 506(c), whether or not such expenses or claims may become secured by a

8    judgment Lien or other non-consensual Lien, levy, or attachment.  Other than the DIP Liens, the

9    DIP Superpriority Claim, and the Carve Out, no costs or expenses of administration, including,

10   without limitation, professional fees allowed and payable under §§ 328, 330, and 331, or

11   otherwise, that have been or may be incurred in the Chapter 11 Case, or in any Successor Case,

12   will be senior to, prior to, or on parity with the Prepetition Superpriority Claim (for purposes

13   hereof, such liens will be deemed part of the Prepetition Replacement Liens.

14            Additionally, as mentioned above, the Debtor will be granting replacement liens and

15   superpriority claims as adequate protection, which is commonplace.  *See, e.g., MBank Dallas*

16   *N.A. v. O'Connor* (*In re O'Connor*), 808 F.2d 1393, 1396-98 (10th Cir. 1987) (allowing the

17   debtors to replace a lien on cash with a lien on property likely to be worth five times as much);

18   *Owens-Corning Fiberglas Corp. v. Ctr. Wholesale, Inc.* (*In re Ctr. Wholesale. Inc.*), 759 F.2d

19   1440, 1450 (9th Cir. 1985) (observing that a lien on additional property of the debtors would

20   likely constitute adequate protection for the secured creditor); *In re Wrecelesham Grange, Inc.*,

21   221 B.R. 978, 981 (Bankr. M.D. Flo. 1997) (noting that a replacement lien of equal value on

22   postpetition rents is adequate protection);  *In re Stein*, 19 B.R. 458. 459 (Bankr. E.D. Pa. 1982)

23   (continued lien on debtors' crops, livestock and equipment resulted in an increase rather than a

24   decrease in collateral, and debtors were granted authority to use cash collateral to meet operating

25   expenses during chapter 11 proceedings).  Further, the Debtor has obtained the consent of the

26   Prepetition Lenders based upon the terms and conditions of the DIP Orders.  For the foregoing

27   reasons, the Debtor respectfully submits that the adequate protection proposed above and in the

28   DIP Orders is appropriate and should be approved.

110339826\V-7

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

## VI.
## REQUEST FOR AN INTERIM AND FINAL HEARING

Pursuant to Bankruptcy Rule 4001(b)(2), the Debtor respectfully requests that the Court set a date for the Interim hearing no later than March 13, 2019 and a Final Hearing 25 days from entry of the Interim Order or by no later than April 8, 2019, whichever is earlier and approve the provisions for notice of the Final Hearing and the objection procedures that are set forth in the Interim Order.

## VII.
## THE NEED FOR IMMEDIATE RELIEF PENDING A FINAL HEARING

Bankruptcy Rule 4001(b) provides that a final hearing on a motion for authorization to use cash collateral may not be commenced earlier than fourteen (14) days after service of such motion. Fed. R. Bankr. P. 4001(b)(2). Upon request, however, a court may conduct a preliminary expedited hearing on a motion and authorize the use of only that amount of cash collateral as is necessary to avoid immediate and irreparable harm to the estate pending a final hearing, based on the business exigencies of individual cases. *See id*. The Debtor submits that, for the reasons set forth herein, authority to use Cash Collateral on an interim basis as requested in the Motion is necessary to enable the Debtor to maintain ongoing business operations pending a resolution in this Chapter 11 Case.

## VIII.
## WAIVER OF BANKRUPTCY RULES 6004(a) AND (h)

Should the Court grant the Motion and enter the DIP Orders, the Debtor seeks a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen-day stay of an order authorizing the use, sale or lease of property under Bankruptcy Rule 6004(h).

## IX.
## NOTICE

Notice of this Motion has been provided to (i) the Office of the United States Trustee for the Central District of California, (ii) the Prepetition Lenders and their counsel, (iii) the DIP Lenders and their counsel, (iv) the Debtor's 20 largest unsecured creditors, and (v) all parties

110339826\V-7

1    requesting notices pursuant to Bankruptcy Rule 2002.   The Debtor submits that no other or

2    further notice need be provided.

3         No previous motion for the relief sought herein has been made to this or any other court.

4                                          **X.**

5                                    **CONCLUSION**

6         WHEREFORE, the Debtor respectfully requests entry of an order (i) granting the relief

7    requested herein; and (ii) granting the Debtor such other and further relief as the Court deems just

8    and proper.

9    Dated:  March 11, 2019                    **DENTONS US LLP**
                                               SAMUEL R. MAIZEL
10                                             TANIA M. MOYRON
                                               GARY W. MARSH
11

12                                             By    */s/ Samuel R. Maizel*
                                                     Samuel R. Maizel
13
                                               Proposed Attorneys for the Chapter 11 Debtor
14                                             and Debtor In Possession

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

46

110339826\V-7

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## EXHIBIT 1

(Proposed Interim Order)

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

110339826\V-7

1  Samuel R. Maizel (SBN 189301)
   samuel.maizel@dentons.com
2  Tania M. Moyron (SBN 235736)
   tania.moyron@dentons.com
3  Gary W. Marsh (pro hac pending)
   gary.marsh@dentons.com
4  DENTONS US LLP
5  601 South Figueroa Street, Suite 2500
   Los Angeles, California  90017-5704
6  Telephone:    (213) 623-9300
   Facsimile:     (213) 623-9924
7
8  Proposed Attorneys for the Chapter 11 Debtor
   and Debtor In Possession
9
10          **UNITED STATES BANKRUPTCY COURT**
       **CENTRAL DISTRICT OF CALIFORNIA - RIVERSIDE DIVISION**

11  In re:

12

13  AIR FORCE VILLAGE WEST, INC. d/b/a
    ALTAVITA VILLAGE,
14
        Debtor and Debtor in Possession.
15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case No. 19-11920 (SC)

Chapter 11 Case

Hon. Scott C. Clarkson

**ORDER APPROVING EMERGENCY
MOTION OF DEBTOR FOR INTERIM AND
FINAL ORDERS (A) AUTHORIZING THE
DEBTOR TO OBTAIN POST PETITION
FINANCING, (B) AUTHORIZING THE
DEBTOR TO USE CASH COLLATERAL,
AND (C) GRANTING ADEQUATE
PROTECTION TO PREPETITION
LENDERS PURSUANT TO 11 U.S.C. §§ 105,
363, 364, 1107 AND 1108; MEMORANDUM
OF POINTS AND AUTHORITIES IN
SUPPORT THEREOF**

<u>EMERGENCY HEARING</u>:
Date:  March 14, 2019
Time:  10:00 a.m.
Place:  Courtroom 126
        U.S. Bankruptcy Court
        3420 Twelfth Street
        Riverside, CA 92501

*Video Courtroom:*
Date:  March 14, 2019
Time:  10:00 a.m.
Place:  3420 Twelfth Street
        Video Hearing Room 126
        Riverside, CA 92501

DENTONS US LLP
1221 AVENUE OF THE AMERICAS,
NEW YORK, NEW YORK 10020-1089
(212) 768-6700

DENTONS US LLP
1221 AVENUE OF THE AMERICAS,
NEW YORK, NEW YORK 10020-1089
(212) 768-6700

## **Relief Requested**

Upon the Motion, dated March 11, 2019 (the **"Motion"**) of Air Force Village West, Inc. d/b/a Altavita Village, (the **"Debtor"**) for interim and final Orders: (i) Authorizing the Debtor to Obtain Secured Postpetition Financing and Use of Cash Collateral; (ii) Granting Adequate Protection; (iii) Modifying the Automatic Stay; (iv) Setting Final Hearing; and (v) Granting Related Relief [Docket No. __] (the **"Motion"**),[1] by which the Debtor seeks:

(a)     approval, on an interim and final basis, of (1) that certain Debtor-in-Possession multi-draw term loan facility (the **"DIP Facility"**) in the aggregate principal amount of up to $4,250,000.00 (plus that portion of interest thereon that converts to additional principal in accordance with the DIP Loan Documents (as defined below)) (the **"New Money Commitment"** and loans thereunder the **"New Money DIP Loans"**), and, subject to entry of a final Order (the **"Final Order"**), a dollar-for-dollar roll-up of the outstanding obligations owed to each Prepetition Lender arising under or in connection with the Working Capital Facility, including principal and accrued interest thereon (the **"Roll-Up Loans"** and, together with the New Money DIP Loans, the **"DIP Loans"**), (2) definitive documents relating to the DIP Facility (as amended, restated, supplemented or otherwise modified from time to time, the **"DIP Loan Documents"**) by and between (x) the Debtor and (y) KBC Bank NV, as lender (a **"DIP Lender"**) and Lapis Advisers, LLP, as lender (in such capacity, a **"DIP Lender"** and, with KBC Bank NV, the **"DIP Lenders,"**) and administrative agent (in such capacity, the **"DIP Agent"**), and

---

[1] Capitalized terms used but not defined in this Interim Order shall have the meanings given to them in the Motion and the DIP Loan Documents (as defined below), as applicable.

2

110463880/V-2

DENTONS US LLP
1221 AVENUE OF THE AMERICAS,
NEW YORK, NEW YORK 10020-1089
(212) 768-6700

(3) all of the Debtor's debts, obligations, covenants, and duties of payment or performance of every kind, matured or unmatured, direct or contingent, owing, arising, due, or payable to the DIP Lenders, arising under or with respect to the DIP Facility, the DIP Loan Documents, this Interim Order, and any Final Order (with the Interim Order, the "**Orders**"), including, without limitation, all obligations to repay principal of and interest on the DIP Loans, and to pay interest, fees, costs, charges, expenses, professional fees, and all sums chargeable to the Debtor under the DIP Loan Documents and the Orders, whether or not evidenced by any note or other instrument (the "**DIP Obligations**"),

(b)    the grant, with respect to the DIP Obligations, of:

(i)    allowed superpriority administrative expense claims, pursuant to section 364(c)(1) of the Bankruptcy Code, having priority (other than as to the proceeds of causes of action arising under sections 502(d), 544, 545, 547, 548, 549, and 550 of the Bankruptcy Code or any sums on deposit in the Debtor's resident escrow account) over any and all administrative expenses of a kind specified in sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113, and 1114 of the Bankruptcy Code, subject only to the Carve-Out (as defined below); and

(ii)    valid, enforceable, non-avoidable, and automatically perfected senior security interests in and liens upon all property of the Debtor's estate and the proceeds thereof, including but not limited to, the Collateral (as defined below), pursuant to section 364(c) and 364(d) of the Bankruptcy Code, subject only to the prepetition liens and security interests of certain equipment lessors as set forth in the DIP

3

DENTONS US LLP
1221 AVENUE OF THE AMERICAS,
NEW YORK, NEW YORK 10020-1089
(212) 768-6700

Loan Documents, and to the lien of the California Department of Social Services ("**CDSS**") on the Vacant Land (as hereinafter defined), to the extent, if any, such lien has not been subordinated pursuant to that certain letter agreement, dated August 9, 2018, between CDSS and certain of the Prepetition Lenders (as defined below) (the "**Permitted Senior Liens**");

(c)     authorization for the Debtor to execute the DIP Loan Documents, and for the Debtor to perform any and all of its obligations thereunder and such other and further acts as may be necessary or appropriate in connection therewith;

(d)     authorization to provide adequate protection, pursuant to section 361 of the Bankruptcy Code, to the Prepetition Lenders in exchange for (i) their consent to the DIP Loan Documents and the security interests and liens provided in the DIP Loan Documents and the Orders; (ii) the use of Cash Collateral; and (iii) the use of the Prepetition Collateral (as defined herein);

(e)     authorization for the Debtor to use **"Cash Collateral"** (as such term is defined in section 363(a) of the Bankruptcy Code, but limited to cash received by the Debtor in the ordinary course of operations of its business) of the Prepetition Lenders, only in accordance with the Budget (as defined below), this Interim Order, and the DIP Loan Documents through the earlier of (i) the occurrence of the Maturity Date and (ii) the date of the Final Hearing (as defined below), pursuant to the terms and conditions set forth in this Interim Order (and thereafter as may be permitted by the Final Order);

4

110463880/V-2

DENTONS US LLP
1221 AVENUE OF THE AMERICAS,
NEW YORK, NEW YORK 10020-1089
(212) 768-6700

(f)    to schedule a hearing, pursuant to Bankruptcy Rule 4001 and Local Rule 4001-2(b) (the "**Interim Hearing**") on the Motion for this Court to consider entry of the Interim Order in the form annexed to the Motion; and

(g)    to schedule, pursuant to Bankruptcy Rule 4001 and Local Rule 4001-2(c), a final hearing (the "**Final Hearing**") for this Court to consider entry of the Final Order in the form annexed to the Motion.

The Interim Hearing having been held by this Court on March ____ 2019; the Court having reviewed the Motion, exhibits thereto, and documents filed in support thereof and any responses thereto; the Court having considered the evidence presented on the record at the Interim Hearing, including the *Declaration of Bill Pace in Support of Debtor's First Day Motions* (the "**Pace Declaration**") [Docket No.___]; it appearing to the Court that notice of the Motion, the relief requested therein, the material terms of this Interim Order, and the Interim Hearing were served by the Debtor in compliance with Bankruptcy Rules 2002 and 4001(b)(1) and the Local Rules; it appearing that granting the relief requested in the Motion is fair and reasonable and in the best interests of the Debtor's estate, its creditors, and all parties-in-interest, and is a sound and prudent exercise of the Debtor's business judgment; and the Court having determined that the relief requested in the Motion is necessary to avoid immediate and irreparable harm:

5

110463880\V-2

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

DENTONS US LLP
1221 AVENUE OF THE AMERICAS,
NEW YORK, NEW YORK 10020-1089
(212) 768-6700

THE COURT MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:[2]

A.    On March 10, 2019 (the "**Petition Date**"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. No trustee, examiner or creditors' committee has been appointed in these chapter 11 cases.

B.    The Debtor is continuing in possession of its property and is operating and managing its business, as debtor in possession, pursuant to sections 1107 and 1108 of the Bankruptcy Code.

C.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157. Consideration of the Motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). The venue of the Debtor's chapter 11 case and the Motion is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

D.    Notice of the Motion, the relief requested therein and the order scheduling the Interim Hearing and response date were served by the Debtor on its twenty largest unsecured creditors, the DIP Lenders, the Prepetition Lenders, other holders of liens filed against the Debtor's property, other affected parties, and the United States Trustee for the Central District of California. Under the circumstances, such notice constitutes due and sufficient notice thereof and complies with Bankruptcy Rule 2002 and 4001(b) and (c).

---

[2] Pursuant to Fed. R. Civ. P. 52, as made applicable herein by Bankruptcy Rule 7052, the Court's findings of fact may be construed as conclusions of law, and its conclusions of law may be construed as findings of fact, to the extent necessary or appropriate.

6

110463880\V-2

DENTONS US LLP
1221 AVENUE OF THE AMERICAS,
NEW YORK, NEW YORK 10020-1089
(212) 768-6700

### Prepetition Credit Facilities

E.    As supported by the Pace Declaration, subject to Paragraphs 29-31 below, the Debtor stipulates, agrees, and acknowledges:

(i)    The Debtor's prepetition indebtedness and credit facilities (the "**Prepetition Credit Facilities**") can be summarized as follows:

(a)    On June 1, 1999, the Riverside County Public Financing Authority (the "**Authority**") issued its Riverside County, California, Public Financing Authority Certificates of Participation (Air Force Village West, Inc.), Series 1999, in the original principal amount of $62,790,000 (the "**Certificates**"), the proceeds of which were loaned to the Debtor. The Certificates were issued pursuant to that certain Trust Agreement, dated as of June 1, 1999, between the Debtor, the Authority and U.S. Bank Trust National Association (as amended, revised, and supplemented, the "**Trust Agreement**"). UMB Bank, N.A. (the "**Certificates Trustee**") succeeded U.S. Bank Trust National Association as trustee under the Trust Agreement;

(b)    As security for the payment of the obligations evidenced by the Certificates, the Debtor pledged its gross revenues, as well as substantially all of the Debtor's personal property, to the Certificates Trustee, and the Certificates Trustee properly perfected its lien on these assets. In addition, as further security for the payment of the obligations evidenced by the Certificates, the Debtor executed and delivered to the Authority, as

7

110463880/V-2

DENTONS US LLP
1221 AVENUE OF THE AMERICAS,
NEW YORK, NEW YORK 10020-1089
(212) 768-6700

beneficiary, a Deed of Trust, Security Agreement and Fixture Filing dated as of June 1, 1999 (as amended and supplemented, the "**Deed of Trust**" and, together with the Trust Agreement, the "**1999 Documents**"). The Authority in turn assigned its rights under the Deed of Trust and the other 1999 Documents to the Certificates Trustee for the benefit of the holders of the Certificates. The Deed of Trust encumbers substantially all of the real property of the Debtor, other than approximately sixty-eight (68) acres of vacant land adjacent to the Debtor's facility (the "**Vacant Land**"). The Deed of Trust was duly recorded in the Official Records of the County of Riverside. All such collateral granted to the Certificates Trustee is collectively defined as the "**Certificates Trustee Collateral.**"

(c)    In addition, under the terms of the 1999 Documents, certain accounts were established and are held by the Certificates Trustee, including, but not limited to, the following accounts, each as defined in the 1999 Documents: the Revenue Fund, the Interest Account, the Principal Account, and the Reserve Account (collectively, the "**Certificate Trustee-Held Funds**"). As of the Petition Date, the Certificate Trustee-Held Funds totaled approximately $2,539,381.32.

(d)    The Debtor has acknowledged and agrees, and the Court finds, that the Certificate Trustee-Held Funds are held in trust for the holders of the Certificates. Further, the Debtor reaffirms its acknowledgement that the Certificate Trustee holds a validly perfected possessory security interest in the Certificates Trustee-Held Funds, and is entitled to access the

8

DENTONS US LLP
1221 AVENUE OF THE AMERICAS,
NEW YORK, NEW YORK 10020-1089
(212) 768-6700

Certificates Trustee-Held Funds in accordance with the terms of the 1999 Documents. To the extent that the automatic stay applies to such Certificates Trustee-Held Funds pursuant to section 362(a) of the Bankruptcy Code, as adequate protection for the use of the Cash Collateral, the Debtor stipulates to relief from such stay for the purpose of allowing the Certificate Trustee to administer and apply the Certificate Trustee-Held Funds in accordance with the 1999 Documents. The Certificates Trustee-Held Funds shall be administered and applied as set forth the 1999 Documents and for the express purposes set forth therein, and shall not be used or made available to the Debtor as Cash Collateral or otherwise pursuant to this Interim Order or any other order entered in this case.

(e)   On April 1, 2005, ABAG Finance Authority for Nonprofit Corporations ("**ABAG**") issued those certain ABAG Finance Authority for Nonprofit Corporations Variable Rate Demand Bonds, Series 2005 (Air Force Village West, Inc.) in the original principal amount of $23,000,000 (the "**Bonds**"), the proceeds of which were loaned to the Debtor.  The Bonds were issued pursuant to an Indenture, dated as of April 1, 2005 (the "**Indenture**"), between ABAG and U.S. Bank National Association, as trustee (the "**Bond Trustee**" and, together with the Certificates Trustee, the "**Trustees**").

(f)   In order to provide credit and liquidity support for the Bonds, on April 1, 2005, the Debtor and KBC entered into that certain Reimbursement

9

DENTONS US LLP
1221 AVENUE OF THE AMERICAS,
NEW YORK, NEW YORK 10020-1089
(212) 768-6700

Agreement, Credit and Security Agreement (the "**Reimbursement Agreement**"), pursuant to which KBC agreed to issue an irrevocable letter of credit in the amount of $23,289,863.01 (the "**Letter of Credit**") upon which the Bond Trustee, in its capacity of trustee of the Bonds, was authorized to draw in order to pay principal and interest on the Bonds to the extent the Debtor failed to make such payments. As a result of certain defaults under the Reimbursement Agreement and the Letter of Credit, on March 2, 2017 KBC provided notice to the Bond Trustee to call the Bonds for mandatory tender pursuant to the Indenture.  The entire outstanding amount of the Letter of Credit was drawn when the Bonds were tendered, and the Bonds became "Bank Bonds" as defined in the Indenture, held by the Bond Trustee for the account of KBC.

(g)    As security for its obligations under the Reimbursement Agreement, the Debtor executed and delivered a Second Supplement and Modification of Deed of Trust, Security Agreement and Fixture Filing dated as of April 1, 2005 to KBC (the "**Modification of Deed of Trust**" and, together with the Indenture and the Reimbursement Agreement, the "**2005 Documents**"), which supplemented the Deed of Trust and, *inter alia*, granted KBC a first priority, security interest in, lien on and mortgage against substantially all of the assets of the Debtor, other than the Vacant Land (the "**KBC Collateral**" and, together with the Certificate Trustee Collateral, the "**Prepetition Collateral**"), that is *pari passu* with the security interest, lien and mortgage of the Certificates Trustee under the Deed of Trust.

10

DENTONS US LLP
1221 AVENUE OF THE AMERICAS,
NEW YORK, NEW YORK 10020-1089
(212) 768-6700

Pursuant to an intercreditor agreement dated as of April 1, 2005, the Certificates Trustee is the sole beneficiary under the Deed of Trust, as modified, and, as such, acts, and holds all security granted, transferred, pledged and assigned under the Deed of Trust, for the equal and ratable benefit of the holders of the Certificates and KBC.

(h)  In addition, under the terms of the 2005 Documents, certain accounts were established and are held by the Bond Trustee, including, but not limited to, a sinking fund]) (collectively, the "**Bond Trustee-Held Funds**" and, together with the Certificates Trustee-Held Funds, the **"Trustee-Held Funds"**). As February 28, 2019, the Bond Trustee-Held Funds totaled approximately $477,171.51.

(i)  The Debtor has acknowledged and agrees, and the Court finds, that the Bond Trustee-Held Funds are held in trust for the holders of the Bonds. Further, the Debtor reaffirms its acknowledgement that the Bond Trustee holds a validly perfected possessory security interest in the Bond Trustee-Held Funds, and is entitled to access the Bond Trustee-Held Funds in accordance with the terms of the 2005 Documents. To the extent that the automatic stay applies to such Bond Trustee-Held Funds pursuant to section 362(a) of the Bankruptcy Code, as adequate protection for the use of the Cash Collateral, the Debtor stipulates to relief from such stay for the purpose of allowing the Bond Trustee to administer and apply the Bond Trustee-Held Funds in accordance with the 2005 Documents. The Bond Trustee-Held Funds shall be administered and applied as set forth in the

11

DENTONS US LLP
1221 AVENUE OF THE AMERICAS,
NEW YORK, NEW YORK 10020-1089
(212) 768-6700

2005 Documents and for the express purposes set forth therein, and shall not be used or made available to the Debtor as Cash Collateral or otherwise pursuant to this Interim Order or any other order entered in this case.

(j)     On August 28, 2018, Cordes & Company, LLC, acting through Bellann Raile, as receiver for certain assets of the Debtor (the "**Receiver**"), and the DIP Lenders (and together with the other lenders party to the Prepetition Credit Agreements, the "**Prepetition Lenders**"), entered into that certain Receivership Certificate Lending Agreement (the "**Working Capital Agreement**" and, together with the 1999 Documents and the 2005 Documents, the "**Prepetition Credit Agreements**"), pursuant to which the DIP Lenders advanced certain funds to the Receiver for the benefit of the Debtor and in support of its operations.

(k)     Amounts due under the Working Capital Agreement are secured, pursuant to the terms thereof and of a Deed of Trust, Security Agreement, and Assignment of Rents, dated August, 27, 2018 (the "**Second Deed of Trust**"), by substantially all of the real and personal property of the Debtor, including the Vacant Land, subject only to the terms of that certain letter agreement regarding the Vacant Land, dated August 9, 2018 (the "**Letter Agreement**"), between the DIP Lenders, the Certificates Trustee and CDSS. CDSS has a lien against the Vacant Land pursuant to California Health & Safety Code § 1793.15 for the Debtor's obligations thereunder, the priority of which is determined by the terms of the Letter

12

DENTONS US LLP
1221 AVENUE OF THE AMERICAS,
NEW YORK, NEW YORK 10020-1089
(212) 768-6700

Agreement.  The Second Deed of Trust was duly recorded in the Official Records of the County of Riverside.

(ii)     The following amounts were due and owing under the Prepetition Credit Facilities as of the indicated dates:

(a)     Under the 1999 Documents, as of March 8, 2019, $40,105,000.00 in principal and $3,051,773.01 in interest, plus  reimbursable expenses.

(b)     Under the 2005 Documents, as of March 8, 2019, $18,035,507.08 in principal and $3,070,095.15 in interest, plus reimbursable expenses.

(c)     Under the Working Capital Agreement, as of March 8, 2019, $2,674,600.30 in principal and $8,419.40 in interest, plus reimbursable expenses.

All such obligations as set forth above are referred to as the "**Prepetition Claims.**"  Each of the Prepetition Lenders reserves any and all rights to amend their respective Prepetition Claims, and nothing contained herein shall be deemed to be a waiver of such rights.  In the event any of the Prepetition Lenders amends their respective claims to increase the amount thereof, the Debtor reserves the right to challenge the amount of the asserted increase above the amounts set forth above.

## Need for Postpetition Financing and Authority to Use Cash Collateral

F.     Based on the pleadings and evidence of record in this chapter 11 case, and given the Debtor's current financial condition, financing arrangements, and capital structure, the Court

13

1
2
3
4
5
6
7
8
9

DENTONS US LLP
1221 AVENUE OF THE AMERICAS,
NEW YORK, NEW YORK 10020-1089
(212) 768-6700

finds that the Debtor has an immediate need to obtain the DIP Loans and to use Cash Collateral to permit the Debtor to, among other things, continue the orderly operation of its business, maximize and preserve its going concern value, make payroll and satisfy other working capital and general corporate purposes, and pay other costs, fees and expenses associated with administration of this chapter 11 case.  In the absence of this Court's authorization to borrow under the DIP Loan Documents and use Cash Collateral, the Debtor's estate would suffer immediate and irreparable harm.

G.     Based upon the pleadings and evidence of record in this chapter 11 case, the Court finds that, despite diligent efforts, the Debtor is unable to obtain financing from sources other than the DIP Lenders on terms more favorable than the New Money DIP Loans and is unable to obtain adequate unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code. The Debtor is also unable to obtain unsecured credit with administrative priority under section 364(c)(1) of the Bankruptcy Code. The Debtor is unable to obtain the New Money DIP Loans and the Prepetition Lenders' consent to the use of Cash Collateral without granting the liens and claims set forth in this Interim Order. After considering all alternatives, the Debtor has concluded, in the exercise of its sound business judgment, that the New Money DIP Loans represent the best financing available to the Debtor at this time.

**Consent to Use of Cash Collateral**

H.     The Prepetition Lenders have consented to the Debtor's proposed use of Cash Collateral on the terms and conditions set forth in this Interim Order. The consent of the Prepetition Lenders to the Debtor's use of Cash Collateral is expressly limited to the uses

14

110463880/V-2

contemplated by the Orders, the DIP Loan Documents, and the Budget and is conditioned on the provisions of this Interim Order.

## Postpetition Budget

I.       Attached as Exhibit 3 to the Motion is a budget (the "Budget") setting forth, among other things, the rolling consolidated 13-week cash flow and financial projections of the Debtor covering the period beginning on March 16, 2019 and itemizing on a weekly basis all uses, and anticipated uses, of the DIP Facility and the Cash Collateral, revenues projected to be received and all expenditures proposed to be made during such period, which shall at all times be in form and substance reasonably satisfactory to the DIP Lenders.

## Need for Expedited Relief

J.       The Debtor has requested immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(b)(2) and the Local Rules. Absent the financing under the New Money DIP Loans, the use of Cash Collateral, and the entry of this Interim Order, the Debtor's estate will be immediately and irreparably harmed. This Court concludes that good cause has been shown and that entry of this Interim Order is in the best interest of the Debtor's estate, creditors, and all other parties in interest.

**WHEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

1.       The Motion is GRANTED on an interim basis on the terms set forth in this Interim Order and in the DIP Credit Agreement.

DENTONS US LLP
1221 AVENUE OF THE AMERICAS,
NEW YORK, NEW YORK 10020-1089
(212) 768-6700

15

110463880\V-2

2.     All responses and objections to the entry of this Interim Order, if any, to the extent not withdrawn or resolved are overruled. This Interim Order shall become effective immediately upon its entry.

**Approval of New Money DIP Loans and DIP Loan Documents**

3.     The terms of the New Money DIP Loans, the Roll-Up Loans and DIP Loan Documents are fair and reasonable, reflect the exercise of the Debtor's prudent business judgment consistent with its fiduciary duties, and constitute reasonably equivalent value and fair consideration.

4.     The Debtor shall be liable for the repayment in full of all DIP Obligations.

5.     The Debtor shall indemnify and hold harmless the DIP Agent and the DIP Lenders in accordance with the terms and conditions of the DIP Credit Agreement.

6.     The New Money DIP Loans, the Roll-Up Loans and DIP Loan Documents have been negotiated in good faith and at arm's length among the Debtor and the DIP Lenders, and all of the DIP Obligations shall be deemed to have been extended by the DIP Lenders in good faith (as that term is used in section 364(e) of the Bankruptcy Code) and in express reliance upon, and with the full benefit of the protections offered by, section 364(e) of the Bankruptcy Code, whether or not this Interim Order or any provision hereof is vacated, reversed, or modified, on appeal or otherwise.

7.     The Debtor has requested entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2) and, absent the relief sought by this Interim Order, the Debtor's estate and creditors would suffer immediate and irreparable harm. Accordingly, the entry of this Interim Order and related authorization of borrowings under the New Money DIP Loans, the

16

DENTONS US LLP
1221 AVENUE OF THE AMERICAS,
NEW YORK, NEW YORK 10020-1089
(212) 768-6700

DENTONS US LLP
1221 AVENUE OF THE AMERICAS,
NEW YORK, NEW YORK 10020-1089
(212) 768-6700

Roll-Up Loans and DIP Loan Documents is in the best interests of the Debtor's estate and creditors.

8.    The New Money DIP Loans, the Roll-Up Loans and the DIP Loan Documents are hereby approved, and the Debtor is hereby authorized to incur indebtedness  pursuant to the DIP Loan Documents, the Budget and this Interim Order, up to an aggregate principal amount of $400,000 on an interim basis, which shall be used for such purposes as are expressly permitted under the DIP Loan Documents, the Interim Order and the Budget, including, without limitation, to pay the interest, fees, and expenses in accordance with this Interim Order and to provide working capital for the Debtor.  Notwithstanding anything in the New Money DIP Loans or the DIP Loan Documents to the contrary, the Debtor is only authorized and permitted to borrow, and the DIP Lenders are only obligated to lend, pursuant to and in accordance with the line-item expenses set forth in the Budget with such permitted variances as are set forth in the DIP Loan Documents.

9.    In furtherance of the foregoing and without further approval of this Court, the Debtor is authorized to perform all acts, to make, execute, and deliver all instruments and documents (including, without limitation, the execution or recordation of security agreements, mortgages, and financing statements), and to pay all fees, that may be reasonably required or necessary for the Debtor's performance of the DIP Obligations, including, without limitation:

(a)    the execution, delivery, and performance of the DIP Loan Documents and any exhibits, schedules and other documents related thereto;

(b)    the execution, delivery, and performance of one or more non-material amendments to the DIP Loan Documents, in each case in such form as the Debtor,

110463880/V-2

1

2 the DIP Lenders and the Prepetition Lenders may agree (it being understood that

3 no further approval of the Court shall be required for amendments to the DIP

4 Loan Documents that do not shorten the maturity of the extensions of credit

5 thereunder, increase the commitments, or increase the rate of interest payable

6 thereunder);

7

8 (c) the non-refundable payment to the DIP Lenders of the fees contemplated by the

9 DIP Loan Documents and such reasonable costs and expenses as may be due from

10 time to time in accordance with the terms of the DIP Loan Documents; and

11

12 (d) the performance of all other acts required under the DIP Loan Documents.

13 ### Relief from the Automatic Stay

14

15 10. The automatic stay provisions of section 362 of the Bankruptcy Code are vacated

16 and modified to the extent necessary to permit: (a) the DIP Lenders and Prepetition Lenders to

17 exercise all their respective rights and remedies under the DIP Loan Documents and the

18 Prepetition Credit Agreements upon the occurrence or during the continuation of an Event of

19 Default (as defined in the DIP Loan Documents) or the Maturity Date, but only after  the

20 provision of five Business Days' written notice by the DIP Lenders or Prepetition Lenders (as

21 applicable) to the Debtor, any unsecured creditors' committee, the Prepetition Lenders/DIP

22 Lenders (as applicable), the U.S. Trustee, and their respective counsel of the intended exercise of

23 such rights or remedies; and (b) the Prepetition Lenders to (i) receive any payments or

24 distributions made by the Debtor to the Prepetition Lenders, (ii) apply, allocate or make

25 payments from any of the funds or accounts maintained by the Trustees (including, without

26 limitation, the Trustee-Held Funds) in accordance with the terms of the 1999 Documents and the

27

28

DENTONS US LLP
1221 AVENUE OF THE AMERICAS,
NEW YORK, NEW YORK 10020-1089
(212) 768-6700

18

110463880/V-2

DENTONS US LLP
1221 AVENUE OF THE AMERICAS,
NEW YORK, NEW YORK 10020-1089
(212) 768-6700

2005 Documents, and (iii) take any other action authorized by this Interim Order.  The Debtor's right to use Cash Collateral shall terminate automatically and immediately upon the issuance of such a written notice.

### No Marshaling of Collateral

11.     Subject to entry of a Final Order, in no event shall the DIP Lenders be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the Collateral. The DIP Lenders' failure to seek relief or otherwise exercise their rights and remedies under this Interim Order, any Final Order, the DIP Loan Documents, or otherwise, shall not constitute a waiver of the DIP Lenders' rights hereunder, thereunder, or otherwise.

### Post-Default Advances Permitted

12.     Notwithstanding the occurrence of an Event of Default or the Maturity Date, the DIP Lenders, in their sole and absolute discretion, may elect to continue to make New Money DIP Loans available to the Debtor consistent with the Interim Order, Final Order and the DIP Loan Documents, and any such New Money DIP Loans shall be afforded the protections provided to the DIP Lenders under the Interim Order, the Final Order and the DIP Loan Documents.

### Compliance with Budget; Permitted Variances

13.     The New Money DIP Loans shall be available solely for: (a) payment of approved expenditures detailed in the Budget; (b) payment of the reasonable and documented fees, costs, or charges of the DIP Lenders, including professional fees and expenses incurred after the Petition Date ("Lender Costs"); and (d) the Adequate Protection Payments. In addition, after entry of the Orders:

19

DENTONS US LLP
1221 AVENUE OF THE AMERICAS,
NEW YORK, NEW YORK 10020-1089
(212) 768-6700

(a)    The Debtor will provide the DIP Lenders with the following by no later than 5:00 p.m. (Pacific Time) on each Friday, commencing on March 22, 2019:  a Weekly Variance Report setting forth: (i) a comparative reconciliation, on a line-by-line basis, of actual cash receipts and disbursements against the cash receipts and disbursements forecast in the Budget, and the percentage variance thereof, for (A) the weekly period ended on (and including) the immediately preceding Sunday and (B) the cumulative period to date; (ii) a written explanation of such variances; and (iii) projections for the following 13 weeks, including a rolling cash receipts and disbursements forecast for such period;

(b)    Other than to the extent otherwise permitted in the DIP Loan Documents, the Debtor shall not make or commit to make any payments other than those identified in the Budget.  On the last business day of any week:  (i) payments for such cumulative period to date shall not exceed 15% of the respective amounts (so long as Tom Plumb of Cordes & Company, LLC, or another employee or representative thereof satisfactory to the DIP Lenders remains responsible for the Budget and reporting thereon) or 10% (if Tom Plumb or another employee or representative of Cordes & Company, LLC is not so engaged), measured as to each line item in the Budget, set forth for such cumulative period to date in the Budget; and (ii) receipts for such cumulative period to date shall not be less than 90% of the amounts, on an aggregate basis, set forth for such cumulative period to date in the Budget; and

(c)    Approved Budget amounts shall not include, without prior Court approval:  (i) purchases or sales of assets outside the ordinary course of business; (ii) the

20

110463880/V-2

DENTONS US LLP
1221 AVENUE OF THE AMERICAS,
NEW YORK, NEW YORK 10020-1089
(212) 768-6700

assumption of executory contracts; (iii) payment of Prepetition debt, or (iv) payments outside the ordinary course of business (including a prohibition of payments of prepetition trade payables to prepetition trade creditors except for payments provided for in the Budget that have been approved by the Court for the payment of prepetition claims of essential creditors that are trade creditors).

## Security for DIP Obligations, Adequate Protection and Carve-Out

14.    Immediately upon the entry of this Interim Order, and effective as of the Petition Date, subject to the Carve-Out, all obligations of the Debtor to the DIP Lenders, including, without limitation, all principal, accrued interest, costs, fees and expenses, shall:

(a)    pursuant to Bankruptcy Code section 364(c)(1), be claims with priority in payment (other than from the proceeds of causes of action arising under sections 502(d), 544, 545, 547, 548, 549, and 550 of the Bankruptcy Code, any sums on deposit in the Debtor's resident escrow account or the Trustee-Held Funds) over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including, without limitation, Bankruptcy Code sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113 and 1114 (the **"DIP Superpriority Expense Claim"**); and

(b)    pursuant to Bankruptcy Code sections 364(c) and (d), be secured by fully and automatically perfected superpriority, priming liens (the **"DIP Senior Liens"**) on all now owned or hereafter acquired assets and property of the Debtor and proceeds thereof (including, without limitation, all cash, cash equivalents, accounts, payment intangibles, promissory notes, consignments, commercial tort

21

DENTONS US LLP
1221 AVENUE OF THE AMERICAS,
NEW YORK, NEW YORK 10020-1089
(212) 768-6700

claims, tax refunds, inventory, goods, chattel paper, documents, deposit accounts, documents, instruments, investment property, letter-of-credit rights, general intangibles, contracts, contract rights, all causes of action and proceeds thereof, computer hardware and software, motor vehicles, intellectual property, real and personal property, plant and equipment of the Debtor (collectively, the "**Collateral**") (provided, however, that the Collateral shall not include either the Trustee-Held Funds, the proceeds of causes of action arising under sections 502(d), 544, 545, 547, 548, 549, and 550 of the Bankruptcy Code or any sums on deposit in the Debtor's resident escrow account),[3] subject only to the Permitted Senior Liens.

15.    As adequate protection for the claims of the Prepetition Lenders in exchange for their consent to the terms of the DIP Loan Documents and the DIP Senior Liens, to the extent (a) the stay of any action by the Prepetition Lenders with respect to their claims or their Prepetition Collateral under section 362 of the Bankruptcy Code, (b) the Debtors' use, sale or lease of any Prepetition Collateral under section 363 of the Bankruptcy Code, or (c) the grant of a senior lien on the Prepetition Collateral under section 364 of the Bankruptcy Code, results in a decrease in the value of the Prepetition Lenders' interest in the Prepetition Collateral, the Prepetition Lenders are hereby granted the following in accordance with sections 361(1), 363(e) and 364(d)(1)(B) of the Bankruptcy Code:

(a)    payments in the amount of professional fees and expenses incurred by the Prepetition Lenders during the course of this chapter 11 case;

---

[3] For the avoidance of doubt, the Collateral includes the DIP Funding Account.

22

DENTONS US LLP
1221 AVENUE OF THE AMERICAS,
NEW YORK, NEW YORK 10020-1089
(212) 768-6700

(b)     subject to the DIP Senior Liens and to the Carve-Out and solely to the extent of any diminution in the value of the Cash Collateral and other Prepetition Collateral resulting from the Debtor's use thereof or the priming of the Prepetition Lender's respective liens against the Prepetition Collateral, additional or replacement lien(s) in and upon the (i) Collateral (other than causes of action arising under sections 502(d), 544, 545, 547, 548, 549, and 550 of the Bankruptcy Code or any sums on deposit in the Debtor's resident escrow account), to the same extent, validity and priority that the Prepetition Lenders possessed in such property on the Petition Date; and (ii) all other assets of the Debtor of any kind or nature whatsoever within the meaning of section 541 of the Bankruptcy Code, whether acquired or arising pre- or postpetition, together with all proceeds, rights, products and profits thereof (collectively (i) and (ii) defined as the "**Replacement Liens**"), each of which is effective and perfected upon the date of this Interim Order;

(c)     all reports and notices required to be provided to the DIP Lenders under the DIP Loan Documents shall be provided concurrently to the Prepetition Lenders; and

(d)     pursuant to section 507(b) of the Bankruptcy Code, but subject to the DIP Superpriority Administrative Claim and the Carve-Out, priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including, without limitation, Bankruptcy Code sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113 and 1114 (other than causes of action arising under sections 502(d), 544, 545, 547, 548, 549, and 550 of the Bankruptcy Code or any sums on deposit in the

23

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

DENTONS US LLP
1221 AVENUE OF THE AMERICAS,
NEW YORK, NEW YORK 10020-1089
(212) 768-6700

Debtor's resident escrow account) (the "**Adequate Protection Superpriority Expense Claim**").

### Perfection of Liens

16.    The DIP Senior Liens and the Replacement Liens granted to the DIP Lenders and the Prepetition Lenders, respectively, under this Interim Order shall be fully and automatically perfected upon the entry of this Interim Order without necessity of the execution, recordation, or filings by the Prepetition Lenders or the Debtor of security agreements, control agreements, pledge agreements, financing statements, assignments or other similar documents.  This Interim Order shall be conclusive evidence of the validity, enforceability, perfection and priority of the DIP Senior Liens and the Replacement Liens.

### No Subordination

17.    The DIP Senior Liens and the Replacement Liens shall not be:  (a) subject or subordinate to:  (i) any lien or security interest that is avoided and preserved for the benefit of the Debtor and its estate under section 551 of the Bankruptcy Code; or (ii) any liens arising after the Petition Date, including, without limitation, any liens or security interests granted in favor of any federal, state, municipal, or other governmental unit, commission, board, or court for any liability of the Debtor, or (b) subordinated to or made pari passu with any other lien or security interest granted under section 364 of the Bankruptcy Code or otherwise.

### No Modification Under Plan or Subsequent Financing

18.    No rights, claims, or liens of the DIP Lenders or the Prepetition Lenders with respect to the protections provided to the DIP Lenders or the Prepetition Lenders under this Interim Order can be modified in any plan of reorganization or liquidation or subsequent

24

110463889/V-2

financing without the prior written consent of the DIP Lenders and the Prepetition Lenders, as applicable.

## Carve-Out

19.    In partial consideration of the Debtor's acknowledgement of the debt due and owing to the Prepetition Lenders and waiving of any claims under sections 506(c) of the Bankruptcy Code (as of the date of the entry of a Final Order) against the Prepetition Lenders and the DIP Lenders, the security interests, liens, and administrative priority granted by the Interim Order and the Final Order or contemplated by the DIP Loan Documents shall be subject to a carve-out (the "**Carve-Out**") for the benefit of retained professionals and the United States Trustee for: (i) all fees required to be paid  to the Clerk of the Bankruptcy Court and the Office of the United States Trustee pursuant to 28 U.S.C.§ 1930(a), and (ii) (a) fees and expenses projected in the Budget and incurred by the Debtor's professionals or the professionals of any official committee of unsecured creditors or other professionals appointed in this case prior to delivery of notice of an Event of Default and allowed by the Court (the **"Carve-Out Notice"**), and (b) after delivery of a Carve-Out Notice, an amount not exceeding $250,000 in the aggregate to pay any fees or expenses incurred by the Debtor's professionals or the professionals of any official committee of unsecured creditors; provided that nothing herein shall be construed to impair the ability of any party to object to the fees, expenses, reimbursement or compensation described herein.  No portion of the Carve-Out, the Cash Collateral or proceeds of the DIP Facility shall be used for the payment of the fees and expenses of any person incurred challenging, or in relation to the challenge of, any of the DIP Lenders' or the Prepetition Lenders liens or claims, or the initiation or prosecutions of any claim or action against any DIP Lender or any Prepetition Lender in any capacity, or any of their respective affiliates, subsidiaries,

25

DENTONS US LLP
1221 AVENUE OF THE AMERICAS,
NEW YORK, NEW YORK 10020-1089
(212) 768-6700

directors, shareholders, employees, advisors, agents, or sub-agents, including formal discovery proceedings in anticipation thereof; provided, however, that any committee of unsecured creditors appointed in the Case shall have the right to expend up to $25,000 of the Cash Collateral to make such investigation. Any payment or reimbursement made on or after the occurrence of an Event of Default in respect of any allowed professional fees shall permanently reduce the Carve-Out on a dollar-for-dollar basis.

**Allowance of Claim**

20.     Except as set forth in paragraph 22 below, the entry of this Interim Order by the Court shall be a conclusive and binding determination on all parties (x) as to the amount of the Prepetition Claims, and (y) as to the scope, extent, perfection, validity, and enforceability, in all respects, each of the Prepetition Lender's security interests and liens in the Prepetition Collateral, including, without limitation, the Cash Collateral.

21.     Claims and Causes of Action. Subject to paragraph 22 of this Interim Order, the Debtor hereby waives, releases, and discharges the Prepetition Lenders, in their capacity as such, and their respective affiliates, agents, attorneys, professionals, officers, directors, and employees (collectively, the "**Released Parties**"), from any and all claims and causes of action arising out of, based upon, or related to, in whole or in part, the Prepetition Credit Agreements; any aspect of the prepetition relationship between the Prepetition Lenders and the Debtor; and any other acts or omissions by the Prepetition Lenders in connection with either the Prepetition Credit Agreements or the Prepetition Lenders' prepetition relationship with the Debtor. Further, subject to paragraph 22 of this Interim Order, the Debtor waives any and all rights to object to or contest the amount of the Prepetition Claims or the Prepetition Lenders' security interest in the

26

DENTONS US LLP
1221 AVENUE OF THE AMERICAS,
NEW YORK, NEW YORK 10020-1089
(212) 768-6700

Prepetition Collateral and agrees not to challenge that all such claims and security interests have been duly perfected and are in all respects valid and enforceable first priority security interests and liens.

### Binding Effect

22.    This Interim Order shall be binding on all creditors and parties in interest in this Case, including, but not limited to, the Debtor and any successors thereto, any Chapter 11 or Chapter 7 trustee that is appointed or elected in these cases; provided, however, that this Interim Order is without prejudice to the rights of any party in interest (other than the Debtor) to challenge or commence an action relating to the validity, amount, perfection, priority, extent, or enforceability of the Prepetition Claims or the prepetition security interests of the Prepetition Lenders or otherwise asserting any claims or causes of action against the Prepetition Lenders (any and all claims and causes of action against the Prepetition Lenders is hereby defined as a "**Challenge**"), so long as any Challenge is made on or before the date that is the earlier of (i) April 15, 2019 or (ii) 60 days from the day a committee of unsecured creditors has been appointed (the "**Challenge Period**"), after which Challenge Period all Challenges shall be deemed finally and conclusively barred; provided further that if one or more Challenges are timely made under this paragraph 22 and properly filed, then except for such Challenges timely made, all potential Challenges are hereby deemed forever waived and relinquished.

### Termination Events

23.    For the avoidance of doubt, the Affirmative Covenants, as set forth in Article V of the DIP Loan Documents (including but not limited to the bankruptcy case related ":Milestones"

27

DENTONS US LLP
1221 AVENUE OF THE AMERICAS,
NEW YORK, NEW YORK 10020-1089
(212) 768-6700

contained in Section 5.1(o)), and the Events of Default, as set forth in Article VIII of the DIP

Loan Documents, are hereby approved in their entirety.

### Section 506(c) Waiver

24.     As a material inducement to the DIP Lenders to agree to provide the DIP Facility,

and in exchange for the DIP Agent and DIP Lenders' willingness to provide the DIP Facility, the

Prepetition Lenders' willingness to subordinate their liens to the DIP Lenders and their

respective agreements to subordinate their liens and superpriority clients to the Carve-Out to the

extent set forth herein, upon entry of the Final Order, no costs or expenses of administration

which have been or may be incurred in connection with the preservation, protection, or

enhancement of realization by the DIP Lenders or the Prepetition Lenders upon the Collateral,

shall be charged against any of the DIP Lenders, the DIP Obligations, the Prepetition Lenders or

the Collateral pursuant to sections 105 or 506(c) of the Bankruptcy Code or otherwise without

the prior express written consent of the DIP Agent, in its sole discretion.

### Miscellaneous

25.     The Debtor and any successor or assign of the Debtor, including any subsequently

appointed chapter 7 or chapter 11 trustee, are bound to the terms of this Interim Order and any

subsequent Final Order of this Court.

26.     None of the DIP Lenders shall be required to file proofs of claim in the above-

captioned case for any claim allowed by this Order.

27.     The DIP Lenders reserve the right to assign all of their rights, claims and

obligations under the DIP Loan Documents and related documents.

110463880/V-2

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

DENTONS US LLP
1221 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10020-1089
(212) 768-6700

28.    The security interests, liens, and administrative priorities granted by the DIP Documents or the Orders shall survive, and shall not be modified, impaired, or discharged by: (a) the entry of an order converting the chapter 11 case of the Debtor to chapter 7, appointing a trustee in this chapter 11 case, dismissing this chapter 11 case, or by any other act or omission; or (b) the entry of an order confirming a plan of reorganization or liquidation in the this chapter 11 case.

29.    In the event of any inconsistency between the provisions of this Interim Order and the DIP Loan Documents, the provisions of this Interim Order shall govern.

30.    The provisions of the DIP Loan Documents and this Interim Order, including all findings herein, shall be binding on and inure to the benefit of all parties in interest in the Debtor's chapter 11 case, including, without limitation, the DIP Lenders, the Prepetition Lenders, any committee of unsecured creditors, the Debtor, and any subsequently appointed or elected trustee, examiner or other fiduciary appointed for the estate of the Debtor and each of their respective successors and assigns; provided however, that the DIP Lenders shall have no obligation to extend any financing or credit to any Chapter 11 or Chapter 7 trustee or similar responsible person appointed or elected to act on behalf of the Debtor's estate.

31.    In determining to make any loan under the DIP Loan Documents and this Interim Order or in exercising any rights or remedies as and when permitted pursuant to this Interim Order, the DIP Loan Documents or the Prepetition Credit Agreements, neither the DIP Lenders nor the Prepetition Lenders shall be deemed to be in control of the operations of the Debtor or to be acting as a "responsible person" or "owner or operator" with respect to the operation and management of the Debtor (as such terms, or any similar terms, are used in the United States

29

110463880\V-2

Comprehensive Environmental Response, Compensation and Liability Act 42 U.S.C. §§ 9601 *et. seq.* as amended, or any similar federal or state statute). Nothing in this Interim Order or the DIP Loan Documents related to this transaction shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Lenders of any liability for any claims arising from the pre- or postpetition activities of the Debtor and any of its Affiliates (as defined in the Bankruptcy Code) in the operation of its business, or in connection with its restructuring efforts.

32.    The "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the DIP Lenders or the Prepetition Lenders with respect to proceeds, product, offspring, or profits with respect to any of the Collateral.

33.    This Interim Order shall  take effect immediately upon the execution and entry hereof and be fully enforceable and effective *nunc pro tunc* to the Petition Date. Notwithstanding Bankruptcy Rules 6004(h), 6006(d), 7062, or 9014, or any other Bankruptcy Rule, any Local Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order.

34.    The Court shall retain jurisdiction to hear and determine all matters arising from the implementation of this Interim Order.

35.    A final hearing to consider the Motion will be held on [DATE] before the Honorable Judge Scott C. Clarkson. Any party desiring to object to the relief sought in the Motion on a final basis shall file a written objection with the Court on or before [DATE].

DENTONS US LLP
1221 AVENUE OF THE AMERICAS,
NEW YORK, NEW YORK 10020-1089
(212) 768-6700

110463880\V-2

1

2    IT IS SO ORDERED.                BY THE COURT

3

4    Dated:                           _____

5                                     **UNITED STATES BANKRUPTCY JUDGE**

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DENTONS US LLP
1221 AVENUE OF THE AMERICAS,
NEW YORK, NEW YORK 10020-1089
(212) 768-6700

31

110463880\V-2

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**EXHIBIT 2**

(DIP Credit Agreement)

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

110339826\V-7

*DRAFT 3/11/19*

**PRIMING SUPERPRIORITY**
**DEBTOR-IN-POSSESSION CREDIT AGREEMENT**

**BY AND AMONG**

**AIR FORCE VILLAGE WEST, INC. D/B/A ALTAVITA VILLAGE**

**AS DEBTOR,**

**THE DIP LENDERS PARTY HERETO,**

**AND**

**LAPIS ADVISERS, LP, AS DIP AGENT**

**DATED AS OF MARCH [__], 2019**

ARTICLE I Defined Terms ..................................................................................................2

    Section 1.1    Definitions..............................................................................2

ARTICLE II Loans ............................................................................................................17

    Section 2.1    DIP Loans ............................................................................17
    Section 2.2    Borrowing Mechanics .........................................................17
    Section 2.3    Pro Rata Shares....................................................................18
    Section 2.4    Use of Proceeds...................................................................18
    Section 2.5    Evidence of Debt; Notes ......................................................18
    Section 2.6    Interest on Loans .................................................................18
    Section 2.7    Fees ......................................................................................19
    Section 2.8    Repayment ...........................................................................19
    Section 2.9    Optional Prepayment ...........................................................19
    Section 2.10    Mandatory Prepayments; ...................................................20
    Section 2.11    Application of Payments and Proceeds................................20
    Section 2.12    General Provisions Regarding Payments ............................20
    Section 2.13    Ratable Sharing ...................................................................21
    Section 2.14    Termination of DIP Commitments .....................................22

ARTICLE III Conditions Precedent; Conditions Subsequent .........................................22

    Section 3.1    Conditions Precedent; Closing Date ....................................22
    Section 3.2    Conditions to Each Borrowing.............................................25
    Section 3.3    Conditions Subsequent........................................................26

ARTICLE IV Representations and Warranties..................................................................26

    Section 4.1    Representations and Warranties...........................................26

ARTICLE V Affirmative Covenants .................................................................................30

    Section 5.1    Affirmative Covenants.........................................................30

ARTICLE VI Negative Covenants/Budget Compliance ..................................................35

    Section 6.1    Negative Covenants .............................................................35
    Section 6.2    Budget Compliance.............................................................38

ARTICLE VII Increased Costs; Taxes; Indemnifications, Set Off; Etc. ........................38

    Section 7.1    Increased Costs; Capital Adequacy .....................................38
    Section 7.2    Taxes; Withholding, Etc. .....................................................38
    Section 7.3    Indemnification ...................................................................40
    Section 7.4    Right of Set Off....................................................................40
    Section 7.5    Funding Breakage ...............................................................41

4831-8871-0793.9

ARTICLE VIII Events of Default ............................................................................................41

Section 8.1    Events of Default ....................................................................41
Section 8.2    Remedies ................................................................................44
Section 8.3    Remedies Cumulative ............................................................44

ARTICLE IX The DIP Agent ..................................................................................................45

Section 9.1    Appointment of DIP Agent ....................................................45
Section 9.2    Acting on Lender Instruction ................................................45
Section 9.3    General Immunity ..................................................................45
Section 9.4    DIP Agent Entitled to Act with the Debtor............................46
Section 9.5    Lenders' Representations, Warranties and Acknowledgment ..................46
Section 9.6    Right to Indemnity ................................................................46
Section 9.7    Successor DIP Agent ............................................................47
Section 9.8    DIP Collateral Documents ....................................................47
Section 9.9    Notice of Default....................................................................48
Section 9.10   Delivery of Documents, Notices, Etc ....................................48

ARTICLE X Miscellaneous ....................................................................................................48

Section 10.1    Amendments and Waivers; Release of DIP Collateral ............48
Section 10.2    Notices ..................................................................................48
Section 10.3    Expenses ................................................................................50
Section 10.4    Enforceability; Successors and Assigns................................51
Section 10.5    Lenders' Obligations Several................................................52
Section 10.6    Integration ............................................................................52
Section 10.7    No Waiver; Remedies ............................................................52
Section 10.8    Setoff ....................................................................................52
Section 10.9    Execution in Counterparts....................................................52
Section 10.10   Governing Law; Submission To Jurisdiction; Venue................53
Section 10.11   Waiver of Jury ......................................................................54
Section 10.12   Severability ..........................................................................54
Section 10.13   Survival ................................................................................54
Section 10.14   Maximum Lawful Interest ....................................................54
Section 10.15   Interpretation ........................................................................55
Section 10.16   Ambiguities ..........................................................................55
Section 10.17   The PATRIOT Act ................................................................55
Section 10.18   Conflicting Provisions in Security Documents......................55
Section 10.19   Certain Matters Relating to Roll-Up Loans ..........................55
Section 10.20   Modifications ........................................................................55
Section 10.21   Release ..................................................................................56


SCHEDULE 2.1             Commitments

iv

*DRAFT 3/11/19*

THIS PRIMING SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT, dated as of March [__], 2019, among Air Force Village West, Inc. d/b/a Altavita Village, a California corporation, as the Debtor, Lapis Advisers, LP, in its capacity as administrative agent for the DIP Lenders and as a DIP Lender (as defined herein), and KBC Bank NV, as a DIP Lender.  Capitalized terms used but not defined herein shall have the meanings given to them in Article I hereto.

## RECITALS

WHEREAS, on March 10, 2019, the Debtor commenced Case No. 6:19-bk-11920, a voluntary proceeding for relief under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court (the "Case");

WHEREAS, on December 29, 2017, UMB and KBC filed a verified complaint against Debtor for breach of contract, judicial foreclosure, and appointment of receiver, initiating case number RIC1724503 in the Superior Court of the State of California for the County of Riverside (the "Receivership Case") and, on February 5, 2018, the Stipulation and Order Appointing Receiver (the "Receivership Order") was entered in the Receivership Case, pursuant to which Cordes & Company, LLC, acting through Bellann Raile, not individually but as receiver (the "Receiver"), was appointed, and the Receivership Estate (as defined in the Receivership Order) was created;

WHEREAS, pursuant to that certain Receivership Certificate Lending Agreement (the "Prepetition Receivership Loan Agreement"), dated August 28, 2018, by and among the Receiver, as borrower, and Lapis and KBC, as lenders (the "Prepetition Receivership Secured Lenders"), the Prepetition Receivership Secured Lenders agreed to make loans to Receiver to finance working capital of the Debtor in the aggregate amount of up to $5,000,000 (the "Prepetition Receivership Indebtedness"), which Prepetition Receivership Indebtedness is secured by the Collateral;

WHEREAS, with the commencement of the Case, the Prepetition Receivership Loan Agreement is no longer available for further working capital advances to the Debtor;

WHEREAS, the Debtor has requested, and the DIP Lenders have agreed, to continue the working capital facility that was provided under the Prepetition Receivership Loan Agreement with NM Loans hereunder and to cause the outstanding amount of the Prepetition Receivership Indebtedness to be refinanced by Roll Up Loans hereunder to support the Debtor's working capital needs during the Case, pursuant to the terms and conditions hereof; and

WHEREAS, the DIP Lenders are only willing to provide the DIP Loans hereunder if, and in so providing such DIP Loans are relying on, the Debtor granting to the DIP Agent (for the benefit of the DIP Agent and the DIP Lenders) a priming, first priority DIP Lien and superpriority claim on the DIP Collateral as more fully described in Article IX hereof and in the other DIP Credit Documents, subject to the Carve-Out, the CDSS Lien, to the extent provided herein, and other Permitted Liens and the Financing Orders.

NOW THEREFORE, in consideration of the premises and the mutual covenants and the agreements herein set forth, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

1

4831-8871-0793.9

ARTICLE I
Defined Terms

Section 1.1      Definitions.  As used in this Agreement, including, without limitation, the preamble, recitals, exhibits and schedules hereto, the following terms have the meanings stated:

"ABAG" means the ABAG Finance Authority for Nonprofit Corporations.

"Account" has the meaning assigned to such term in the UCC.

"Action" against a Person means an action, suit, litigation, arbitration, investigation, complaint, contest, hearing, inquiry, inquest, audit, examination or other proceeding threatened or pending against or affecting such Person or its property, whether civil, criminal, administrative, investigative or appellate, in law or equity before any arbitrator or Governmental Body.

"Affiliate" means, with respect to a Person, any other Person which directly or indirectly, through one or more intermediaries, controls or is controlled by or is under common control with such Person, and without limiting the generality of the foregoing, includes (i) any Person which beneficially owns or holds five (5%) percent or more of any class of the Capital Stock of such Person or other equity interests in such Person, (ii) any Person of which such Person beneficially owns or holds five (5%) percent or more of any class of the Capital Stock or in which such Person beneficially owns or holds five (5%) percent or more of the equity interests, (iii) any director or executive officer of such Person.  For the purposes of this definition, the term "control" (including with correlative meanings, the terms "controlled by" and "under common control with"), as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of Capital Stock, by agreement or otherwise.

"Aggregate Amounts Due" has the meaning stated in Section 2.13.

"Asset Sale" means a sale, lease or sublease (as lessor or sublessor), sale and leaseback, assignment, conveyance, transfer or other disposition to, or any exchange of property with, any Person, in one or more transactions or a series of related transactions, of all or any part of the businesses of the Debtor, and/or of all or any part of the assets or properties of any kind of the Debtor, whether real, personal, or mixed and whether tangible or intangible, whether now owned or hereafter acquired, other than inventory (or other assets) sold or leased in the ordinary course of business.

"Assignee" has the meaning stated in Section 10.4(b).

"Assignment" has the meaning stated in Section 10.4(b).

"Assignment Agreement" has the meaning stated in Section 10.4(b).

"Authorized Officer" means, as applied to any Person, any individual holding the position of chairman of the board, executive director (or the equivalent thereof), and such Person's chief financial officer or treasurer or the Person or entity acting in that capacity.

2

"<u>Bankruptcy Code</u>" means Title 11 of the United States Code entitled "Bankruptcy", as now and hereafter in effect, or any successor statute.

"<u>Bankruptcy Court</u>" means the United States Bankruptcy Court for the Central District of California.

"<u>Borrowing</u>" means an advance of a DIP Loan made hereunder on the Interim Order Entry Date or thereafter.

"<u>Borrowing Certificate</u>" means a Borrowing Certificate in form and substance satisfactory to the DIP Lenders.

"<u>Borrowing Date</u>" means the date of a Borrowing.

"<u>Budget</u>" means, as of any date of determination, the most recent rolling consolidated 13-week cash flow and financial projections of the Borrower delivered, initially, on the Closing Date, and thereafter, on a weekly basis in accordance with <u>Section 5.1(a)(ii)</u> covering, initially, the period beginning on March 16, 2019 and itemizing on a weekly basis all uses, and anticipated uses, of the DIP Loans, revenues projected to be received and all expenditures proposed to be made during such period, which shall at all times be in form and substance reasonably satisfactory to the DIP Lenders.

"<u>Business Day</u>" means a day other than Saturday or Sunday or other day on which commercial banks in Los Angeles, California or New York City, New York are authorized or required by law or other governmental action to close.

"<u>Capital Lease</u>" means, as applied to any Person, any lease of any property (whether real, personal or mixed) by that Person as lessee that, in conformity with GAAP, is or should be accounted for as a capital lease on the balance sheet of that Person.

"<u>Capital Stock</u>" means any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person (other than a corporation), including, without limitation, partnership interests and membership interests, and any and all warrants, rights or options to purchase or other arrangements or rights to acquire any of the foregoing.

"<u>Carve-Out</u>" has the meaning given such term in the Interim Order (before the entry of the Final Order) and, after the entry of the Final Order, the Final Order.

"<u>Case</u>" has the meaning set forth in the recitals to this Agreement together with any successor case.

"<u>Cash</u>" means a credit balance in any Deposit Account, money or currency.

"<u>CDSS</u>" means the California Department of Social Services, and any successor Governmental Body.

"<u>CDSS Letter Agreement</u>" means the Letter Agreement, dated August 9, 2018, by and among the Prepetition Receivership Secured Lenders, UMB and CDSS pursuant to which CDSS conditionally subordinated the CDSS Lien in favor of the Prepetition Receivership Secured Lenders, subject to the terms and conditions set forth therein.

"CDSS Lien" means the statutory Lien in favor of the CDSS arising under the California Civil Code encumbering approximately 68 acres of undeveloped real property immediately adjacent to the Debtor's main facility.

"Change of Control" means any one or more of the following events: (i) the transfer (in one transaction or a series of transactions) of all or substantially all of the assets of the Debtor to any Person or group; (ii) the liquidation or dissolution of the Debtor or the adoption of a plan by the Board of Directors of the Debtor relating to the dissolution or liquidation of the Debtor; (iii) the conversion of the Debtor from a California non-profit corporation to a "for profit" corporation or other entity; (iv) any Person or two or more Persons acting in concert shall have acquired by contract or otherwise, or shall have entered into a contract or arrangement that, upon consummation thereof, will result in its or their acquisition of the power to exercise, directly or indirectly, a controlling influence over the management or policies of the Debtor or control the election of members of the board of directors or equivalent governing body of the Debtor; or (v) any change in the composition or membership of the Debtor's board of directors, or day to day management of the Debtor, from that in effect on the date hereof, except for any changes approved in advance by the DIP Lenders.

"Closing Date" means the date hereof.

"Closing Date Certificate" has the meaning stated in Section 3.1(p).

"Committee" means any statutory committee of unsecured creditors of Debtor appointed by the Bankruptcy Court after the date hereof.

"Commitment Fee" has the meaning given such term in Section 2.7(a).

"Controlled Account" has the meaning stated in Section 5.1(g) and includes any deposit account, securities account, or commodity account (as all such terms are defined in the UCC) and any other bank account or investment account over which the DIP Agent has a DIP Lien for the benefit of the DIP Lenders pursuant to any Financing Order or other order of the Bankruptcy Court.

"Controlled Account Agreement" has the meaning stated in Section 5.1(g).

"Consents" means any approval, consent, authorization or order of, notice to or registration or filing with, or any other action by, any Governmental Body or other Person.

"Credit Bid" means the submission by a DIP Lender of a bid at a public or private sale to purchase of all or any portion of the DIP Collateral in which any of the DIP Obligations owing to such DIP Lender are used and applied as a credit on account of the purchase price.

"Debtor" means Air Force Village West, Inc. d/b/a Altavita Village, a California nonprofit corporation, as debtor and debtor-in-possession, and each of its respective successors and assigns (including, without limitation, any trustee or other fiduciary hereafter appointed as its legal representative or with respect to the property of the estate of the Debtor, whether under chapter 11 of the Bankruptcy Code or any subsequent chapter 7 case and the Debtor's successor upon conclusion of the Case).

4

"<u>Debtor Relief Laws</u>" shall mean the Bankruptcy Code and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, examinership, or similar debtor relief laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"<u>Deed of Trust</u>" means the Deed of Trust, dated as of the date hereof, by the Debtor in favor of DIP Agent for the benefit of the DIP Lenders.

"<u>Default</u>" means a condition or event that, after notice or lapse of time or both, would constitute an Event of Default.

"<u>Deposit Account</u>" means any deposit account (as such term is defined in the UCC), including, without limitation, a demand, time, savings, passbook or like account with a bank, savings and loan association, credit union or like organization, other than an account evidenced by a negotiable certificate of deposit.

"<u>DIP Agent</u>" means Lapis and any successor agent appointed pursuant to Section 9.8.

"<u>DIP Agreement</u>" or "<u>Agreement</u>" means this Priming Superpriority Debtor-in-Possession Agreement, as it may be amended, restated, supplemented or otherwise modified from time to time.

"<u>DIP Collateral</u>" means any and all "DIP Collateral" as defined in the Security Agreement, together with any other collateral granted by Debtor to the DIP Agent for the benefit of the DIP Lenders pursuant to any other DIP Collateral Document, as applicable; provided, however, that the DIP Collateral shall not include any Excluded Property.

"<u>DIP Collateral Documents</u>" means the Deed of Trust, the Security Agreement, Controlled Account Agreements and all other instruments, documents and agreements delivered by Debtor pursuant to this Agreement or any of the other DIP Credit Documents pursuant to which Debtor grants a DIP Lien, or any other Lien, mortgage, or encumbrance, to the DIP Agent for the benefit of the DIP Lenders, as any of the foregoing may be amended, restated, supplemented, modified, or replaced from time to time.

"<u>DIP Commitment</u>" means, with respect to each DIP Lender on the Closing Date, the amount set forth opposite such DIP Lender's name on <u>Schedule 2.1</u> as such DIP Lender's "Total Commitment" or such lesser amount as determined in accordance with the Financing Orders and the Budget.

"<u>DIP Commitment Period</u>" means (a) with respect to NM Loans, the period commencing on the date on which the Bankruptcy Court issues the Interim Order and ending on the Maturity Date and (b) with respect to Roll-Up Loans, the period commencing on the Final Order Entry Date and ending on the date such Roll-Up Loans are made hereunder.

"<u>DIP Credit Document</u>" means any of this Agreement, the DIP Notes (if any), the DIP Collateral Documents and all other documents, instruments or agreements executed and delivered by Debtor for the benefit of the DIP Agent or any DIP Lender in connection herewith.

"<u>DIP Lenders</u>" has the meaning stated in the Preamble to this Agreement.

"<u>DIP Lien</u>" means any Lien granted under or pursuant to any DIP Collateral Document or any Financing Order.

"<u>DIP Obligations</u>" means all indebtedness, obligations, covenants, duties of payment or performance of every kind and all other liabilities of Debtor from time to time owed to the DIP Agent or the DIP Lenders, whether direct or indirect, joint or several, absolute or contingent, matured or unmatured, liquidated or unliquidated, secured or unsecured, arising by contract, operation of law or otherwise, owing, arising, due or incurred under this Agreement, the Financing Orders or any other DIP Credit Document or in respect of any of the DIP Loans, or any other instruments at any time evidencing any of the foregoing or otherwise, including, without limitation,  all obligations to repay principal of and interest on the DIP Loans, and to pay interest, fees, costs, charges, expenses, professional fees, and all sums chargeable to the Debtor under the DIP Credit Documents and the Financing Orders, whether or not evidenced by any note or other instrument, and Debtor's obligation to provide the DIP Lenders with adequate protection of their interests in the Prepetition Collateral and other property to be used, sold, leased or otherwise disposed of by Debtor after the commencement of the Case under the terms of any Financing Order (including, without limitation, coverage as to the account of any loss, damages, depletion, diminution or depreciation resulting from Debtor's use (or in the case of inventory or equipment sale) of such property.

"<u>DIP Loan</u>" means individually and collectively, each NM Loan and each Roll-Up Loan.

"<u>Dollars</u>" and the sign "<u>$</u>" mean the lawful money of the United States of America.

"<u>Eligible Assignee</u>" means (i) any DIP Lender or any Affiliate of any DIP Lender (including another investment fund managed by the same Affiliate), or (ii) any other Person approved by the DIP Lenders pursuant to Section 9.4, such approval not to be unreasonably withheld.

"<u>Employee Benefit Plan</u>" means any "employee benefit plan" as defined in Section 3(3) of ERISA that is or, within the six years preceding the date of this Agreement, was sponsored, maintained or contributed to by, or required to be contributed to by, the Debtor or any of its ERISA Affiliates.

"<u>Environmental Laws</u>" means all federal, state, local and foreign laws (including without limitation common law), statutes, regulations and rules whether now or hereinafter in effect relating in any way to the environment, the preservation or reclamation of natural resources, the management, release or threatened release of any Hazardous Material or health and safety matters, including, without limitation, the Resource Conservation and Recovery Act, the Comprehensive Environmental Response Compensation and Liability Act of 1980, the Superfund Amendments and Reauthorization Act of 1986, the Federal Clean Water Act, the Federal Clean Air Act, the Toxic Substances Control Act, in each case as amended, and all rules, regulations, judgments, decrees, orders and licenses arising under all such laws.

"<u>Environmental Liability</u>" means any actual, alleged or contingent liability or obligations of the Debtor directly or indirectly resulting from or based on (i) violations or alleged violations of any Environmental Law, (ii) the generation, use, handling, transportation,

6

management, storage, treatment or disposal of any Hazardous Material, (iii) exposure to any Hazardous Material, (iv) the release or threatened release of any Hazardous Material into the environment or (v) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with any of the foregoing.

"Environmental Permits" means all permits, licenses, authorizations, registrations and other governmental consents required by applicable Environmental Laws for the use, storage, treatment, transportation, release, emission and disposal of raw materials, by-products, wastes and other substances used or produced by or otherwise relating to the operations of the Debtor.

"Equipment" means, as to Debtor, all of Debtor's now owned and hereafter acquired equipment, wherever located, including machinery, data processing and computer equipment (whether owned or licensed and including embedded software), vehicles, tools, furniture, fixtures, all attachments, accessions and property now or hereafter affixed thereto or used in connection therewith, and substitutions and replacements thereof, wherever located.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and any successor thereto.

"ERISA Affiliate" means, as applied to any Person, (i) any corporation that is a member of a controlled group of corporations within the meaning of Section 414(b) of the Internal Revenue Code of which that Person is a member, (ii) any trade or business (whether or not incorporated) that is a member of a group of trades or businesses under common control within the meaning of Section 414(c) of the Internal Revenue Code of which that Person is a member, and (iii) any member of an affiliated service group within the meaning of Section 414(m) or (o) of the Internal Revenue Code of which that Person, any corporation described in clause (i) above or any trade or business described in clause (ii) above is a member.  Any former ERISA Affiliate of the Debtor, shall continue to be considered an ERISA Affiliate of the Debtor within the meaning of this definition with respect to the period such entity was an ERISA Affiliate of the Debtor and with respect to liabilities arising after such period for which the Debtor could be liable under the Internal Revenue Code or ERISA.

"ERISA Event" means (i) a "reportable event" within the meaning of Section 4043 of ERISA and the regulations issued thereunder with respect to any Pension Plan (excluding those for which the provision for 30-day notice to the PBGC has been waived by regulation), (ii) the failure to meet the minimum funding standard of Section 412 of the Internal Revenue Code with respect to any Pension Plan (whether or not waived in accordance with Section 412(d) of the Internal Revenue Code) or the failure to make by its due date a required installment under Section 412(m) of the Internal Revenue Code with respect to any Pension Plan or the failure to make any required contribution to a Multiemployer Plan, (iii) the provision by the administrator of any Pension Plan pursuant to Section 4041(a)(2) of ERISA of a notice of intent to terminate such plan in a distress termination described in Section 4041(c) of ERISA, (iv) the withdrawal by the Debtor or any of its ERISA Affiliates from any Pension Plan with two or more contributing sponsors or the termination of any such Pension Plan resulting in liability pursuant to Section 4063 or 4064 of ERISA, (v) the institution by the PBGC of proceedings to terminate any Pension Plan, or the occurrence of any event or condition which might constitute grounds under ERISA for the termination of, or the appointment of a trustee to

7

administer, any Pension Plan, (vi) the imposition of liability on the Debtor or any of its ERISA Affiliates pursuant to Section 4062(e) or 4069 of ERISA or by reason of the application of Section 4212(c) of ERISA, (vii) the withdrawal of the Debtor or any of its ERISA Affiliates in a complete or partial withdrawal (within the meaning of Sections 4203 and 4205 of ERISA) from any Multiemployer Plan if there is any potential liability therefor, or the receipt by the Debtor or any of its  ERISA Affiliates of notice from any Multiemployer Plan that it is in reorganization or insolvency pursuant to Section 4241 or 4245 of ERISA, or that it intends to terminate or has terminated under Section 4041A or 4042 of ERISA, (viii) the occurrence of an act or omission which could give rise to the imposition on the Debtor or any its ERISA Affiliates of fines, penalties, taxes or related charges under Chapter 43 of the Internal Revenue Code or under Section 409, Section 502(c), (i) or (1), or Section 4071 of ERISA in respect of any Employee Benefit Plan, (ix) the assertion of a material claim (other than routine claims for benefits) against any Employee Benefit Plan other than a Multiemployer Plan or the assets thereof, or against the Debtor or any of its ERISA Affiliates in connection with any Employee Benefit Plan, (x) receipt from the Internal Revenue Service of notice of the failure of any Pension Plan (or any other Employee Benefit Plan intended to be qualified under Section 401(a) of the Internal Revenue Code) to qualify under Section 401(a) of the Internal Revenue Code, or the failure of any trust forming part of any Pension Plan to qualify for exemption from taxation under Section 501(a) of the Internal Revenue Code, or (xi) the imposition of a Lien pursuant to Section 401(a)(29) or 412(n) of the Internal Revenue Code or pursuant to ERISA with respect to any Pension Plan.

"<u>Event of Default</u>" means each of the conditions or events set forth in Section 8.1.

"<u>Excluded Property</u>" means (a) causes of action of the Debtor arising under Chapter 5 of the Bankruptcy Code or the proceeds thereof; (b) the Resident Escrow Account; and (c) the Trustee-Held Funds, as such term is defined in the Interim Order.

"<u>Exit Fee</u>" shall have the meaning given such term in Section 2.7(b) hereof.

"<u>Extraordinary Receipts</u>" means any cash received by or for the account of Debtor not in the ordinary course of business (without duplication of any other item referred to in the definition of Net Proceeds herein), including (a) foreign, United States, state or local tax refunds, (b) pension plan reversions, (c) proceeds of insurance (other than proceeds of business interruption insurance to the extent such proceeds constitute compensation for lost earnings), (d) judgments, proceeds of settlements or other consideration of any kind in connection with any cause of action, (e) condemnation awards (and payments in lieu thereof), (f) indemnity payments, (g) acquisition purchase price adjustments and insurance proceeds not included as the proceeds of asset dispositions and (h) any purchase price adjustment received in connection with any purchase agreement.

"<u>Fees</u>" means, collectively, the Commitment Fee and the Exit Fee.

"<u>Final Order</u>" means a final order (which must be acceptable in form and substance to the DIP Lenders in their sole discretion) entered or to be entered by the Bankruptcy Court authorizing the secured financing (including the Roll-Up Loans) under the DIP Credit Documents contemplated hereunder.

"<u>Final Order Entry Date</u>" means the date on which the Bankruptcy Court issues the Final Order.

8

"<u>Financials</u>" means, with respect to any Person for any period, the balance sheet of such Person as at the end of such period, and the related statement of income and expense and statement of cash flow of such Person for such period, each setting forth in comparative form the figures for the previous comparable fiscal period, all in reasonable detail and prepared in accordance with GAAP applied consistently throughout the periods reflected therein and with prior periods.

"<u>Financing Order</u>" means, collectively, the Interim Order, the Final Order and such other orders relating thereto or authorizing the granting of credit by DIP Lenders to the Debtor on an emergency, interim or permanent basis, pursuant to section 364 of the Bankruptcy Code as may be issued or entered by the Bankruptcy Court in the Case.

"<u>Fiscal Quarter</u>" means a fiscal quarter of any Fiscal Year.

"<u>Fiscal Year</u>" means each 12 calendar month period constituting a fiscal year of the Debtor.

"<u>GAAP</u>" means generally accepted accounting principles in the United States as in effect from time to time, consistently applied throughout the periods to which reference is made.

"<u>Governmental Body</u>" means any agency, bureau, commission, court, department, official, political subdivision, tribunal or other instrumentality of any administrative, judicial, legislative, executive, regulatory, police or taxing authority of any government, whether supranational, national, federal, state, regional, provincial, local, domestic or foreign, and includes, without limitation, the European Union and its agencies and instrumentalities.

"<u>Hazardous Materials</u>" means any hazardous or toxic substance, waste, contaminant, pollutant, gas or material, including, without limitation, radioactive materials, oil, petroleum and petroleum products and constituents thereof, which are regulated under any Environmental Law, including, without limitation, any substance, waste or material which is (i) designated a "pollutant", "hazardous substance", "extremely hazardous substance" or "toxic chemical" under any Environmental Law, or (ii) regulated in any way under the Regulations of any state or other jurisdiction where the Debtor conducts its business or owns any real property or has any leasehold or in which any Relevant Property is located.

"<u>Indebtedness</u>" means, with respect to any Person, without duplication, the following:  (i) all indebtedness of such Person for borrowed money, (ii) all obligations of such Person for the deferred purchase price of property or services, (other than accounts payable and accrued liabilities that would be classified as current liabilities under GAAP which payables and liabilities are incurred in respect of property or services purchased in the ordinary course of business if and only for so long as either (A) no item of such accounts payable and accrued liabilities is  more than 90 days past due or (B) in the case of the Debtor, Debtor has notified the DIP Lenders in writing thereof (including pursuant to the Schedules hereto) and payments in respect thereof are being made (or not made, as applicable) in accordance with and if permitted by the Budget and the Financing Orders, (iii) all obligations of such Person evidenced by notes, bonds, debentures or similar borrowing or securities instruments, (iv) all obligations of such Person created or arising under any conditional sale or other title retention agreement with respect to property

9

acquired by such Person, (v) all obligations of such Person as lessee under Capital Leases, (vi) all obligations of such Person in respect of banker's acceptances and letters of credit, (vii) all obligations of such Person secured by Liens on the assets and property of such Person, (viii) all obligations of such Person to purchase, redeem, retire, defease or otherwise make any payment in respect of any Capital Stock or other ownership or profit interest in such Person or any other Person or any warrants, rights or options to acquire such Capital Stock, (ix) net liabilities in respect of such Person's hedge agreements as determined in accordance with GAAP, (x) all obligations of such Person in respect of any guaranty by such Person of any obligation of another Person of the type described in clauses (i) through (ix) of this definition and (xi) all obligations of another Person of the type described in clauses (i) through (x) secured by a Lien on the property or assets of such Person (whether or not such Person is otherwise liable for such obligations of such other Person).

"Indemnified Persons" has the meaning stated in Section 7.3.

"Intellectual Property" means, collectively, all copyrights, all patents and all trademarks, together with:  (i) all inventions, processes, production methods, proprietary information, know-how and trade secrets; (ii) all licenses or user or other agreements granted to the Debtor with respect to any of the foregoing, in each case whether now or hereafter owned or used including the licenses or other agreements with respect to any DIP Collateral; (iii) all customer lists, identification of suppliers, data, plans, blueprints, specifications, designs, drawings, recorded knowledge, surveys, engineering reports, test reports, manuals, materials standards, processing standards, performance standards, catalogs, computer and automatic machinery software and programs; (iv) all sales data and other information relating to sales or service of products now or hereafter manufactured; (v) all accounting information and all media in which or on which any information or knowledge or data or records may be recorded or stored and all computer programs used for the compilation or printout of such information, knowledge, records or data; and (vi) all causes of action, claims and warranties, in each case, now or hereafter owned or acquired by the Debtor in respect of any of the items listed above.

"Interest Payment Date" means each of: (a) the first day of each calendar month (and if such day is not a Business Day, the immediately preceding Business Day), (b) the date of any prepayment of the DIP Loans, whether voluntary or mandatory, to the extent accrued on the amount being prepaid, and (c) the Maturity Date.

"Interim Order" means the Interim Order entered by the Bankruptcy Court on March [___], 2019, authorizing the secured financing (including the Roll-Up Loans) under the DIP Credit Documents.

"Interim Order Entry Date" means the date on which the Bankruptcy Court issues the Interim Order.

"Internal Revenue Code" means the Internal Revenue Code of 1986, as amended to the date hereof and from time to time hereafter, and any successor statute.

"Investment" means (i) any direct or indirect purchase or other acquisition by the Debtor of, or of a beneficial interest in, any of any Capital Stock of any other Person, (ii) any direct or indirect redemption, retirement, purchase or other acquisition for value, by the Debtor from any Person, of any Capital Stock of such Person, and (iii) any direct or

10

indirect loan, advance or capital contribution by the Debtor to any other Person, including all indebtedness and accounts receivable from that other Person that are not current assets or did not arise from sales of inventory to that other Person in the ordinary course of business and/or constitute ordinary trade credit extended in the ordinary course of business. The amount of any Investment shall be the original cost of such Investment plus the cost of all additional Investments, without any adjustments for increases or decreases in value, or write-ups, write-downs or write-offs with respect to such Investment.

"Knowledge" means, with respect to the Debtor, the knowledge of the Debtor's Authorized Officers, after reasonable inquiry by such Authorized Officers.

"Lapis" means Lapis Advisers, LP.

"Leasehold Property" means any leasehold interest of Debtor as lessee under any lease of real or personal property, other than any such leasehold interest designated from time to time by the DIP Lenders in their sole discretion as not being required to be included in the DIP Collateral.

"Lien" means any mortgage, deed of trust, security interest, charge, pledge, hypothecation, assignment, attachment, deposit arrangement, encumbrance, lien (statutory, judgment or otherwise, but excluding any right of set off arising by operation of law or pursuant to agreements entered into in the ordinary course of business), or other security agreement or preferential arrangement of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any Capital Lease, any Synthetic Lease, any financing lease involving substantially the same economic effect as any of the foregoing and the filing of any financing statement under the UCC or comparable law of any jurisdiction in respect of the foregoing).

"Losses" has the meaning stated in Section 7.3.

"Margin Stock" means "margin stock" as defined in Regulation U of the Board of Governors of the Federal Reserve System as in effect from time to time.

"Material Adverse Effect" means any material adverse effect on or change in (i) the business, operations, properties, prospects, assets or condition (financial or otherwise) of the Debtor, (ii) the ability of the Debtor to perform its obligations hereunder or under any of the DIP Credit Documents, (iii) the legality, validity or enforceability of any DIP Credit Document (including the provisions hereof providing for the DIP Lenders to refinance and replace their Prepetition Receivership Obligations with Roll-Up Loans), or (iv) the DIP Collateral or the perfection or priority of any DIP Liens granted to the DIP Agent for the benefit of the DIP Lenders under any of the DIP Collateral Documents.

"Material Contracts" means, with respect to any Person, each contract to which such Person is a party which is material to the business, financial condition, operations, performance, properties or reasonably foreseeable business prospects of such Person.

"Maturity Date" means the earliest to occur of the date that is (a) September 9, 2019, (b) April 19, 2019, if the Final Order has not been entered by the Bankruptcy Court as of such date, (c) the confirmation of a plan of reorganization or liquidation for the Debtor in the Case, (d) the closing date of any Transaction, and (e) the day on which the DIP

11

Lenders accelerate the DIP Obligations (or the DIP Obligations automatically and immediately accelerate) or the DIP Obligations otherwise become immediately due and payable pursuant to the terms hereof.

"<u>Multiemployer Plan</u>" means any Employee Benefit Plan that is a "multi-employer plan" as defined in Section 3(37) of ERISA.

"<u>Net Asset Sale Proceeds</u>" means, for the Debtor, with respect to any Asset Sale, an amount equal to:  (i) Cash payments (including any Cash received by way of deferred payment pursuant to, or by monetization of, a note receivable or otherwise, but only as and when so received) received by the Debtor from such Asset Sale, <u>minus</u> (ii) the sum of (A) income or gains taxes actually payable by the seller as a result of any gain recognized in connection with such Asset Sale and (B) if at the time of payment thereof and after giving thereto, (i) the Debtor is in pro forma compliance with the provisions of Section 6.2, (ii) any such payment is permitted to be made at such time in accordance with the Budget and (iii) no Default or Event of Default shall have occurred and be continuing or would result therefrom, reasonable, customary and documented out-of-pocket attorneys' fees, accountants' fees, and brokerage, consultant and other reasonable customary and documented fees and expenses actually incurred in connection with such Asset Sale.

"<u>Net Indebtedness Proceeds</u>" means the proceeds of any Indebtedness incurred by Debtor after the Petition Date (other than pursuant to this DIP Agreement) <u>minus</u> if, at the time of payment thereof and after giving thereto, (i) the Debtor is in pro forma compliance with the provisions of Section 6.2, (ii) any such payment is permitted to be made at such time in accordance with the Budget and (iii) no Default or Event of Default shall have occurred and be continuing or would result therefrom, reasonable, customary and documented out-of-pocket attorneys' fees, accountants' fees, and other reasonable customary and documented fees and expenses actually incurred in connection with the issuance of such Indebtedness.

"<u>Net Insurance/Condemnation Proceeds</u>" means, for the Debtor, an amount equal to: (i) any Cash payments or proceeds received by or owed to the Debtor after the Petition Date (A) under any casualty insurance policy in respect of a covered loss thereunder or (B) as a result of the taking of any assets of the Debtor by any Person pursuant to the power of eminent domain, condemnation or otherwise, or pursuant to a sale of any such assets to a purchaser with such power under threat of such a taking <u>minus</u> (ii) (A) any actual and reasonable documented costs and expenses (including reasonable out-of-pocket attorney's fees) incurred by the Debtor in connection with the adjustment or settlement of any claims of the Debtor in respect thereof, and (B) any bona fide, reasonable, customary and documented costs actually incurred in connection with any sale of such assets as referred to in clause (i)(B) of this definition, including income taxes actually payable as a result of any gain recognized in connection therewith.

"<u>Net Proceeds</u>" means, as of any time, the aggregate of Net Asset Sale Proceeds, Net Insurance/Condemnation Proceeds, Net Indebtedness Proceeds, and Extraordinary Receipts.

"<u>NM Commitment</u>" means with respect to each DIP Lender on the Closing Date, the amount set forth opposite such DIP Lender's name on <u>Schedule 2.1</u> as such DIP Lender's

12

"NM Commitment" or such lesser amount as set forth in the Financing Orders and the Budget.

"NM Loan" has the meaning given such term in Section 2.1(a).

"Notices" has the meaning stated in Section 10.2.

"Operating Account" means the Debtor's account at MUFG Union Bank, NA, currently used as its operating account.

"Participant" has the meaning stated in Section 10.4(c).

"Participation" has the meaning stated in Section 10.4(c)

"PATRIOT Act" has the meaning given such term in Section 4.1(y).

"PBGC" means the Pension Benefit Guaranty Corporation or any successor thereto.

"Pension Plan" means any Employee Benefit Plan, other than a Multiemployer Plan, that is subject to Section 412 of the Internal Revenue Code or Section 302 of ERISA.

"Permit" means any permit, license, approval, consent, permission, notice, franchise, confirmation, endorsement, waiver, certification, registration, qualification, clearance or other authorization issued, granted, given or otherwise made available by or under the authority of any Governmental Body or pursuant to any federal, state, local or foreign Regulation.

"Permitted Indebtedness" means the Indebtedness permitted pursuant to Section 6.1(a).

"Permitted Investment" has the meaning stated in Section 6.1(c).

"Permitted Liens" has the meaning stated in Section 6.1(b).

"Permitted Subordinated Indebtedness" has the meaning stated in Section 6.1(a)(iv).

"Person" means and includes natural persons, corporations, limited partnerships, general partnerships, limited liability companies, limited liability partnerships, joint stock companies, joint ventures, associations, companies, trusts, banks, trust companies, land trusts, business trusts or other organizations, whether or not legal entities, other legal entities and Governmental Bodies.

"Petition Date" means March 10, 2019.

"Post-Petition" means following the Petition Date.

"Prepetition Collateral" has the meaning given such term in the Interim Order.

"Prepetition Credit Agreements" means, collectively, the Prepetition Trust Agreement, the Prepetition Indenture, the Prepetition Reimbursement Agreement and the Prepetition Receivership Loan Agreement.

4831-8871-0793.9

"<u>Prepetition Indebtedness</u>" means the Indebtedness issued or loaned and outstanding under a Prepetition Credit Agreement.

"<u>Prepetition Indenture</u>" means that certain Indenture (as amended from time to time), dated as of April 1, 2005, by and between ABAG and US Bank, as trustee, pursuant to which ABAG issued those certain ABAG Finance Authority for Nonprofit Corporations Variable Rate Demand Revenue Bonds, Series 2005 (Air Force Village West, Inc.) in the original principal amount of $23,000,000, the proceeds of which were loaned to Debtor.

"<u>Prepetition Obligations</u>" means the obligations as set forth in the respective Prepetition Credit Agreements and all other documents, instruments and agreements executed in connection therewith.

"<u>Prepetition Receivership Collateral</u>" means the Prepetition Collateral securing the Prepetition Receivership Indebtedness.  For the avoidance of doubt, Prepetition Collateral includes the "Collateral" as defined in the Receivership Credit Agreement.

"<u>Prepetition Receivership Loan Agreement</u>" has the meaning given such term in the Recitals.

"<u>Prepetition Receivership Loan Documents</u>" means the Prepetition Receivership Loan Agreement and the Financing Documents (as defined therein).

"<u>Prepetition Receivership Indebtedness</u>" has the meaning given such term in the Recitals.

"<u>Prepetition Receivership Obligations</u>" means the Prepetition Obligations arising from the Prepetition Receivership Indebtedness.

"<u>Prepetition Receivership Secured Lenders</u>" has the meaning given such term in the Recitals.

"<u>Prepetition Reimbursement Agreement</u>" means the Reimbursement Agreement, Credit and Security Agreement, dated April 1, 2005, by and between KBC and Debtor, pursuant to which KBC issued an irrevocable letter of credit in the amount of $23,289,863.01 in favor of US Bank to provide credit support for the Indebtedness issued under the Prepetition Indenture. US Bank subsequently drew down such letter of credit in full for the benefit of the holders of the bonds issued under the Prepetition Indenture, and such bonds were tendered to KBC.

"<u>Prepetition Payment</u>" means a payment (by way of adequate protection or otherwise) of principal or interest or otherwise on account of the Prepetition Obligations or any trade payables or other prepetition claims against the Debtor.

"<u>Prepetition Secured Parties</u>" means each of RCPFA, UMB, ABAG, US Bank, KBC, and Lapis, and any other agent, trustee, bondholder, noteholder, lender or other secured party under any Prepetition Credit Agreement.

"<u>Prepetition Trust Agreement</u>" means that certain Trust Agreement, dated as of June 1, 1999, as amended from time to time, by and among Debtor, RCPFA, and UMB, as successor trustee to US Bank pursuant to which RCPFA issued certificates of

14

participation in the original principal amount of $62,790,000, the proceeds of which were loaned to Debtor.

"Projected Financials" means, with respect to any Person for any period, the projected balance sheet of such Person as at the end of such period, and the related projected statement of income and expense and projected statement of cash flow of such Person for such period, all in reasonable detail and prepared in accordance with GAAP applied consistently throughout the periods reflected therein and with prior periods.

"Pro Rata Share" means with respect to all payments, computations and other matters relating to the DIP Loans of any DIP Lender, the percentage obtained by dividing (i) the aggregate principal amount of DIP Loans of such DIP Lender by (ii) the aggregate principal amount of DIP Loans of all DIP Lenders.

"RCPFA" means the Riverside County Public Financing Authority.

"Receiver" has the meaning given such term in the Recitals.

"Receivership Case" has the meaning given such term in the Recitals.

"Receivership Order" has the meaning given such term in the Recitals.

"Regulation" means each applicable law, rule, regulation, order, guidance or recommendation (or any change in its interpretation or administration) by any Governmental Body, central bank or comparable agency and any request or directive (whether or not having the force of law) of any of those Persons and each judgment, injunction, order, writ, decree or award of any Governmental Body, arbitrator or other Person.

"Released Parties" shall have the meaning given such term in Section 10.20.

"Relevant Property" means, for the Debtor, all sites, facilities, locations, real property and leaseholds (i) presently or formerly owned, leased, used or operated by the Debtor (whether or not such properties are currently owned, leased, used or operated by the Debtor), (ii) at which any Hazardous Material has been transported, disposed, treated, stored or released by the Debtor, or (iii) that are directly adjacent to any sites, facilities, locations, real property or leaseholds presently or formerly owned, leased, used or operated by the Debtor.

"Resident Escrow Account" means the escrow account at MUFG Union Bank, N.A., currently used by the Debtor as its resident escrow account.

"Roll-Up Commitment" means with respect to each Roll-Up Lender on the Closing Date, the amount set forth opposite such DIP Lender's name as such Roll-Up Lender's Roll-Up Commitment on Schedule 2.1.

"Roll-Up Lenders" means each of the DIP Lenders identified as a "Roll-Up Lender" on Schedule 2.1 attached hereto and made a part hereof, and each of their successors and assigns.

"Roll-Up Loans" has the meaning given such term in Section 2.1(b).

15

"Securities Act" means the Securities Act of 1933, as amended from time to time, and any successor statute.

"Security Agreement" means the Security Agreement, dated as of the date hereof, among the Debtor and the DIP Agent for the benefit of the DIP Lenders.

"Sub-Agent" has the meaning stated in Section 9.3.

"Subsidiary" means, with respect to any Person, any corporation, partnership, limited liability company, association, joint venture or other business entity of which more than 50% of the total voting power of shares of stock or other ownership interests entitled (without regard to the occurrence of any contingency) to vote in the election of the Person or Persons (whether directors, managers, trustees or other Persons performing similar functions) having the power to direct or cause the direction of the management and policies thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof.

"Synthetic Lease" means any lease of goods or other property, whether real or personal, which is treated as an operating lease under GAAP and as a loan or financing for U.S. income tax purposes.

"Tax" means any present or future tax, levy, impost, duty, assessment, charge, fee, deduction or withholding of any nature and whatever called, by whomsoever, on whomsoever and wherever imposed, levied, collected, withheld or assessed.

"Transaction" has the meaning given such term in Section 5.1(q).

"Transaction Benchmarks" shall have the meaning given such term in Section 5.1(q) of this Agreement.

"UCC" means the Uniform Commercial Code (or any similar or equivalent legislation) as in effect in the State of New York; provided that if by reason of mandatory provisions of law, the perfection, the effect of perfection or non-perfection or the priority of the DIP Liens is governed by the Uniform Commercial Code as in effect in a United States jurisdiction other than New York, "UCC" shall mean the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such perfection, effect of perfection or non-perfection or priority.

"UMB" means UMB Bank, National Association.

"US Bank" means U.S. Bank Trust National Association.

"Weekly Variance Report" means, for each calendar week, a budget variance and reconciliation report setting forth in form and substance reasonably satisfactory to the DIP Lenders (i) a comparative reconciliation, on a line-by-line basis, of actual cash receipts and disbursements against the cash receipts and disbursements forecast in the Budget, and the percentage variance thereof, for (A) the weekly period ended on (and including) the immediately preceding Sunday and (B) the cumulative period to date; (ii) a written explanation of such variances; and (iii) projections for the following 13 weeks, including a rolling cash receipts and disbursements forecast for such period. Each

16

Weekly Variance Report shall be certified by an authorized officer of the Debtor as being prepared in good faith and fairly presenting in all material respects the information set forth therein.

"Westmont" means Westmont Development, LP, and any Subsidiaries or Affiliates thereof.

ARTICLE II
Loans

Section 2.1      DIP Loans.

(a)      The NM Loans.  Subject to the terms and conditions set forth herein and in the Financing Orders, upon Debtor's request for a NM Loan in accordance with Section 2.2(b), each DIP Lender agrees, severally and not jointly, to make term loans pursuant to this Section 2.1(a) (the "NM Loans") during the DIP Commitment Period in an amount equal to such DIP Lender's Pro Rata Share of such requested NM Loan.  Each NM Loan shall be for purposes consistent with the Budget and otherwise consistent with this Agreement; provided that both before and after giving effect to any NM Loan, the NM Loans shall not exceed (1) the individual NM Commitment and DIP Commitment of any DIP Lender (after giving effect to all prior Borrowings of DIP Loans), (2) the aggregate NM Commitments, and (3) the aggregate DIP Commitments (after giving effect to all prior Borrowings of DIP Loans).  Once repaid, DIP Loans borrowed hereunder may not be reborrowed.

(b)      The Roll-Up Loans.  Subject to the terms and conditions set forth herein and in the Financing Orders, an aggregate principal amount of Prepetition Receivership Obligations held by each Roll-Up Lender equal to such Roll-Up Lender's Roll-Up Commitment shall be, on the date on which the Final Order is entered by the Bankruptcy Court, substituted and exchanged for (and prepaid and satisfied by) and deemed to be DIP Loans hereunder in an aggregate principal amount equal to such Roll-Up Lender's Roll-Up Commitment (loans made pursuant to this Section 2.1(b), the "Roll-Up Loans"); provided, however, that amounts borrowed (or substituted and exchanged for Roll-Up Loans) under this Section 2.1(b) and repaid or prepaid may not be reborrowed.

(c)      Generally.  Any amount borrowed under this Section 2.1 shall (i) bear interest as provided in Section 2.6(a) hereof and (ii) along with all other DIP Obligations (including accrued and unpaid fees, costs, and expenses) be entitled to the Liens, DIP Collateral and other rights and benefits provided pursuant to the Financing Orders, this Agreement and the other DIP Credit Documents.

Section 2.2      Borrowing Mechanics.

(a)      The DIP Loans shall be funded by each DIP Lender into the Debtor's Operating Account (which must be a Controlled Account), and anything herein to the contrary notwithstanding, shall be disbursed solely in accordance with the Budget and the Financing Orders, subject to Sections 3.1 and 3.2.

(b)      Not less than three Business Days prior to any Borrowing Date (other than the Interim Order Entry Date, in which case, such notice shall be made on or before the Interim Order Entry Date), the Debtor shall deliver to the DIP Agent a fully executed Borrowing Certificate no later than 10:00 a.m. (New York City time) on such date.  Such Borrowing Certificate shall be in

17

form and substance reasonably satisfactory to the DIP Lenders, shall be irrevocable and shall specify the amount of the proposed DIP Loans and the Borrowing date thereof.  On the Borrowing date specified in any Borrowing Certificate delivered in accordance with this Section 2.2(b), DIP Lenders shall disburse such funds to the Operating Account and shall use reasonable efforts to make the funds available to the Debtor no later than 2:00 p.m. (New York City time) on the requested Borrowing date.

Section 2.3    <u>Pro Rata Shares</u>.  All NM Loans shall be made by the DIP Lenders simultaneously and proportionately to their respective Pro Rata Shares, it being understood that no DIP Lender shall be responsible for any default by any other DIP Lender in such other DIP Lender's obligation to make the NM Loans hereunder.  All Roll-Up Loans shall be deemed made by the Roll-Up Lenders simultaneously and proportionately to their respective Roll-Up Commitments upon the issuance of the Final Order, it being understood that no Roll-Up Lender shall be responsible for any default by any other Roll-Up Lender in such other Roll-Up Lender's deemed obligation to make the Roll-Up Loans hereunder.

Section 2.4    <u>Use of Proceeds</u>.  The proceeds of the NM Loans shall be used by the Debtor in accordance with the Budget and the Financing Orders solely for (a)(i) working capital and general corporate purposes of the Debtor and (ii) bankruptcy-related costs and expenses (subject to the Carve-Out), and (b) from and after entry of the Final Order, the discharge of the Pre-Petition Receivership Obligations of the Debtor arising from the Prepetition Receivership Indebtedness to the DIP Lenders, in their capacity as Pre-Petition Receivership Secured Lenders, pursuant to Section 2.1(b) by Roll-Up Loans. None of the proceeds of the DIP Loans shall be used in connection with the investigation (including discovery proceedings), initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against the DIP Agent or the DIP Lenders (whether in their capacity as DIP Lenders, Pre-Petition Secured Parties, or in any other capacity), including in  connection with the validity of the DIP Liens granted to the DIP Lenders, or the Liens granted to the Pre-Petition Secured Parties in the Prepetition Collateral arising under the Pre-Petition Credit Agreements; provided, that the foregoing shall be without prejudice to any other rights of the Debtor.

Section 2.5    <u>Evidence of Debt; Notes</u>.

(a)    <u>Evidence of Debt</u>.  Each DIP Lender shall maintain in its internal records an account or accounts evidencing the DIP Obligations owed to such DIP Lender, including the amounts of the DIP Loans owed to it and each repayment and prepayment in respect thereof. Any such recordation shall be conclusive and binding on the Debtor, absent manifest error; provided, failure to make any such recordation, or any error in such recordation, shall not affect any DIP Lender's DIP Commitments, DIP Loans or any of the DIP Obligations.

(b)    <u>Notes</u>.  The Debtor shall, if requested by a DIP Lender execute and deliver a promissory note to evidence such DIP Lender's DIP Loans. Any such promissory note shall be in form and substance satisfactory to the DIP Lenders.

Section 2.6    <u>Interest on Loans</u>.

(a)    <u>Applicable Rate; Payment of Interest</u>.  Except as otherwise set forth herein, each DIP Loan (including each NM Loan and Roll-Up Loan) shall bear interest on the unpaid principal amount thereof from the date made through repayment (whether by acceleration or otherwise) on the unpaid principal amount thereof at a rate per annum equal to ten percent (10.00%).  Accrued interest on each DIP Loan shall be paid in full on each Interest Payment Date as follows:  (i) thirty percent (30%) of the accrued interest amount shall be paid in cash, and (ii) seventy percent

18

(70%) of the accrued interest amount shall, in lieu of being paid in cash on such Interest Payment Date, be capitalized and added to the principal amount outstanding under the DIP Loans and shall bear interest from such Interest Payment Date at the same rate as the original principal amount of the DIP Loans and shall be treated as principal of the DIP Loans for all purposes.

(b)      Calculation of Interest Rates.  Interest payable pursuant to this Section 2.6 shall be computed on the basis of a 360-day year for the actual number of days elapsed in the period during which it accrues.  In computing interest on any DIP Loan, the date of the making of such DIP Loan shall be included, and the date of payment of such DIP Loan shall be excluded; provided, if such DIP Loan is repaid on the same day on which it is made, one day's interest shall be paid on such DIP Loan.

(c)      Default Interest.  Upon the occurrence and during the continuance of an Event of Default, the principal amount of all DIP Loans and, to the extent permitted by applicable law, any interest payments on the DIP Loans or any fees or other amounts owed hereunder not paid when due, in each case whether at stated maturity, by notice of prepayment, by acceleration or otherwise, shall thereafter bear interest (including, without limitation, interest, as provided in this Agreement, accruing during the Case, whether or not such interest accrues or is recoverable against the Debtor after the filing of the Case for purposes of the Bankruptcy Code or is an allowed claim in such proceeding) payable on written demand (or automatically upon the occurrence and during the continuation of an Event of Default under Sections 8.1(f) or 8.1(g)) at a rate that is 2.0% per annum in excess of the interest rate otherwise payable hereunder with respect to the DIP Loans.

Section 2.7      Fees.

(a)      Each DIP Lender will be entitled to a fee, for its own account, equal to one half of one percent (0.50%) of the average daily unused amount of the NM Commitment of such DIP Lender for the period from and including the Closing Date to, but not including, the Maturity Date, which shall be payable on the Maturity Date (the "Commitment Fee").  The unused amount of a DIP Lender's NM Commitment for any day shall be equal to such NM Commitment less such DIP Lender's Pro Rata Share of the aggregate principal amount of the NM Loans then outstanding on such day.

(b)      Each DIP Lender will be entitled to a fee, for its own account, equal to three percent (3.00%) of such DIP Lender's NM Loan Commitment, payable on the Maturity Date (the "Exit Fee").

(c)      The Commitment Fee and the Exit Fee shall be deemed fully earned on the Closing Date and shall be non-refundable when paid.

Section 2.8      Repayment.  Subject to Sections 2.11 and 2.12, the DIP Loans shall be due and payable, and the Debtor shall be required to repay all of the DIP Obligations (including, without limitation, all accrued and unpaid principal, interest, fees, costs, and expenses on the DIP Loans) on the Maturity Date.

Section 2.9      Optional Prepayment.

(a)      Optional Prepayment.  Subject to the Financing Orders and the Budget at any time, the Debtor may prepay, without premium or penalty, the DIP Loans on any Business Day in whole or in part; any such prepayment must include all accrued and unpaid interest on the DIP

19

Loans being prepaid thereby and all other accrued and unpaid fees (including the Fees), expenses and other amounts payable under the DIP Credit Documents; provided that each partial repayment shall be in the amount of $100,000 or multiples of $50,000 in excess thereof (or, if less, the outstanding amount of DIP Obligations).  The DIP Loans shall be prepaid according to each respective DIP Lender's Pro Rata Share thereof.

(b)      Notice of Optional Prepayment.  Such prepayment shall be made on a Business Day and upon not less than three Business Days' prior written or telephonic notice from the Debtor given to the DIP Agent by 12:00 p.m. (New York City time) on the date required and, if given by telephone, promptly confirmed in writing to the DIP Agent (and the DIP Agent will promptly transmit such telephonic or original notice for the applicable DIP Loans by electronic transmission or telephone to each DIP Lender).  Upon the giving of such notice, the principal amount of the DIP Loans specified in such notice (and other corresponding DIP Obligations pursuant to Section 2.9(a)) shall become due and payable on the date specified therein.

Section 2.10      Mandatory Prepayments;.

(a)      Net Proceeds.  No later than the first Business Day following the date of receipt by the Debtor of any Net Proceeds, the Debtor shall prepay the DIP Loans (including the applicable portion of the Fees and all other accrued fees, costs and expenses) as set forth in Section 2.12 in an aggregate amount equal to such Net Proceeds.

(b)      Prepayment Certificate.  Concurrently with any prepayment of the DIP Loans pursuant to Section 2.10(a), the Debtor shall deliver to the DIP Agent a certificate of an Authorized Officer demonstrating the calculation in reasonable detail of the amount of the applicable Net Proceeds.  In the event that the Debtor shall subsequently determine that the actual amount received exceeded the amount set forth in such certificate, the Debtor shall promptly make an additional prepayment of the DIP Loans in accordance with Section 2.12 in an amount equal to such excess, and the Debtor shall concurrently therewith deliver to the DIP Agent a certificate of an Authorized Officer demonstrating the derivation of such excess.

Section 2.11      Application of Payments and Proceeds.  Any amount required to be paid pursuant to Section 2.10(a) or any other provision of this Agreement, and all proceeds of the DIP Collateral (whether before or after an Event of Default) shall be applied (a) first, to pay any amounts (including attorneys' fees) payable to the DIP Agent or any DIP Lender under Section 10.3 hereof, (b) second, to pay accrued and unpaid interest, the Fees and any other fees, costs, expenses and other outstanding DIP Obligations, and (c) third, to repay any principal amounts outstanding in respect of the DIP Loans.

Section 2.12      General Provisions Regarding Payments.

(a)      Payments.  All payments by the Debtor of principal, interest, fees and other DIP Obligations shall be made by the Debtor to each DIP Lender in accordance with its Pro Rata Share and, in the case of payments to the DIP Agent, in accordance with the fees, costs, and expense reimbursements due to the DIP Agent hereunder.  All such payments shall be in Dollars in same day funds, without defense, setoff or counterclaim, free of any restriction or condition, and delivered to the appropriate DIP Lender or DIP Agent not later than 2:00 p.m. (New York City time) on the date due at the applicable DIP Lender's office for receipt of notices hereunder (or as otherwise instructed by the DIP Lender to the Debtor) without presentment, demand, protest or notice or any kind, all of which are expressly waived by the Debtor.

20

(b)    <u>Non-Conforming Payments</u>.  Any payment by or on behalf of the Debtor that is not made in same day funds prior to 2:00 p.m. (New York City time) shall be deemed to be a non-conforming payment.  Any such payment shall not be deemed to have been received by the DIP Agent or DIP Lender, as applicable until the later of (i) the time such funds become available funds and (ii) the applicable next Business Day.  Each DIP Lender shall give prompt telephonic notice to the Debtor and each other DIP Lender (confirmed in writing) if any payment is non-conforming.  To the extent any non-conforming payment may be deemed to have been received on a date after the date such payment was due hereunder pursuant to the provisions of this Section 2.10(a), such failure of such payment to have been made when due will constitute or become a Default or Event of Default to the extent so provided under the terms of Section 8.1.  Interest shall continue to accrue on any principal as to which a non-conforming payment is made until such funds become available funds (but in no event less than the period from the date of such payment to the next succeeding applicable Business Day) at the rate determined pursuant to Section 2.6 from the date such amount was due and payable until the date such funds become available funds (but in no event less than the period from the date of such payment to the next succeeding applicable Business Day).

(c)    <u>Payments to Include Accrued Interest</u>.  All payments in respect of the principal amount of any DIP Loan (whether mandatory or optional) shall include payment of accrued interest on the principal amount being repaid or prepaid calculated in accordance with Section 2.6, and all such payments (and, in any event, any payments in respect of any DIP Loan on a date when interest is due and payable with respect to such DIP Loan) shall be applied to the payment of interest before application to principal.

(d)    <u>Business Days</u>.  Whenever any payment to be made hereunder shall be stated to be due on a day that is not a Business Day, such payment shall be made on the next succeeding Business Day and such extension of time shall be included in the computation of the payment of interest hereunder.

Section 2.13    <u>Ratable Sharing</u>.  The DIP Lenders hereby agree among themselves that, except as otherwise provided in the DIP Collateral Documents with respect to amounts realized from the exercise of rights with respect to DIP Liens, if any of them shall, whether by voluntary payment (other than a voluntary prepayment of DIP Loans made and applied in accordance with the terms hereof), through the exercise of any right of set-off or banker's lien, by counterclaim or cross action or by the enforcement of any right under the DIP Credit Documents or otherwise, or as adequate protection of a deposit treated as cash collateral under the Bankruptcy Code, receive payment or reduction of a proportion of the aggregate amount of principal, interest, fees and other amounts then due and owing to such DIP Lender hereunder or under the other DIP Credit Documents (collectively, the "<u>Aggregate Amounts Due</u>" to such DIP Lender) which is greater than the proportion received by any other DIP Lender in respect of the Aggregate Amounts Due to such other DIP Lender, then the DIP Lender receiving such proportionately greater payment shall (a) notify the DIP Agent and each other DIP Lender of the receipt of such payment and (b) apply a portion of such payment to purchase participations (which it shall be deemed to have purchased from each seller of a participation simultaneously upon the receipt by such seller of its portion of such payment) or make such other adjustments as shall be equitable, so that the benefit of all such payments shall be shared by the DIP Lenders in accordance with their Pro Rata Shares; <u>provided</u>, if all or part of such proportionately greater payment received by such purchasing DIP Lender is thereafter recovered from such DIP Lender upon the bankruptcy or reorganization of the Debtor or otherwise, those purchases shall be rescinded and the purchase prices paid for such participations shall be returned to such purchasing DIP Lender ratably to the extent of such recovery, but without interest.  The Debtor expressly consents to the foregoing arrangement and agrees that any holder of a participation so purchased may exercise any and all rights of banker's lien, set-off or counterclaim with respect to any and all monies

21

owing by the Debtor to that holder with respect thereto as fully as if that holder were owed the amount of the participation held by that holder.

Section 2.14    Termination of DIP Commitments.  Unless previously terminated, each of the DIP Commitments automatically shall terminate at the end of the DIP Commitment Period.  Upon the making of any DIP Loan, each DIP Lender's DIP Commitment shall be permanently reduced by an amount equal to the principal amount of such DIP Loan.

ARTICLE III
Conditions Precedent; Conditions Subsequent

Section 3.1    Conditions Precedent; Closing Date.  The obligation of any DIP Lender to make any DIP Loan on the Closing Date or any other date on which the Debtor requests a Borrowing is subject to the satisfaction, or waiver in accordance with Section 10.1, of the following conditions on or before the Closing Date:

(a)    Certificate.  The DIP Lenders shall have received a certificate of the secretary or assistant secretary, or other Authorized Officer, of Debtor with respect to (i) the articles of incorporation of Debtor, (ii) the bylaws of Debtor, (iii) the resolutions of the board of directors of Debtor approving each DIP Credit Document and the other documents to be delivered by Debtor under the DIP Credit Documents and the performance of the obligations of Debtor thereunder, and (iv) the names and true signatures of the officers of Debtor or such other persons authorized to sign each DIP Credit Document to which Debtor is a party and the other documents to be delivered by it under the DIP Credit Documents.

(b)    Good Standing Certificates.  The DIP Lenders shall have received a good standing certificate from the applicable Governmental Body of the jurisdiction of incorporation of Debtor and in each jurisdiction in which it is qualified as a foreign corporation or other entity to do business, each dated within 30 days prior to the Closing Date.

(c)    Interim Order And Final Order.  The Interim Order and the Final Order, and all motions relating thereto, approving and authorizing the DIP Loans, all provisions thereof and the priorities and DIP Liens granted under Bankruptcy Code section 364(c) and (d), as applicable, shall be in form and substance satisfactory to the DIP Lenders and their counsel, the Interim Order shall have been entered by the Bankruptcy Court on or before the date hereof and the Final Order shall be scheduled to be issued no later than April 24, 2019, and shall include, without limitation, provisions (a) modifying the automatic stay to permit the creation and perfection of the DIP Liens, (b) providing for the automatic vacation of such stay to permit the enforcement of the DIP Lenders' rights and remedies under the DIP Loan Documents, including, without limitation, the enforcement, upon five (5) days' prior written notice, of such remedies against the DIP Collateral, requiring the Debtor's best efforts (subject to applicable law) to sell the DIP Collateral if requested by the DIP Lenders, (c) upon entry of the Final Order, prohibiting the assertion of claims arising under section 506(c) of the Bankruptcy Code against the DIP Lenders or, except as expressly permitted therein, the commencement of other actions adverse to the DIP Agent or any DIP Lender or their respective rights and remedies under the DIP Loan Documents, the Interim Order, the Final Order, or any other order, (d) prohibiting the incurrence of Indebtedness by Debtor, other than Permitted Indebtedness, with priority equal to or greater than the DIP Loans, (e) prohibiting any granting or imposition of Liens other than DIP Liens and Permitted Liens, and (f) authorizing and approving the Debtor to execute and deliver the DIP Loan Documents to which each shall be a party and the transactions contemplated therein, including, without limitation, the granting of the super priority status, the first-priority and priming security interests

22

and DIP Liens upon the DIP Collateral in accordance with Article IX hereof and the payment of all fees and expenses due to the DIP Lenders and the DIP Agent. As of the Final Order Entry Date, the Final Order shall further state, among other things, that, upon entry of the Final Order, (a) the DIP Agent, the DIP Lenders, the Prepetition Receivership Secured Lenders, and all of their respective counsel, advisors and consultants, shall each be entitled to the benefit of a "good faith" finding pursuant to section 364(e) of the Bankruptcy Code, and (b) permit the DIP Lenders, individually or together, the right to Credit Bid (pursuant to section 363(k) of the Bankruptcy Code and/or applicable law) the DIP Loans, in whole or in part, in connection with any sale or disposition of assets in the Case.

(d)    <u>Compliance with Financing Orders</u>. No Financing Order shall have been reversed, modified, amended, stayed or vacated, in the case of any modification or amendment, in a manner, or relating to a matter, without the consent of the DIP Lenders. The Debtor shall be in compliance in all respects with the Financing Orders and all other orders of the Bankruptcy Court binding on it.

(e)    <u>Debtor-in-possession</u>. No trustee or examiner shall have been appointed with respect to the Debtor or its properties.

(f)    <u>First Day Motions</u>. All "first day" motions and related orders (including, without limitation, in respect of cash management) entered by the Bankruptcy Court in the Case shall be in form and substance satisfactory to the DIP Lenders and their counsel.

(g)    <u>Approved Budget and Projections</u>. The DIP Lenders shall have received (i) a Budget in form and substance acceptable to the DIP Lenders, and thereupon proceeds of the DIP Loans shall be used by the Debtor solely in accordance with the Budget and (ii) such other information (financial or otherwise) as may be reasonably requested by them.

(h)    <u>Performance of Obligations</u>. All costs, fees, expenses (including, without limitation, legal fees and expenses) and other compensation payable to the DIP Agent and the DIP Lenders shall have been paid to the extent due and payable in accordance with the terms of the Interim Order, the Final Order, and this Agreement, and the Debtor shall have complied with all of its other obligations to the DIP Lenders.

(i)    <u>Litigation, etc</u>. There shall not exist any action, suit, investigation, litigation or proceeding pending (other than the Case) or threatened in any court or before any Governmental Body that, in the opinion of any DIP Lender, affects any of the transactions contemplated hereby, or that has or could be reasonably likely to have a Material Adverse Effect.

(j)    <u>Cash Management</u>. Cash management arrangements satisfactory to the DIP Lenders in form and substance shall be in place. The DIP Lenders or their advisors shall have completed a review of the Debtor's cash management systems and determined that all cash and cash equivalents of the Debtor is subject to a DIP Lien in favor of the DIP Agent, for the benefit of the DIP Lenders, pursuant to Control Agreements.

(k)    <u>Insurance/Assets</u>. The Interim Order shall provide that the DIP Agent for the benefit of the DIP Lenders shall be named as loss payee (in respect of property/casualty insurance policies maintained by the Debtor) and that the DIP Agent and the DIP Lenders are additional insureds (in respect of liability insurance policies maintained by the Debtor), and that the DIP Lenders shall be provided with 30 days' advance notice of non-renewal, cancellation, or amendment riders in respect of such policies.

23

(l)    <u>Waivers/Consents</u>.  As may be required, the DIP Lenders shall have received all necessary third party and Governmental Body waivers and consents, and the Debtor shall, and shall have complied with all applicable laws, decrees and material agreements of any Governmental Body.

(m)    <u>No Default</u>.  No Default or Event of Default shall exist at the time of, or after giving effect to, the transactions contemplated on the Closing Date, including the advancing of any DIP Loans.

(n)    <u>Prepetition Receivership Obligations</u>.  The DIP Lenders shall be satisfied, in their sole discretion, that, among other things, the Interim Order requires the agent and lenders party to the Prepetition Receivership Obligations to accept the repayment in full of all Prepetition Receivership Obligations, terminates the Prepetition Receivership Loan Documents, and releases and discharges all Liens granted by Debtor to secure the Prepetition Receivership Obligations, all in form and substance satisfactory to the DIP Lenders; provided, however that the Interim Order may provide for Liens in favor of the Prepetition Receivership Secured Lenders to exist to secure certain limited Prepetition Receivership Obligations owed by Debtor with respect to expense reimbursements in an amount acceptable to the DIP Lenders in their sole and absolute discretion. The Bankruptcy Court shall have found and so ordered that the DIP Loans are a refinancing or replacement of the Prepetition Receivership Obligations and the DIP Lenders are entitled to all of the rights, interests and benefits held by the lenders party to the Prepetition Receivership Loan Documents.

(o)    <u>Representations and Warranties</u>.  All representations and warranties in the DIP Loan Documents shall be true and correct as of the Closing Date.

(p)    <u>Closing Date Certificate</u>.  The DIP Lenders shall have received an executed Closing Date Certificate (the "<u>Closing Date Certificate</u>"), from the Debtor, together with any attachments thereto.

(q)    <u>UCC Financing Statements</u>.  The DIP Agent shall have received UCC financing statements duly authorized by Debtor with respect to all personal, real and mixed property DIP Collateral of Debtor, for filing in all jurisdictions as may be necessary or, in the opinion of the DIP Lenders, desirable, to perfect the security interests created in such DIP Collateral pursuant to the DIP Collateral Documents.

(r)    <u>DIP Credit Documents</u>.  The DIP Lenders shall have received duly executed original copies of each DIP Credit Document (other than any DIP Credit Document which the DIP Lenders have allowed to be executed at a later date).  The deed of trust, financing statements and other DIP Credit Documents related to perfection of the security interest and Liens of the DIP Agent for the benefit of the DIP Lenders in the DIP Collateral shall, at the DIP Lenders' option, have been filed in all appropriate jurisdictions (or arrangements for such filings acceptable to the DIP Lenders shall have been made).

(s)    <u>Real Property DIP Collateral</u>.  The DIP Lenders shall have received, with respect to any real property owned by Debtor, all conveyances, agreements, surveys, appraisals, title insurance policies, environmental assessments and other documents, as the DIP Lenders shall deem necessary or appropriate in connection with same.

(t)    <u>Other Actions to Perfect Security Interests</u>.  The DIP Lenders shall have received evidence that Debtor shall have taken or caused to be taken any other action, executed and

24

delivered or caused to be executed and delivered any other agreement, document and instrument, and made or caused to be made any other filing and recording (other than as set forth herein), reasonably required by the DIP Lenders to perfect, and to ensure the perfection of, their security interests in the DIP Collateral with the priority required by the DIP Credit Documents.

(u)    Other Information.  The DIP Lenders shall have received any other financial or non-financial information regarding the Debtor as any DIP Lender may reasonably request.

(v)    Proceedings.  All proceedings taken or to be taken in connection with the transactions contemplated by this Agreement shall be satisfactory to the DIP Lenders and their counsel.

(w)    Fees and Costs.  The Interim Order and Budget shall provide, in form and substance satisfactory to the DIP Lenders in their sole discretion, for the Debtor to pay, on the terms and schedule provided therein, all fees and reasonable out-of-pocket expenses of the DIP Lenders and the DIP Agent incurred in connection with this Agreement and the other DIP Credit Documents, including the reasonable fees, costs and expenses of Baker & Hostetler LLP, as counsel to Lapis and the DIP Agent, Ballard Spahr LLP, counsel to KBC, and any other reasonable attorneys' fees, costs and expenses of local counsel to the DIP Agent and the DIP Lenders.  The DIP Lenders shall be satisfied, in their sole discretion, that all such fees and expenses constitute DIP Obligations under the Financing Orders and are secured in full by the DIP Liens on the DIP Collateral.

(x)    Lien Search Results.  The DIP Lenders shall have received UCC, Lien, judgment, and petitions, and intellectual property lien searches from all jurisdictions requested by the DIP Lenders, the results of which shall be satisfactory to the DIP Lenders.

(y)    No Material Adverse Change.  The Debtor, as debtor-in-possession, shall have continued to operate its business in the ordinary course through the Closing Date, and since the Petition Date there shall have been no Material Adverse Effect.

Section 3.2    Conditions to Each Borrowing.  The obligations of each DIP Lender to make any DIP Loan on any Borrowing Date, including the Closing Date, is subject to the satisfaction, or waiver in accordance with Section 10.1, of the following conditions precedent:

(a)    Borrowing Certificate.  The DIP Agent and the DIP Lenders shall have received a fully executed and delivered Borrowing Certificate, in accordance with Section 2.2.  Each Borrowing Certificate shall be executed by an Authorized Officer of the Debtor and delivered to the DIP Agent on a Business Day.

(b)    Representations and Warranties.  As of such Borrowing Date (both before and after giving effect to the advance of the DIP Loans and application of its proceeds), the representations and warranties of the Debtor contained in the DIP Credit Documents shall be true and correct in all material respects on and as of that Borrowing Date, as if made on and as of that Borrowing Date (except to the extent such representations and warranties specifically relate to an earlier date, such representations and warranties were true and correct on and as of such earlier date).

(c)    No Default or Event of Default.  As of such Borrowing Date, no event shall have occurred and be continuing or would result from the consummation of the applicable Borrowing (or the application of its proceeds) that would constitute an Event of Default or a Default.

25

(d)     Consents.  The DIP Lenders shall have received such Consents and other information, approvals, opinions or documents reasonably requested by the DIP Lenders in connection with such Borrowing.

(e)     Available Commitments.  After making the DIP Loans requested on such Borrowing Date, the aggregate outstanding principal amount of (i) the NM Loans shall not exceed the NM Commitment, and (ii) DIP Loans shall not exceed the aggregate amount of DIP Commitments.

(f)     No Material Adverse Effect.  Since the Petition Date, no Material Adverse Effect shall have occurred after giving effect to the making of the DIP Loans.

Section 3.3     Conditions Subsequent.  The Debtor shall satisfy each of the following conditions in the time period provided below therefor; provided, however that the DIP Lenders may extend any such time period in their sole discretion upon written request therefor from the Debtor:

(a)     Insurance Endorsements.  The Debtor shall, within 10 Business Days after the Closing Date, take all actions reasonably required by the DIP Lenders to (i)(x) make each casualty insurance policy of the Debtor payable to the DIP Agent for the benefit of the DIP Lenders, as their interests may appear, in case of loss, or (y) name the DIP Agent and the DIP Lenders as a named insured under each liability policy, and (ii) deliver to the DIP Lenders endorsements, reasonably satisfactory to the DIP Lenders in their sole discretion, with respect to such policies.

(b)     Post-Closing Agreement.  The Debtor shall perform timely perform all obligations and commitments in any post-closing agreement between the DIP Lenders and the Debtor with respect to any requirement of Sections 3.1 or 3.2 hereof that the DIP Lenders have, in the exercise of their sole and absolute discretion, agreed to be satisfied at a later date.

ARTICLE IV
Representations and Warranties

Section 4.1     Representations and Warranties.  In order to induce the DIP Lenders to enter into this Agreement and to make each DIP Loan to be made hereby, Debtor hereby represents and warrants to each DIP Lender, on the Closing Date and on each Borrowing Date as follows:

(a)     Status; Authorization.  Debtor is duly organized, validly existing, and in good standing under the laws of its jurisdiction of incorporation and is duly qualified and in good standing in every other jurisdiction where it is doing business except where the failure to so qualify could not reasonably be expected to have a Material Adverse Effect, and, subject to the entry by the Bankruptcy Court of the Interim Order and the Final Order, the execution, delivery and performance by Debtor of the DIP Credit Documents (i) are within its respective authority, (ii) have been duly authorized, and (iii) do not conflict with or contravene its constitutive documents.  The execution, delivery, performance of its obligations, and exercise of its rights under the DIP Credit Documents by Debtor, including, without limitation, the making of the DIP Loans under this Agreement, (y) do not require any Consents that have not been obtained or notices to third parties that have not been provided and (z) are not and will not be in conflict with or be prohibited or prevented by (A) any Regulation, (B) any corporate governance document, corporate minute or resolution of Debtor or (C) any instrument, agreement or provision thereof, in each case binding on it or affecting any of its property.

26

(b)    <u>Execution and Binding Effect</u>.  Subject to the entry by the Bankruptcy Court of the Interim Order and the Final Order upon execution and delivery thereof, each DIP Credit Document shall constitute the legal, valid and binding obligation of Debtor, enforceable in accordance with its terms.

(c)    <u>Properties</u>.

(i)    Debtor has good and marketable title to all real property owned or purported to be owned by it, in each case free of all Liens other than the Permitted Liens.

(ii)    Except as set forth on <u>Schedule 4.1(c)</u>, Debtor enjoys, and will enjoy, peaceful and undisturbed possession of, or a lease or license to use, all property (subject only to the Permitted Liens) that is necessary for the conduct of its business.

(d)    <u>Litigation</u>.  Except for the Case and the Receivership Case, there are no legal or other proceedings or investigations pending or, to the Knowledge of Debtor, threatened against the Debtor before any court, tribunal or regulatory authority which could, if adversely determined, alone or together, reasonably be expected to have a Material Adverse Effect.

(e)    <u>Governmental Approvals and Filings</u>.  Other than the Bankruptcy Court's entry of the Interim Order and Final Order and the filings and recordations contemplated by the DIP Collateral Documents, no approval, order, consent, authorization, certificate, license, permit or validation of, or exemption or other action by, or filing, recording or registration with, or notice to, any Governmental Body is or will be necessary in connection with the execution and delivery of this Agreement or any other DIP Credit Document, consummation by Debtor of the transactions herein or therein contemplated, or performance of or compliance with the terms and conditions hereof or thereof.  Debtor is not an "investment company" or a company "controlled" by an "investment company", with the meaning of the Investment Company Act of 1940, as amended.

(f)    <u>Absence of Conflicts</u>.  Subject to the Bankruptcy Court's entry of the Interim Order and Final Order, the execution and delivery by Debtor of this Agreement and each other DIP Credit Document to which it is a party and performance by it hereunder and thereunder will not violate any law (including, without limitation, Regulations T, U and X of the Federal Reserve Board) and will not conflict with or result in a breach of any order, writ, injunction, resolution, decree or other similar document or instrument of any court or Governmental Body or its certificate of incorporation or by-laws or similar constituent documents or create (with or without the giving of notice or lapse of time, or both) a default under or breach of any material agreement, bond, note or indenture, in each case to which it is a party (by successor in interest or otherwise), or by which it is bound or any material portion of its properties or assets is affected, or, except under the DIP Collateral Documents, result in the imposition of any Lien (other than Permitted Liens) of any nature whatsoever upon any of the properties or assets owned by or used in connection with the business of the Debtor.

(g)    <u>DIP Collateral</u>.

(i)    From and after the issuance of the Interim Order and the Final Order, the DIP Agent, for the benefit of the DIP Lenders, shall have a first-priority perfected security interests and DIP Liens in and to all of the DIP Collateral, free and clear of any Liens other than the Permitted Liens, and entitled to priority under applicable law, with no financing statements, hypothecations, chattel mortgages, real estate mortgages or

27

similar filings on record with respect to Debtor or DIP Collateral anywhere other than such filings in connection with this Agreement, the DIP Collateral Documents or the Permitted Liens. Each of the representations and warranties made by Debtor in each DIP Collateral Document to which it is a party is true and correct in all material respects as of each date made or deemed made.

(ii)     The Interim Order is (and the Final Order when entered will be) effective to create in favor of the DIP, for the benefit of the DIP Lenders, legal, valid, enforceable and fully perfected security interests in and Liens on the DIP Collateral of the Debtor. Subject to the Interim Order and the entry by the Bankruptcy Court of the Final Order, the provisions of each DIP Collateral Document are effective to create in favor of the DIP Agent, for the benefit of the DIP Lenders, a legal, valid and enforceable security interest in all right, title and interest of the Debtor in the DIP Collateral described therein, and the DIP Agent, for the benefit of the DIP Lenders, will have a fully perfected security interest in all right, title and interest in all of the DIP Collateral described therein, in each case, subject to the exceptions contained in the Financing Orders and this Agreement, superior to and prior to the rights of all third Persons, and subject to no other Liens other than Permitted Liens.

(iii)     The provisions of each DIP Collateral Document are effective to create in favor of the DIP Agent, , for the benefit of the DIP Lenders, a legal, valid and enforceable security interest in all right, title and interest of the Debtor in the DIP Collateral described therein, and, upon the registrations, recordings and other actions necessary or appropriate to create, preserve and perfect the security interest granted to the extent contemplated by the DIP Collateral Documents, the DIP Agent, for the benefit of the DIP Lenders, will have a fully perfected security interest in all right, title and interest in all of the DIP Collateral described therein.

(h)     <u>Subsidiaries</u>. The Debtor does not own any Subsidiaries, other than a charitable foundation which is not, and shall not be, a party to the Case.

(i)     <u>Material Misstatements and Omissions</u>. Any projections and pro forma financial information contained in or delivered pursuant to any DIP Credit Document (including the Budget and each Weekly Variance Report) or any other document, certificate or written statement furnished to the DIP Agent or any DIP Lender pursuant to any DIP Credit Document are based upon good faith estimates and assumptions believed by the Debtor to be reasonable at the time made, it being recognized by the DIP Agent and the DIP Lenders that any projections as to future events contained therein are not to be viewed as facts and that actual results during the period or periods covered by any such projections may differ from the projected results (provided that nothing in this clause (n) shall operate to eliminate or derogate any of the Debtor's obligations under the DIP Credit Documents, including, without limitation, Sections 5.1(a)(iv) and 6.2).

(j)     <u>Budgets</u>. All facts in the Budget and each Weekly Variance Report (when delivered) are accurate and the Debtor has disclosed to the DIP Lenders all material assumptions in the Budget and each Weekly Variance Report. After giving effect to the DIP Loans projected to be made under the Budget, the Debtor believes, in good faith and in the exercise of its commercially reasonable judgment, that it has or will have sufficient capital and funds to pay and satisfy the expenses, obligations and liabilities of the Debtor as set forth, as and when provided to be paid or satisfied, in the Budget.

28

(k)     Labor Practices. Except as described in Schedule 4.1(n), the Debtor is not engaged in any unfair labor practice that could reasonably be expected to have a Material Adverse Effect.

(l)     Employee Benefits. The Debtor is not subject to regulation under ERISA and has not established, and does not bear, any liability for any Employee Benefit Plan or Multiemployer Plan.

(m)     Environmental Matters.

(i)     Except as set forth on Schedule 4.1(p), there are no Environmental Liabilities at any Relevant Property, which individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

(ii)     The Debtor:  (A) has operated its business in compliance with all applicable Environmental Laws; (B) has obtained all Environmental Permits required by applicable Environmental Laws for the ownership and operation of its properties, and all such Environmental Permits are in full force and effect or such Person has made all appropriate filings for issuance or renewal of such Environmental Permits; (C) is not aware of any acts, omissions, events or circumstances that may interfere with or prevent continued compliance with the Environmental Laws and Environmental Permits referred to in the preceding clauses (A) and (B); (D) has not received notice of any asserted or threatened claim, action, suit, proceeding, hearing, investigation or request for information relating to any environmental matter; and (E) has not received notice from any Governmental Body that the Debtor is a potentially responsible party under any Environmental Law at any disposal site containing Hazardous Materials, nor has the Debtor received any notice that any lien under any Environmental Law against any property of the Debtor exists, in each case, except for matters set forth on Schedule 4.1(p) and matters, which individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

(n)     Insurance.  The policies, binders or self-insurance programs for fire, liability, product liability, workmen's compensation, vehicular and other insurance currently held by or on behalf of the Debtor insure its material properties and business activities against such losses and risks as are adequate to protect its properties in accordance with customary industry practice.  As of the date hereof, all such policies, binders and self-insurance programs are in full force and effect.  As of the date hereof, except as set forth on Schedule 4.1(q), the Debtor has not received notice from any insurer or agent of such insurer that substantial capital improvements or other expenditures are required.  As of the date hereof, the Debtor has not received notice of cancellation of any material insurance policy or binder.

(o)     Absence of Events of Default and Material Adverse Effect.  Since the Petition Date, no event has occurred and is continuing and no condition exists which constitutes a Default or Event of Default.  Since the Petition Date, no Material Adverse Effect has occurred.

(p)     Absence of Other Defaults.  Except as disclosed on Schedule 4.1(q), the Debtor is not in default under any agreement, ordinance, resolution, judicial decree, bond, note, indenture, order or judgment to which it is a party (by successor in interest or otherwise) or by which it is bound, or any other agreement or other instrument by which any of the properties or assets owned by it or used in the conduct of its business is affected, which individually or in the aggregate could reasonably be expected to have a Material Adverse Effect.  The Debtor has

29

complied and is in compliance in all respect with all laws, except for such instances of non-compliance that, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

(q)    Material Contracts. The Debtor is not in default in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any of the Material Contracts, and no condition exists which, with the giving of notice or the lapse of time or both, could constitute such a default thereunder. The Debtor will provide a schedule of all Material Contracts to the DIP Agent upon request.

(r)    Brokerage Fees. Except for fees payable to Cushman & Wakefield in connection with the potential sale of the Debtor's real property, no broker's or finder's fee or commission will be payable with respect to the execution and delivery of this Agreement and the other DIP Credit Documents, and no other similar fees or commissions will be payable by the Debtor for any other services rendered to the Debtor ancillary to the credit transactions contemplated herein.

(s)    Margin Regulations. No part of the proceeds of the DIP Loans issued hereunder will be used for the purpose of buying or carrying any Margin Stock or to extend credit to others for the purpose of buying or carrying any Margin Stock, in either case in a manner which would violate or conflict with Regulations T, U or X of the Board Governors of the Federal Reserve System. The Debtor is not engaged in the business of extending credit to others for the purpose of buying or carrying any Margin Stock. Neither the making of the DIP Loans nor any use of proceeds of any such Loans will violate or conflict with the provisions of Regulations T, U or X of the Board of Governors of the Federal Reserve System, as amended from time to time.

(t)    Taxes. The Debtor has filed all federal and other material Tax returns required to be filed by it and has not failed to pay any material Taxes, or interest and penalties relating thereto, on or before the due dates thereof except for Taxes not yet due and except for those the amount or validity of which is currently being contested in good faith by appropriate proceedings diligently pursued and available to the Debtor and with respect to which adequate reserves have been set aside on its books in accordance with GAAP.

ARTICLE V
Affirmative Covenants

Section 5.1    Affirmative Covenants. The Debtor covenants and agrees that until payment in full of all DIP Obligations (other than indemnification obligations for which a claim does not exist as of the applicable date of determination), the Debtor shall perform all the covenants in this Article V applicable to it:

(a)    Basic Reporting Requirements. The Debtor shall furnish to the DIP Lenders:

(i)    on every Friday following the date hereof until the Maturity Date (or, in the case of any Friday that is not a Business Day, the immediately preceding Business Day), the Debtor agrees to deliver a Budget to the DIP Lenders, which Budget shall be reasonably satisfactory to the DIP Lenders and accompanied by a projection of sources and uses of cash by the Debtor on a weekly basis for the 13 week period covered by such Budget;

(ii)    on each Friday (or, in the case of any Friday that is not a Business Day, the immediately succeeding Business Day) following the date hereof until all DIP

30

Obligations (other than indemnification obligations for which a claim does not exist as of the applicable date of determination) have been paid in full, a Weekly Variance Report (or, if such Friday is not a Business Day, the immediately preceding Business Day);

(iii)    As soon as practicable in advance of filing with the Bankruptcy Court or delivering to the Committee appointed in the Case or to the United States Trustee for the Central District of California, as the case may be, the Final Order (which must be in form and substance reasonably satisfactory to the DIP Lenders), all other proposed orders and pleadings related to the approval of this Agreement and the transactions contemplated herein (which must be in form and substance reasonably satisfactory to the DIP Lenders) and any plan of reorganization and/or any disclosure statement related thereto or any proposed asset purchase agreements, merger agreements, or acquisition agreements;

(iv)    at any time and from time to time that the Debtor receives any written notice from CDSS or other Governmental Body, the Debtor shall immediately provide a copy of such notice to the DIP Lenders, and the Debtor shall provide to the DIP Lenders copies of all reports, certificates and notices that the Debtor may provide to CDSS or other Governmental Body;

(v)    as promptly as reasonably practicable from time to time following any DIP Lender's request therefor, such other information (including historical information) regarding the operations, business affairs and financial condition of Debtor, the progress of the Case (including Case exit strategies) or compliance with the terms of any DIP Loan Document, as any DIP Lender may reasonably request.

(b)    Visitation; Verification.  The Debtor shall keep true and accurate books of account in accordance with GAAP and shall permit the DIP Lenders, or any of their designated representatives, upon reasonable notice and at the expense of the Debtor, during normal business hours to visit and inspect the premises of the Debtor to examine the books of account of the Debtor (and to make copies and/or extracts therefrom) and to discuss the affairs, finances and accounts of the Debtor with, and to be advised as to the same by, the managers, executives and officers of the Debtor and to be advised as to such or other business records upon the request of the DIP Lenders.  Management, advisors, consultants and senior personnel of the Debtor shall be available upon reasonable advance notice from the DIP Lenders (or their agents or representatives) for meetings with the DIP Lenders and their agents or representatives at reasonable times and locations.

(c)    Existence; Maintenance of Properties; Compliance with Regulations.  The Debtor shall maintain its corporate/legal existence and business, maintain its assets in good operating conditions and repair (subject to ordinary wear and tear and casualty damage and to all provisions of this Agreement permitting sales of certain of the Debtor's assets), keep its business and assets adequately insured, maintain its chief executive office in the United States, continue to engage in the same or substantially similar lines of business as of the Petition Date, and comply in all respects with all Regulations, including without limitation, ERISA and Environmental Laws, except where a failure to do so could not individually or in the aggregate reasonably be expected to have a Material Adverse Effect.

(d)    Notice of Material Events.  The Debtor shall notify the DIP Lenders promptly in writing upon an Authorized Officer becoming aware of any of the following:  (i) the occurrence of any Default or Event of Default, (ii) any noncompliance with any Environmental Law or proceeding in respect thereof which could reasonably be expected to have a Material Adverse

31

Effect, (iii) any change of chief executive office address of the Debtor, (iv) any pending or, to the Knowledge of Debtor, threatened litigation or similar proceeding affecting the Debtor involving claims in excess of $100,000 in the aggregate or any material change in any such litigation or proceeding previously reported, (v) claims in excess of $100,000 in the aggregate against any assets or properties of the Debtor encumbered in favor of the DIP Agent and/or the DIP Lenders, and (vi) any other development that results in, or could reasonably be expected to result in, a Material Adverse Effect.

(e)      Further Assurances.

(i)      The Debtor shall cooperate with the the DIP Agent and the DIP Lenders, take such action, execute such documents, and provide such information as the DIP Lenders may from time to time reasonably request in order to effect the transactions contemplated by and the purposes and intent of the DIP Credit Documents.

(ii)      The Debtor shall promptly, upon request by any DIP Lender, correct, and cause each of the other parties to the DIP Credit Documents to promptly correct, any defect or error that may be discovered in any DIP Credit Document or in the execution, acknowledgment or recordation of the DIP Credit Document.  Promptly upon request by the DIP Lenders, the Debtor shall execute, authorize, acknowledge, deliver, record, file and register, any and all such further acts, deeds, conveyances, documents, security agreements, pledge agreements, mortgages, deeds of trust, trust deeds, assignments, financing statements and continuations, notices of assignment, transfers, certificates, assurances and other instruments as the DIP Lenders may require from time to time in order to carry out more effectively the purposes and intent of each DIP Credit Document. Without limiting the foregoing, the Debtor shall (A) authorize the filing by the DIP Agent of UCC-1 financing statements for all jurisdictions deemed necessary or desirable by the DIP Lenders, and (B) take such action from time to time (including, without limitation, authorizing, filing, executing and/or delivering such assignments, security agreements and other instruments) as shall be reasonably requested by the DIP Lenders to create, in favor of the DIP Agent for the benefit of the DIP Lenders, to the extent required under the respective DIP Collateral Documents and to the maximum extent permitted under applicable law, a first-priority perfected Lien in all of the DIP Collateral, subject only to Permitted Liens.

(f)      Controlled Account Agreements.

(i)      The Debtor shall use its commercially reasonable efforts, upon the DIP Lenders' request, to enter into an account control agreement in form and substance acceptable to the DIP Lenders (each, a "Controlled Account Agreement") as necessary to provide the DIP Agent, for the benefit of the DIP Lenders, to the extent not prohibited by applicable law, with "control" over, except as set forth below, each Deposit Account of the Debtor (each, a "Controlled Account") as provided for under Section 9-104 of Article 9 of the UCC (or other applicable law) for the purpose of perfecting the security interest which the DIP Agent for the benefit of the DIP Lenders has in such Deposit Account pursuant to the DIP Collateral Documents.  No arrangement contemplated hereby or by any Controlled Account Agreement in respect of any such Deposit Account of the Debtor, shall be modified by the Debtor without the prior written consent of the DIP Lenders.

32

(ii)     Upon the occurrence and during the continuance of an Event of Default, any disbursements of proceeds in any Controlled Account will only be made at the direction of the DIP Lenders; prior to the occurrence of an Event of Default, the Debtor will have access to any funds on deposit in the Controlled Accounts for use solely in accordance with this Agreement and the other DIP Credit Documents.  The DIP Agent and the DIP Lenders assume no responsibility for the Controlled Accounts, including, without limitation, any claim of accord and satisfaction or release with respect to deposits which any banks accept thereunder.  Upon the occurrence and during the continuance of an Event of Default, all remittances which the Debtor receives in payment of any Accounts, and the proceeds of any other DIP Collateral, shall be (A) kept separate and apart from the Debtor's own funds so that they are capable of identification as the DIP Agent's property; (B) held by the Debtor as trustee of an express trust for the DIP Lenders' benefit; and (C) immediately deposited in such accounts designated by the DIP Lenders.  Upon the occurrence and during the continuance of an Event of Default, all proceeds received or collected by the DIP Lenders with respect to the Accounts, and reserves and other property of the Debtor in possession of the DIP Agent or the DIP Lenders at any time or times hereafter, may be held by the DIP Agent or the DIP Lenders, as the case may be, without interest to the Debtor until all DIP Obligations are paid in full or applied by the DIP Lenders on account of the DIP Obligations.  The DIP Lenders may release to the Debtor such portions of such reserves and proceeds as the DIP Lenders may determine.  Neither the DIP Agent nor the DIP Lenders have any duty to protect, insure, collect or realize upon the Accounts or to preserve rights in them.

(g)     <u>Insurance</u>.  The Debtor shall maintain, at its expense, and keep in effect with responsible insurance companies, such liability insurance for bodily injury and third-party property damage as is customary in the case of companies engaged in the same or similar business or having similar properties, similarly situated.  The Debtor shall keep and maintain, at its expense, its material real and personal property insured against loss or damage by fire, theft, explosion, spoilage and all other risks ordinarily insured against by other owners or users of such properties in similar businesses in an amount equal to the full replacement or cash value thereof, subject to deductible amounts which the Debtor, in its reasonable judgment, deems prudent.  At any time that a Default or an Event of Default has occurred and is continuing, the DIP Lenders shall make, settle, and adjust all claims under the Debtor's policies of insurance and make all determinations and decisions with respect to such policies of insurance.

(h)     <u>Information Regarding DIP Collateral</u>.  The Debtor will furnish to the DIP Lenders prompt written notice of any change in (i) any the Debtor's corporate name or any trade name used to identify it in the conduct of its business or the Debtor's chief executive office, its principal place of business or its jurisdiction of organization, (ii) the Debtor's identity or corporate structure or (iii) the Debtor's federal Taxpayer Identification Number.  The Debtor will not effect or permit any change referred to in the preceding sentence unless all filings have been made under the UCC and all other actions have been taken that are required so that such change will not at any time adversely affect the validity, perfection or priority of any Lien established under any DIP Credit Document on the DIP Collateral.

(i)     <u>Existence; Conduct of Business</u>.  The Debtor will do or cause to be done all things necessary to preserve, renew and keep in full force and effect its legal existence and the rights, licenses, permits (including, without limitation, Environmental Permits) privileges, franchises, patents, copyrights, trademarks and trade names material to the conduct of its business, except to the extent that failure to so act, which either individually or in the aggregate,

33

could not reasonably be expected to have a Material Adverse Effect.  The Debtor shall maintain its credit and risk policies substantially as in effect on the Petition Date.

(j)     Payment of Obligations.  In accordance with the Bankruptcy Code and the Budget, and subject to Bankruptcy Court approval, and except for Indebtedness or other obligations (in each case, other than (x) Tax liabilities, (y) obligations in respect of workers' compensation, unemployment insurance and other social security legislation and (z) other Indebtedness and obligations that have resulted in, or could result in, by statute or otherwise, Liens in any of the DIP Collateral that are prior in ranking to, or otherwise pari passu with, any of the Liens in favor of the DIP Agent for the benefit of the DIP Lenders securing the DIP Obligations) that the Debtor is not permitted to pay at such time in accordance with Section 6.2 and the Budget, the Debtor will pay its Indebtedness and other obligations, including Tax liabilities, before the same shall become delinquent or in default, except where (i) the validity or amount thereof is being contested in good faith by appropriate proceedings diligently pursued by the Debtor, (ii) the Debtor has set aside on its books adequate reserves with respect thereto in accordance with GAAP, (iii) such contest effectively suspends collection of the contested obligation and the enforcement of any Lien securing such obligation and (iv) the failure to make payment pending such contest could not reasonably be expected to result in a Material Adverse Effect.

(k)     Compliance with Laws.  Except as otherwise excused by the Bankruptcy Code, the Debtor will comply with all laws (including, without limitation, all Environmental Laws), rules, licenses, permits, Regulations and orders of any Governmental Body applicable to it or its property, except where failures to do so, in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

(l)     Subsidiaries.  Without limitation of the prohibition against forming Subsidiaries under Section 6.1(g) or waiving any Event of Default arising therefrom, if any Subsidiary is nonetheless formed or acquired by the Debtor after the Closing Date, the Debtor will, prior to the date upon which such Subsidiary is formed or acquired, notify the the DIP Lenders thereof and immediately following such formation or acquisition, cause any equity interest in, assets owned or leased by, or Indebtedness owned by or on behalf, of such Subsidiary to be added to the DIP Collateral.  DIP Lenders may require that any such Subsidiary be joined to this Agreement or the DIP Collateral Documents as a borrower or debtor hereunder or thereunder pursuant to joinder agreements in form and substance reasonably satisfactory to DIP Lenders.

(m)     Compliance with ERISA.  The Debtor shall and shall cause its ERISA Affiliates to:  (i) maintain each Employee Benefit Plan in compliance in all material respects with the applicable provisions of ERISA, the Internal Revenue Code and other Federal and State law; (ii) cause each Employee Benefit Plan that is intended to be qualified under Section 401(a) of the Internal Revenue Code to maintain such qualification; (iii) not terminate any Pension Plan so as to incur any material liability to the PBGC; (iv) not allow or suffer to exist any prohibited transaction involving any Employee Benefit Plan or any trust created thereunder which would subject the Debtor or such ERISA Affiliate to a material tax or other material liability on prohibited transactions imposed under Section 4975 of the Internal Revenue Code or ERISA; (v) make all required contributions to any Employee Benefit Plan which it is obligated to pay under Section 302 of ERISA, Section 412 of the Internal Revenue Code or the terms of such Employee Benefit Plan; or (vi) not allow or suffer to exist any occurrence of, with respect to any such Pension Plan, an ERISA Event which could reasonably be likely to have a Material Adverse Effect or any other event or condition which presents a material risk of termination by the PBGC

34

of any Employee Benefit Plan that is a single employer plan, which termination could result in any material liability to the PBGC.

(n)      Transaction.  Notwithstanding anything herein to the contrary, and except as otherwise agreed by the DIP Lenders, the Debtor shall immediately upon the Closing Date sell all or substantially all of its assets and business operations as promptly as possible, either as a going-concern or through asset purchase sales, pursuant to a transaction or series of transactions for a purchase price no lower than the purchase price set forth in the letter of intent from Westmont to the Debtor dated March 8, 2019, pursuant to the Financing Orders, and on terms and conditions satisfactory to the DIP Lenders (one or more such transactions, collectively, the "Transaction"). Any acquisition agreements, asset purchase agreement(s), arrangements, pleadings or other documents relating to such Transaction which Debtor shall enter into must be acceptable to the DIP Lenders in their sole and absolute discretion.

(o)      Milestones.  In connection with the Transaction and the conduct of the Case, Debtor shall (i) provide to the DIP Lenders a draft asset purchase agreement to be entered into with Westmont (or any other stalking-horse bidder for the purchase of the DIP Collateral), satisfactory to the DIP Lenders and pursuant to which any due diligence must be complete by April 22, 2019, on or before March 18, 2019; (ii) file a motion to approve bid procedures for such sale with the Bankruptcy Court, in form and substance satisfactory to the DIP Lenders, on or before March 19, 2019; (iii) reach an agreement by and among Westmont, the Debtor, and the DIP Lenders to a final form of asset purchase agreement for purchase by Westmont (or any other successful bidder) of the DIP Collateral on or before April 15, 2019; (iv) arrange a hearing with the Bankruptcy Court on or around April 18, 2019 (or the first available date for the Bankruptcy Court in proximity to such date) to approve bid procedures (which shall be in form and substance satisfactory to the DIP Lenders); (v) obtain the Final Order on or before April 24, 2019, (vi) obtain a bid procedures order from the Bankruptcy Court setting the deadline for bids from all other potential buyers of the DIP Collateral to occur by May 17, 2019; (vii) conduct the court-approved bankruptcy auction for the sale of the DIP Collateral (in accordance with procedures approved by the Bankruptcy Court and acceptable to the DIP Lenders) on or before May 22, 2019; (viii) arrange a hearing with the Bankruptcy Court to approve the sale of the DIP Collateral to the successful bidder at such auction on or before May 29, 2019 (or the first available date for the Bankruptcy Court in proximity to such date); and (ix) have the effective date of the closing on the sale of all or substantially all of the Debtor's assets to occur on or before August 1, 2019.

(p)      Prepetition Reimbursement Agreement.  Sections 6.01, 6.02, 6.03, 6.07, and 6.31 of the Prepetition Reimbursement Agreement are incorporated herein by reference as though stated herein in full.  Each reference to "Corporation" therein shall be a reference to the Debtor herein.  Other defined terms used in those sections shall have the meaning given such terms in the Prepetition Reimbursement Agreement unless otherwise defined herein.

ARTICLE VI
Negative Covenants/Budget Compliance

Section 6.1    Negative Covenants.  The Debtor covenants and agrees that until all of the DIP Obligations (other than indemnification obligations for which a claim does not exist as of the applicable date of determination) have been paid in full, the Debtor shall perform all covenants in this Section 6.1 applicable to it:

(a)      Indebtedness.  The Debtor shall not incur, create, assume, become or be liable in any manner with respect to, or permit to exist, any Indebtedness, or guarantee, assume, endorse,

35

or otherwise become responsible for (directly or indirectly), any Indebtedness, performance, obligations or dividends of any other Person, except:

(i)      the DIP Obligations;

(ii)      purchase money Indebtedness (including Capital Leases) arising after the date hereof to the extent secured by purchase money security interests in Equipment (including Capital Leases) not to exceed $25,000 in the aggregate at any time outstanding so long as such security interests do not apply to any property of Debtor other than the Equipment so acquired, and the Indebtedness secured thereby does not exceed the cost of the Equipment so acquired, as the case may be;

(iii)      Indebtedness constituting Prepetition Obligations; provided that such Indebtedness remains at all times junior and subordinate to the DIP Obligations pursuant to the Financing Orders and in accordance with Article IX ("Permitted Subordinated Indebtedness"); and

(iv)      Unsecured trade debt of Debtor incurred in the ordinary course of business after the Petition Date in an aggregate amount outstanding at any time not to exceed $25,000.

(b)      Liens.  The Debtor shall not create or incur any Liens on any of the property or assets of the Debtor, except (the Liens described in the following clauses (i) through (xiii), the "Permitted Liens"):

(i)      the Liens of the DIP Agent for the benefit of the DIP Lenders securing the DIP Obligations;

(ii)      Liens against Prepetition Collateral securing Prepetition Obligations;

(iii)      Liens securing the payment of taxes, assessments or other governmental charges or levies either not yet overdue or the validity of which are being contested in good faith by appropriate proceedings diligently pursued and available to the Debtor and with respect to which adequate reserves have been set aside on its books;

(iv)      non-consensual statutory Liens (other than Liens securing the payment of taxes) arising in the ordinary course of the Debtor's business to the extent:  (A) such Liens secure Indebtedness which is not overdue or (B) such Liens secure Indebtedness relating to claims or liabilities which are fully insured and being defended at the sole cost and expense and at the sole risk of the insurer or being contested in good faith by appropriate proceedings diligently pursued by the Debtor, in each case prior to the commencement of foreclosure or other similar proceedings and with respect to which adequate reserves have been set aside on its books;

(v)      zoning and land use restrictions, easements, encumbrances, licenses, covenants and other restrictions affecting the use of real property which do not interfere in any material respect with the use of such real property or ordinary conduct of the business of the Debtor as presently conducted thereon or materially impair the value of the real property which may be subject thereto;

36

(vi)    purchase money security interests in Equipment (including Capital Leases) to secure Indebtedness permitted under Section 6.1(a)(ii) hereof;

(vii)    pledges and deposits of cash by the Debtor after the date hereof in the ordinary course of business in connection with workers' compensation, unemployment insurance and other types of social security benefits consistent with the current practices of the Debtor as of the date hereof;

(viii)    pledges and deposits of cash by the Debtor after the date hereof to secure the performance of tenders, bids, leases, trade contracts (other than for the repayment of Indebtedness), statutory obligations and other similar obligations in each case in the ordinary course of business consistent with the current practices of the Debtor as of the date hereof; provided, that, in connection with any performance bonds issued by a surety or other person, the issuer of such bond shall have waived in writing any rights in or to, or other interest in, any of the DIP Collateral in an agreement, in form and substance satisfactory to the DIP Agent;

(ix)    Liens arising from (A) operating leases and the precautionary UCC financing statement filings in respect thereof and (B) Equipment or other materials which are not owned by the Debtor located on the premises of the Debtor (but not in connection with, or as part of, the financing thereof) from time to time in the ordinary course of business and consistent with current practices of the Debtor and the precautionary UCC financing statement filings in respect thereof;

(x)    judgments and other similar Liens arising in connection with court proceedings that do not constitute an Event of Default; provided, that, (A) the enforcement of such judgments and Liens remain at all times subject to the automatic stay provisions of the Bankruptcy Code, (B) except as otherwise consented to in writing by the DIP Lenders, such Liens are being contested in good faith and by appropriate proceedings diligently pursued by the Debtor, as the case may be, and (C) adequate reserves or other appropriate provision, if any, as are required by GAAP have been made therefor; and

(xi)    Liens in favor of CDSS, subject to the CDSS Letter Agreement.

(c)    Investments.  The Debtor shall not make any Investments other than Investments in: (i) marketable obligations of the United States maturing within one (1) year; (ii) certificates of deposit, bankers' acceptances and time and demand deposits of United States banks having total assets in excess of $1,000,000,000 or other similar cash equivalents; and (iii) existing Investments on the Closing Date shown on the Budget or financial statements (each of (i) through (iii) above, a "Permitted Investment").

(d)    Mergers; Asset Sales.  Except pursuant to a Transaction in accordance with Section 5.1(q) and other than other than any disposals of obsolete, worn out or surplus property, the Debtor shall not, without the written consent of the DIP Lenders, (i) consummate a merger, amalgamation or consolidation, (ii) enter into any Asset Sales or otherwise effect the disposition of any assets, (iii) purchase, sell, lease or otherwise dispose of assets other than inventory in the ordinary course, (iv) make any changes in the corporate structure or identity of the Debtor which could reasonably be expected to have a Material Adverse Effect or (v) enter into any binding agreement to do any of the foregoing.

(e)     <u>Restricted Payments</u>.  The Debtor shall not directly or indirectly, declare, order, pay, make or set apart any sum for any Indebtedness other than the DIP Loans.

(f)     <u>Subsidiaries</u>.  The Debtor shall not form, or cause to be formed, any  Subsidiary or joint venture without the written consent of the DIP Lenders.

(g)     <u>Material Contracts</u>.  From and after the Closing Date, the Debtor shall not enter into a material contractual obligation without the consent of the DIP Lenders.

(h)     <u>Chapter 11 Claims</u>.  Except as provided in the Financing Orders, Debtor will not incur, create, assume, suffer to exist or permit any other superpriority expense claim under Section 364 of the Bankruptcy Code or any or Lien which is senior to or pari passu with, the Liens securing the DIP Obligations.

Section 6.2     <u>Budget Compliance</u>.  The Borrower shall comply with the Budget (subject to the permitted variances provided in the next immediate sentence), and shall not make any payments, or incur any obligations or liabilities, that are projected and provided for in the Budget.  As of the last Business Day of each week:  (i) actual cash receipts received by the Debtor during such week shall not be less than 90% the projected amounts set forth in the Budget for such week; and (y) actual expenses and cash disbursements of the Debtor during such week shall not be greater than 15% (so long as Tom Plumb of Cordes & Company, LLC, or another employee or representative thereof satisfactory to the DIP Lenders, remains responsible for the Budget and reporting thereon) or 10% (if Tom Plumb or another employee or representative of Cordes & Company, LLC, is not so engaged) of the respective amounts, measured as to each line item in the Budget, set forth for such cumulative period to date in the Budget.

ARTICLE VII
Increased Costs; Taxes; Indemnifications, Set Off; Etc.

Section 7.1     <u>Increased Costs; Capital Adequacy</u>.  In the event that any DIP Lender shall have determined that the adoption, effectiveness, phase in or applicability after the Closing Date of any law, rule or regulation (or any provision thereof) regarding capital adequacy, or any change therein or in the interpretation or administration thereof by any Governmental Body, central bank or comparable agency charged with the interpretation or administration thereof, or compliance by any DIP Lender with any guideline, request or directive regarding capital adequacy (whether or not having the force of law) of any such Governmental Body, central bank or comparable agency, has or would have the effect of reducing the rate of return on the capital of such DIP Lender as a consequence of, or with reference to, such DIP Lender's Loans or DIP Commitments or other obligations hereunder with respect to the Loans to a level below that which such DIP Lender could have achieved but for such adoption, effectiveness, phase in, applicability, change or compliance (taking into consideration the policies of such DIP Lender with regard to capital adequacy), then from time to time after the adoption, effectiveness or applicability of such Regulation, within five (5) Business Days after receipt by the Debtor from such DIP Lender of the statement referred to in the next sentence, the Debtor shall pay to such DIP Lender such additional amount or amounts as will compensate such DIP Lender on an after tax basis for such reduction.  Such DIP Lender shall deliver to the Debtor (with a copy to the DIP Agent) a written statement, setting forth in reasonable detail the basis for calculating the additional amounts owed to DIP Lender under this Section 7.1, which statement shall be conclusive and binding, upon all parties hereto absent manifest error.

Section 7.2     <u>Taxes; Withholding, Etc.</u>

38

(a)      <u>Payments to Be Free and Clear</u>.  Except as otherwise required under this Section 7.2, all sums payable by the Debtor hereunder and under the other DIP Credit Documents shall (except to the extent required by law) be paid free and clear of, and without any deduction or withholding on account of, any Tax (other than a Tax on the overall net income of any DIP Lender) imposed, levied, collected, withheld or assessed by or within the United States of America or any political subdivision in or of the United States of America or any other jurisdiction from or to which a payment is made by or on behalf of the Debtor or by any federation or organization of which the United States of America or any such jurisdiction is a member at the time of payment; <u>provided</u>, <u>however</u>, that the Debtor shall be under no obligation to increase the sum payable to any DIP Lender or otherwise indemnify any DIP Lender (x) not organized under the laws of the United States or a state thereof (a "<u>Foreign Lender</u>") by an amount equal to the amount of the United States Tax required to be withheld under United States law from the sums paid to such Foreign Lender, if such withholding is caused by the failure of such Foreign Lender (A) to be engaged in the active conduct of a trade or business in the United States, or all amounts of interest and fees to be paid to such Foreign Lender hereunder are not effectively connected with such trade or business within the meaning of U.S. Treasury Regulation 1.1441-1(a) or (B)  to comply with Section 7.2(c) or (y) that is not a Foreign Lender if such withholding is caused by a failure of such DIP Lender to comply with Section 7.2(d).

(b)      <u>Withholding of Taxes</u>.  If the Debtor is required by law to make any deduction or withholding on account of any such Tax from any sum paid or payable by the Debtor to the DIP Agent or any DIP Lender in the ordinary or general conduct of business:  (i) the Debtor shall notify the DIP Lenders of any such requirement or any change in any such requirement as soon as the Debtor becomes aware of it, (ii) the Debtor shall pay any such Tax before the date on which penalties attach thereto, such payment to be made (if the liability to pay is imposed on Debtor) for its own account or (if that liability is imposed on the DIP Agent or such DIP Lender, as the case may be) on behalf of and in the name of the DIP Agent or such DIP Lender, (iii) in the case of Taxes other than Taxes on the overall net income of any DIP Lender or Taxes otherwise excluded from payment or indemnity under Section 7.2(a), the sum payable by Debtor in respect of which the relevant deduction, withholding or payment is required shall be increased to the extent necessary to ensure that, after the making of that deduction, withholding or payment, the DIP Agent or such DIP Lender, as the case may be, receives on the an amount equal to what it would have received had no such deduction, withholding or payment been required or made, and (iv) within 30 days after paying any sum from which it is required by law to make any deduction or withholding, and within 30 days after the due date of payment of any Tax which it is required by clause (ii) above to pay, the Debtor shall deliver to the DIP Lenders evidence satisfactory to the other affected parties of such deduction, withholding or payment and of the remittance thereof to the relevant taxing or other authority.

(c)      <u>Foreign Lenders</u>.  Upon the reasonable request of the Debtor, each Foreign Lender agrees that it will deliver to the Debtor (i) two (2) properly completed and duly executed copies of United States Internal Revenue Service Form W-8BEN or W-8ECI or other applicable United States Internal Revenue Service forms, or successor applicable form(s), as the case may be, together with any other certificate or statement of exemption required under the Internal Revenue Code or regulations issued thereunder on or before the date a Foreign Lender becomes a party hereunder.  Upon the reasonable request of the Debtor, each such Foreign Lender also agrees to deliver to the Debtor and the DIP Agent two (2) further copies of said Form W-8BEN or W-8ECI or other applicable United States Internal Revenue Service forms, or successor applicable form(s) or other manner of certification, as the case may be, properly completed and duly executed, on or before the date that any such form expires or becomes obsolete or after the occurrence of any event requiring a change in the most recent form previously delivered by it to

39

the Debtor, and such extensions or renewals thereof as may reasonably be requested by the Debtor, unless in any such case an event (including, without limitation, any change in treaty, law or regulation) has occurred prior to the date on which any such delivery would otherwise be required which renders all such forms inapplicable or which would prevent such Foreign Lender from duly completing and delivering any such form with respect to it and such DIP Lender so advises the Debtor.  Such Foreign Lender shall certify in the case of a Form W-8BEN or W-8ECI or other applicable United States Internal Revenue Service forms that it is entitled to receive payments under this Agreement without (or at a reduced rate of) deduction or withholding of any United States federal income taxes and that it is entitled to an exemption from United State backup withholding tax.

(d)    U.S. Lenders.  Upon the reasonable request of the Debtor, each DIP Lender other than a Foreign Lender shall deliver to the Debtor two (2) properly completed and duly executed copies of United States Internal Revenue Service Form W-9 (certifying that such DIP Lender is entitled to an exemption from U.S. backup withholding tax) or any successor form on or before the date such DIP Lender becomes a party hereto.  Upon the reasonable request of the Debtor, each such DIP Lender also agrees to deliver to the Debtor two (2) further copies of said Form W-9, properly completed and duly executed, on or before the date that any such form expires or becomes obsolete or after the occurrence of any event requiring a change in the most recent form previously delivered by it to the Debtor, and such extensions or renewals thereof as may reasonably be requested by the Debtor, unless in any such case an event (including, without limitation, any change in treaty, law or regulation) has occurred prior to the date on which any such delivery would otherwise be required that renders all such forms inapplicable or that would prevent such DIP Lender from duly completing and delivering any such form with respect to it and such DIP Lender so advises the Debtor.

Section 7.3    Indemnification.  The Debtor will indemnify and defend the DIP Agent, the DIP Lenders and each of their respective shareholders, partners, members, managers, directors, officers, employees, agents, attorneys and Affiliates (collectively, the "Indemnified Persons") against and hold each Indemnified Person harmless from any and all liabilities, obligations, losses, damages, costs, expenses, claims, penalties, Actions, judgments, disbursements of any kind or nature whatsoever, interest, fines, cleanup costs, settlements, costs of preparation and investigation, costs incurred in enforcing this indemnity and reasonable attorneys' fees and expenses (collectively, "Losses"), that any of the Indemnified Persons may incur, suffer, sustain or become subject to arising out of, relating to, or due to (i) any inaccuracy or breach of any of the representations and warranties of the Debtor contained in any DIP Credit  Document or in any certificate delivered thereunder, (ii) the nonfulfillment or breach of any covenant, undertaking, agreement or other obligation of the Debtor contained in any DIP Credit Document or in any certificate delivered thereunder, (iii) any Environmental Liability, (iv) any claim, suit, action or cause of action now or hereafter asserted by a broker or any Person acting in a similar capacity arising from or in connection with the execution and delivery of this Agreement or any other DIP Credit Document or the consummation of the transactions contemplated herein or therein; and/or (iv) any use of proceeds of any Loans; provided that such indemnity shall not, as to any Indemnified Person, be available to the extent such Losses arise out of the gross negligence or willful misconduct of such Indemnified Person.  This Section 7.3 shall survive termination of this Agreement.

Section 7.4    Right of Set Off.  In addition to any rights now or hereafter granted under applicable law and not by way of limitation of any such rights, upon the occurrence and during the continuance of any Event of Default, each DIP Lender and the DIP Agent are hereby authorized by the Debtor at any time or from time to time, without notice to the Debtor or to any other Person, any such notice being hereby expressly waived, to set off and to appropriate and to apply any and all deposits (general or special, including Indebtedness evidenced by certificates of deposit, whether matured or

unmatured, but not including trust accounts) and any other Indebtedness at any time held or owing by such DIP Lender or the DIP Agent to or for the credit or the account of the Debtor against and on account of the DIP Obligations of the Debtor to such DIP Lender or the DIP Agent hereunder, irrespective of whether or not (a) such DIP Lender or the DIP Agent shall have made any demand hereunder or (b) the principal of or the interest on the DIP Loans or any other amounts due hereunder or the other DIP Credit Documents shall have become due and payable and although such obligations and liabilities, or any of them, may be contingent or unmatured.

Section 7.5    Funding Breakage.  In addition to the compensation required under Section 7.1, the Debtor shall pay all administrative fees charged by any DIP Lender and indemnify each DIP Lender against any loss or expense (including loss of margin) which such DIP Lender has incurred as a consequence of any prepayment of any DIP Loan (whether or not such payment is mandatory or automatic and whether or not such payment or prepayment is then due).  If any DIP Lender sustains or incurs any such loss or expense or if any DIP Lender has charged the Debtor for an administrative expense it shall from time to time promptly notify the Debtor, and the other DIP Lender, in writing setting forth in reasonable detail the amount determined in good faith by such DIP Lender (such determination shall be conclusive absent manifest error) to be necessary to indemnify such DIP Lender for such loss or expense and the amount of such administrative expense.  Such amount shall be due and payable by the Debtor to such DIP Lender, five Business Days after such notice is given.

ARTICLE VIII<br>Events of Default

Section 8.1    Events of Default.  Any one or more of the following events which shall occur and be continuing shall constitute an "Event of Default":

(a)    Failure to Make Payments When Due.  Failure by the Debtor to pay any of the DIP Obligations, including failure by the Debtor to pay when due any installment of principal of, or interest on, the DIP Loans, whether at stated maturity, by acceleration, by notice of voluntary prepayment, by mandatory prepayment or otherwise, or any fee or any other amount due hereunder, and such failure, except in respect of principal or other DIP Obligations due on the Maturity Date, is continuing for five (5) Business Days after the date due therefor;

(b)    Breach of Certain Covenants.  Failure of the Debtor to perform or comply with any term or condition contained in Section 2.4, Section 3.3, Article V or Article VI;

(c)    Breach of Representations, Etc.  Any representation, warranty, certification or other statement made or deemed made by the Debtor in any DIP Credit Document or in any statement or certificate at any time given by the Debtor in writing, pursuant hereto or thereto or in connection herewith or therewith shall be false in any material respect as of the date made or deemed made;

(d)    Other Defaults Under DIP Credit Documents.  The Debtor shall default in the performance of or compliance with any term contained in any of the DIP Credit Documents, other than any such term referred to in any other section of this Section 8.1, and such default shall not have been remedied or waived within five (5) days after the earlier of (i) the date upon which an Authorized Officer of the Debtor had Knowledge of such default and (ii) the date upon which notice thereof is given to the Debtor by the DIP Lenders;

(e)    Other Indebtedness.  (i)  Failure of the Debtor to pay when due and required pursuant to any Financing Order, any principal of or interest on or any other amount payable in

41

respect of one or more items of Indebtedness in an individual principal amount of $25,000 or more or with an aggregate principal amount of $50,000 or more, in each case beyond the grace period, if any, provided therefor, (ii) breach or default by the Debtor with respect to any other material term of (A) one or more items of Indebtedness in the individual or aggregate principal amounts referred to in clause (i) above or (B) any loan agreement, mortgage, indenture or other agreement relating to such item of Indebtedness, in each case without cure or waiver within the grace period, if any, provided therefor, if the effect of such breach or default is to cause, or to permit the holder or holders of such Indebtedness (or a trustee on behalf of such holder or holders), to cause, such Indebtedness to become or be declared due and payable (or redeemable) prior to its stated maturity or the stated maturity of any underlying obligation, as the case may be, or (iii) the occurrence of an event of default under Section 8.01(n) of the Prepetition Reimbursement Agreement (other than as a result of the Case or the Receivership Case);

      (f)     Conversion or Dismissal of Case.  (i) The entry of an order dismissing the Case or converting the Case to a case  under chapter 7 of the Bankruptcy Code, or the Debtor files, without the prior written consent of the DIP Lenders, a motion or other pleading seeking entry of such an order or supports or fails to timely oppose such dismissal or conversion; or (ii) a trustee, responsible officer or an examiner having expanded powers under Bankruptcy Code Section 1104 (other than (x) a fee examiner or (y) for purposes of an investigation pursuant to Sections 1106(a)(3) and (4) of the Bankruptcy Code) is appointed or elected in the Case, or the Borrower applies for, consents to, supports, acquiesces in or fails to promptly oppose, any such appointment, or the Bankruptcy Court shall have entered an order providing for such appointment, in each case without the prior written consent of the DIP Lenders in their sole discretion.

      (g)     Challenges.  Debtor takes any action to, or fails to take all reasonable actions necessary to oppose any action by any other Person (including, but not limited to, (a) challenging the standing of such party to bring any such action, (b) filing pleadings, providing evidentiary support, and appearing in court to support and present the same in opposition of such party's action, and (c) timely prosecuting all available appeals of any order or decision authorizing such party's actions or approving relief granted to such party or timely opposing all appeals (or attempts to appeal) decisions denying standing or relief to such party), in each case, except as expressly permitted hereunder and in the Financing Orders, (i) impair any of the material rights and remedies of the DIP Agent and the DIP Lenders under the DIP Credit Documents, or (ii) avoid, subordinate, disallow, or require disgorgement by the DIP Lenders of any amount received in respect of the DIP Obligations;

      (h)     DIP Credit Documents Impaired.  At any time after the execution and delivery thereof, (i) this Agreement or any DIP Credit Document ceases to be in full force and effect (other than by reason of a release of DIP Collateral in accordance with the terms hereof or thereof or the satisfaction in full of the DIP Obligations in accordance with the terms hereof) or shall be declared null and void, or the DIP Agent for the benefit of the DIP Lenders shall not have or shall cease to have a valid and perfected first priority Lien, subject only to Permitted Liens, in any material portion of DIP Collateral purported to be covered by the DIP Collateral Documents or (ii) the Debtor shall contest the validity or enforceability of any DIP Credit Document in writing or deny in writing that it has any further liability under any DIP Credit Document to which it is a party;

      (i)     Liens.  At any time after the execution and delivery thereof, the Liens created by the DIP Collateral Documents shall not constitute a valid and perfected first priority Lien on the DIP Collateral intended to be covered thereby (to the extent perfection by filing, registration,

recordation or possession is required herein or therein) in favor of the DIP Agent for the benefit of the DIP Lenders, free and clear of all other Liens (other than Permitted Liens), or, except for expiration in accordance with its terms, any of the DIP Collateral Documents shall for whatever reason be terminated or cease to be in full force and effect, or the enforceability thereof shall be contested by the Debtor;

(j)    <u>Condemnation or Forfeiture of DIP Collateral</u>.  Any judicial process, condemnation or forfeiture proceedings is brought against any material item or portion of the DIP Collateral or any rights therein shall be subject to such judicial process, condemnation or forfeiture proceedings;

(k)    <u>Defaults Under Material Contracts</u>.  Any default by the Debtor under any contract or license agreement, which default continues for more than the applicable cure period, if any, with respect thereto and/or is not waived in writing by the other parties thereto, or any amendment, modification, waiver, termination or failure to renew and which default, amendment, modification, waiver, termination or failure to renew could reasonably be expected to have a Material Adverse Effect;

(l)    <u>Plan or Sale</u>.  Without the DIP Lenders' prior written consent, the Debtor files a plan of reorganization or liquidation, or enters into any Transaction or a Change of Control occurs;

(m)    <u>Trustee</u>.  A trustee, receiver, examiner, or responsible officer with enlarged powers relating to the operation of the business of Debtor (powers beyond those set forth in sections 1106(a)(3) and (a)(4) of the Bankruptcy Code), shall be appointed in the Case;

(n)    <u>Government Restraint</u>.  Any Governmental Body, by a final, non-appealable order, ruling or other action, shall prevent the Debtor from conducting any material part of the Debtor's business, to the extent such prevention could reasonably be expected to result in a Material Adverse Effect;

(o)    <u>Operating Licenses</u>.  The loss, revocation, or termination of any license, permit, lease or agreement necessary or material to the Debtor's business, or the cessation of any material part of the Debtor's business, to the extent such loss, revocation, or termination could reasonably be expected to result in a Material Adverse Effect;

(p)    <u>Prepetition Payments</u>.  Other than payments authorized by the Bankruptcy Court in respect of (i) accrued payroll and related expenses as of the commencement of the Case, (ii) certain creditors, in each case to the extent authorized by one or more "first day" or other orders satisfactory to the DIP Lenders and (iii) payments of franchise (and similar) taxes incurred prior to the Petition Date necessary to maintain the Debtor's existence and qualification or good standing in its jurisdiction of formation and any other jurisdictions in which it conducts business or as otherwise permitted under the DIP Loan Documents, the Debtor shall make any Prepetition Payment;

(q)    <u>Relief from Automatic Stay</u>.  The Bankruptcy Court shall enter an order granting relief from the automatic stay to any creditor or party in interest (i) to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets of the Debtor, or (ii) to permit other actions that the DIP Lenders may, in their sole discretion, deem to have a Material Adverse Effect;

43

(r)    Financing Orders.  The Debtor shall fail to comply with, or there is otherwise any breach or default of, any Financing Order or any other order of the Bankruptcy Court or any order shall be entered reversing, amending, supplementing, staying for a period in excess of five (5) Business Days, vacating or otherwise modifying in any material respect the Interim Order or the Final Order without the prior written consent of the DIP Lenders;

(s)    Judgments.  Any judgments which are in the aggregate in excess of $25,000 as to any Post-Petition obligation shall be rendered against the Debtor and the enforcement thereof shall not be stayed (by operation of law, the rules or orders of a court with jurisdiction over the matter or by consent of the party litigants); or there shall be rendered against the Debtor a nonmonetary judgment with respect to a Post-Petition event which causes or would reasonably be expected to cause a Material Adverse Effect;

(t)    Material Impairment.  The filing of a motion, pleading or proceeding by the Debtor which could reasonably be expected to result in a material impairment of the rights or interests of the DIP Agent or the DIP Lenders under the DIP Loan Documents or any Financing Order or a determination by a court with respect to a motion, pleading or proceeding brought by another party which results in such a material impairment.

Section 8.2    Remedies.  Upon the occurrence of an Event of Default then: (i), the DIP Lenders may, or may cause the DIP Agent to,, by written notice to Debtor (with a copy to counsel for the Committee and to the United States Trustee), take any or all of the following actions, at the same or different times, in each case without further order of or application to the Bankruptcy Court (*provided*, that with respect to the enforcement of DIP Liens or other remedies with respect to the DIP Collateral under clause (iii) below, the DIP Lenders shall provide the Debtor (with a copy to counsel for the Committee and to the United States Trustee) with five (5) Business Days' written notice prior to taking the action contemplated thereby; in any hearing after the giving of the aforementioned notice, the only issue that may be raised by any party in opposition thereto being whether, in fact, an Event of Default has occurred and is continuing):  (a) declare the DIP Commitments terminated, whereupon all DIP Commitments of each DIP Lender shall forthwith terminate immediately; (b) declare the principal of and any accrued interest in respect of all DIP Loans and any promissory notes evidencing such DIP Loans and all other DIP Obligations owing with respect thereto hereunder and thereunder to be, whereupon the same shall become, forthwith immediately due and payable without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Debtor; and (c) enforce all of the DIP Liens and security interests created pursuant to the DIP Collateral Documents securing DIP Obligations owing to the DIP Lenders in accordance with applicable Regulations and (ii) in addition to the foregoing, upon the occurrence of an Event of Default, the DIP Lenders may, (i) exercise any right of counterclaim, setoff, banker's lien or otherwise which it may have with respect to money or property of the Debtor, (ii) bring any lawsuit, action or other proceeding permitted by law for the specific performance of, or injunction against any violation of, any DIP Credit Document and may exercise any power granted under or to recover judgment under any DIP Credit Document, and (iii) exercise any other right or remedy permitted by application Regulations or otherwise available to the  DIP Lenders, or to the DIP Agent for the benefit of the DIP Lenders, at law, in equity or otherwise;

Section 8.3    Remedies Cumulative.  No remedy herein conferred upon any DIP Lender or the DIP Agent is intended to be exclusive of any other remedy and each and every remedy shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute or any other provision of law.

44

ARTICLE IX

The DIP Agent

Section 9.1    Appointment of DIP Agent.  Lapis is hereby appointed the DIP Agent hereunder, and each DIP Lender hereby authorizes the DIP Agent to act as its agent in accordance with the terms hereof and the other DIP Credit Documents.  The DIP Agent hereby agrees to act upon the express conditions contained herein and the other DIP Credit Documents, as applicable.  The provisions of this Article X are solely for the benefit of the DIP Agent and the DIP Lenders and neither Debtor nor any other Person shall have any rights as a third party beneficiary of any of the provisions thereof.  In performing its functions and duties hereunder, the DIP Agent shall act solely as an agent of the DIP Lenders and does not assume and shall not be deemed to have assumed any obligation toward or relationship of agency or trust with or for the Debtor or any other third party.

Section 9.2    Acting on Lender Instruction.  Notwithstanding anything herein or elsewhere to the contrary, the DIP Agent shall not take any action, including, without limitation, with respect to the exercise of any rights or remedies under this Agreement or the DIP Collateral Documents, grant any consent, approve the form or substance of any document, or otherwise exercise any of its rights or duties under this Agreement or the DIP Collateral Documents, except, in each instance, at the direction, or with the consent, of the DIP Lenders.  The DIP Agent shall have only those duties and responsibilities that are expressly specified herein and the other DIP Credit Documents.  The DIP Agent may execute any of its duties under this Agreement and the other DIP Credit Documents by or through agents or attorneys in fact, or may assign such duties to its wholly owned nominee without the consent of the DIP Lenders, and shall be entitled to rely on advice of counsel concerning all matters pertaining to such duties.  The DIP Agent shall not have, by reason hereof or any of the other DIP Credit Documents, a fiduciary relationship in respect of any DIP Lender and nothing herein or any of the other DIP Credit Documents, expressed or implied, is intended to or shall be so construed as to impose upon the DIP Agent any obligations in respect hereof or any of the other DIP Credit Documents except as expressly set forth herein or therein.

Section 9.3    General Immunity.

(a)    No Responsibility for Certain Matters.  The DIP Agent shall not be responsible to any DIP Lender for the execution, effectiveness, genuineness, validity, enforceability, collectibility or sufficiency hereof or any other DIP Credit Document or for any representations, warranties, recitals or statements made herein or therein or made in any written or oral statements or in any financial or other statements, instruments, reports or certificates or any other documents furnished by the DIP Agent to any DIP Lender or by or on behalf of Debtor to the DIP Agent or any DIP Lender in connection with the DIP Credit Documents and the transactions contemplated thereby or for the financial condition or business affairs of Debtor or any other Person liable for the payment of any DIP Obligations, nor shall the DIP Agent be required to ascertain or inquire as to the performance or observance of any of the terms, conditions, provisions, covenants or agreements contained in any of the DIP Credit Documents or as to the use of the proceeds of the DIP Loans or as to the existence or possible existence of any Event of Default or Default.  Anything contained herein to the contrary notwithstanding, the DIP Agent shall not have any liability arising from confirmations of the amount of outstanding Loans.

(b)    Exculpatory Provisions.  None of the DIP Agent or any of its officers, trustees, partners, members, directors, employees, attorneys or agents shall be liable to the DIP Lenders for any action taken or omitted by the DIP Agent under or in connection with any of the DIP Credit Documents at the direction of the DIP Lenders, except to the extent caused by the DIP Agent's gross negligence or willful misconduct.  The DIP Agent shall be entitled to refrain from any act

45

or the taking of any action (including the failure to take an action) in connection herewith or under any of the other DIP Credit Documents or from the exercise of any power, discretion or authority vested in it hereunder or thereunder unless and until the DIP Agent shall have received instructions in respect thereof from the DIP Lenders and, upon receipt of such instructions from the DIP Lenders, the DIP Agent shall be entitled to act or (where so instructed) refrain from acting, or to exercise such power, discretion or authority, in accordance with such instructions. Without prejudice to the generality of the foregoing, (i) the DIP Agent shall be entitled to rely, and shall be fully protected in relying, upon any communication, instrument or document believed by it to be genuine and correct and to have been signed or sent by the proper Person or Persons, and shall be entitled to rely and shall be protected in relying on opinions and judgments of attorneys (who may be attorneys for the Debtor), accountants, experts and other professional advisors selected by it, and (ii) no DIP Lender shall have any right of action whatsoever against the DIP Agent as a result of the DIP Agent acting or refraining from acting hereunder or any of the other DIP Credit Documents in accordance with the instructions of the DIP Lenders.  The DIP Agent shall be fully justified in failing or refusing to take any action under this Agreement or any other DIP Credit Document which involves discretionary decision making absent express written instructions from the DIP Lenders with respect thereto.

Section 9.4    <u>DIP Agent Entitled to Act with the Debtor</u>.  The DIP Agent and its Affiliates may accept deposits from, lend money to and generally engage in any kind of banking, trust, financial advisory or other business with the Debtor or any of its Affiliates as if it were not performing the duties specified herein, and may accept fees and other consideration from the Debtor for services in connection herewith and otherwise without having to account for the same to the DIP Lenders.

Section 9.5    <u>Lenders' Representations, Warranties and Acknowledgment</u>.

(a)    Each DIP Lender represents and warrants that it has made its own independent investigation of the financial condition and affairs of the Debtor in connection with Borrowings hereunder and that it has made and shall continue to make its own appraisal of the creditworthiness of the Debtor.  The DIP Agent shall not have any duty or responsibility, either initially or on a continuing basis, to make any such investigation or any such appraisal on behalf of the DIP Lenders or to provide any DIP Lender with any credit or other information with respect thereto, whether coming into its possession before the making of the DIP Loans or at any time or times thereafter, and the DIP Agent shall not have any responsibility with respect to the accuracy of or the completeness of any information provided to the DIP Lenders.

(b)    Each DIP Lender, by delivering its signature page to this Agreement and funding or holding any of its DIP Loans and accepting its DIP Commitments on the Closing Date, shall be deemed to have acknowledged receipt of, and consented to and approved, each DIP Credit Document and each other document required to be approved by the DIP Agent or the DIP Lenders, as applicable on the Closing Date.

Section 9.6    <u>Right to Indemnity</u>.  [Each DIP Lender, in proportion to its Pro Rata Share, severally (and not jointly) agrees to indemnify the DIP Agent and its stockholders, directors, officers, employees, agents, attorneys and Affiliates (each an "Indemnified Agent Person"), to the extent that the DIP Agent shall not have been reimbursed by Debtor, for and against any, liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses (including attorneys' fees and disbursements) or disbursements of any kind or nature whatsoever which may be imposed on, incurred by or asserted against such Indemnified Agent Person in exercising its powers, rights and remedies or performing its duties hereunder or under the other DIP Credit Documents or otherwise in its capacity as the DIP Agent in any way relating to or arising out hereof or in connection with the DIP Credit

46

Documents; provided, no DIP Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from the DIP Agent's gross negligence or willful misconduct.  If any indemnity furnished to the DIP Agent for any purpose shall, in the opinion of such the DIP Agent, be insufficient or become impaired, the DIP Agent may call for additional indemnity and cease, or not commence, to do the acts indemnified against until such additional indemnity is furnished; provided, further, in no event shall this sentence require any DIP Lender to indemnify the DIP Agent against any liability, obligation, loss, damage, penalty, action, judgment, suit, cost, expense or disbursement in excess of such DIP Lender's Pro Rata Share thereof, and provided, further, this sentence shall not be deemed to require any DIP Lender to indemnify the DIP Agent against any liability, obligation, loss, damage, penalty, action, judgment, suit, cost, expense or disbursement described in the proviso in the immediately preceding sentence.] [***Subject to continuing discussion among the Lenders***]

Section 9.7      Successor DIP Agent.

(a)      The DIP Agent may resign at any time by giving not less than ten (10) Business Days prior written notice thereof to the DIP Lenders and the Debtor.  Upon any such resignation, KBC Bank NV shall become the successor DIP Agent.

(b)      Upon the effectiveness of the resignation or termination of the DIP Agent, the resigning DIP Agent shall be discharged from its duties and obligations under the DIP Credit Documents.  After the effectiveness of the resignation or termination of an DIP Agent, the provisions of Section 7.3, Section 10.3 and this Article IX shall inure to the former DIP Agent's benefit as to any actions taken or omitted to be taken by it while it was acting as the DIP Agent under this Agreement.

Section 9.8      DIP Collateral Documents.

(a)      DIP Agent as the DIP Agent under DIP Collateral Documents.  Each DIP Lender hereby further authorizes the DIP Agent, on behalf of and for the benefit of the DIP Lenders, to be the agent for and representative of the DIP Lenders with respect to the DIP Collateral and the DIP Collateral Documents.

(b)      DIP Agent's Right to Realize on DIP Collateral.  Anything contained in any of the DIP Credit Documents to the contrary notwithstanding, the Debtor, the DIP Agent and each DIP Lender hereby agree that (i) no DIP Lender shall have any right individually to realize upon any of the DIP Collateral, it being understood and agreed that all powers, rights and remedies hereunder may be exercised solely by the DIP Agent, on behalf of the DIP Lenders in accordance with the terms hereof and only at the direction of the DIP Lenders, and (ii) in the event of a foreclosure by the DIP Agent on any of the DIP Collateral pursuant to a public or private sale, the DIP Agent or any DIP Lender may be the purchaser of any or all of such DIP Collateral at any such sale and if so instructed by the DIP Lenders (but only if so instructed) the DIP Agent, as agent for and representative of the DIP Lenders (but not any DIP Lender or the DIP Lenders in its or their respective individual capacities unless the DIP Lenders shall otherwise agree in writing) shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the DIP Collateral sold at any such public sale or any sale under Section 363 of the Bankruptcy Code or any reorganization, to use and apply any of the DIP Obligations as a credit on account of the purchase price for any collateral payable by the DIP Agent at such sale.

47

Section 9.9      Notice of Default.  The DIP Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default hereunder unless the DIP Agent has received notice from a DIP Lender or the Debtor referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default".  In the event that the DIP Agent receives such a notice, the DIP Agent shall promptly give notice thereof to the DIP Lenders.  The DIP Agent shall take such action with respect to such Default or Event of Default as shall be directed by the DIP Lenders and shall be indemnified for any losses, costs, liabilities or any claims arising therefrom (except to the extent arising from the gross negligence or willful misconduct of the DIP Agent).

Section 9.10      Delivery of Documents, Notices, Etc.  In addition to, and in furtherance of any requirement placed upon the DIP Agent herein to deliver, provide, distribute, notify or otherwise convey items received from the Debtor to the DIP Lenders, the DIP Agent shall promptly notify the DIP Lenders of any notices, documents, requests, demands or other items the DIP Agent received from the Debtor and promptly deliver or convey, to the extent they are in written form, such notices, documents, requests, demands or items to the DIP Lenders.

ARTICLE X
Miscellaneous

Section 10.1      Amendments and Waivers; Release of DIP Collateral.

(a)      General Amendments and Waivers.  No amendment, modification, termination (other than pursuant to the express terms of the DIP Credit Documents) or waiver of any provision of the DIP Credit Documents, or consent to any departure by the Debtor therefrom, shall be effective without the written consent of the DIP Lenders.

(b)      Effect of Notices, Waivers or Consents.  Any waiver or consent shall be effective only in the specific instance and for the specific purpose for which it was given.  No notice to or demand on Debtor in any case shall entitle Debtor to any other or further notice (except as otherwise specifically required hereunder or under any of the DIP Credit Documents) or demand in similar or other circumstances.  Any amendment, modification, termination, waiver or consent effected in accordance with this Section 10.1 shall be binding upon each DIP Lender at the time outstanding, each future DIP Lender and Debtor, if signed by Debtor.

(c)      Certain DIP Collateral Releases.  Debtor is entitled to receive the release of DIP Collateral that is the subject of an Asset Sale, or any other sale, transfer or other disposition, in each case, expressly permitted by, and consummated in accordance with, Section 6.1(d), from the Lien of the DIP Collateral Documents, so long as the proceeds (including the Net Asset Sale Proceeds) of such Asset Sale or other sale, transfer or disposition that are required to be used to prepay the DIP Loans pursuant to the terms of the DIP Credit Documents are in fact so prepaid as required hereby (including as required by Section 2.10(a)).

Section 10.2      Notices.  All notices, requests, demands and other communications to any party or given under any DIP Credit Document (collectively, the "Notices") will be in writing and delivered personally, by overnight courier or by registered mail to the parties at the following address or sent by electronic transmission (with confirmation of transmission), to the address specified below (or at such other address as will be specified by a party by like notice given at least five calendar days prior thereto):

(a)      If to the Debtor, at:

48

Air Force Village West, Inc. d/b/a Altavita Village
17050 Arnold Drive
Riverside, CA 92518
Attention:  Mary Carruthers, Chairman of the Board
E-mail:  carruthersm@stifel.com
Telephone:  (909) 307-8478

with a copy to (which shall not constitute notice):

Dentons US LLP
601 S. Figueroa Street
Suite 2500
Los Angeles, CA 90017
Attention:  Samuel R. Maizel
E-mail:  samuel.maizel@dentons.com
Telephone:  (213) 892-2910

(b)     If to Lapis, as DIP Agent or DIP Lender, at:

Lapis Advisers, LP
265 Magnolia Avenue, Suite A
Larkspur, CA  94939
Attention:  Kjerstin Hatch
E-mail:  khatch@lapisadvisers.com
Telephone:  (415) 376–6286

With a copy to (which shall not constitute notice):

Baker & Hostetler LLP
11601 Wilshire Boulevard
Los Angeles, CA 90025-0509
Attention:  Eric Sagerman
E-mail:  ESagerman@bakerlaw.com
Telephone:  (310) 442-8875

(c)     If to KBC, at:

KBC Bank NV
1177 Avenue of the Americas
New York, New York  10036
Attention:  Francis X. Payne, Managing Director
Susan M. Silver, Managing Director
Email:  _____
Telephone:  _____

with a copy to (which shall not constitute notice):

Ballard Spahr LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103-7599
Attention:  Vincent J. Marriott, III

49

*DRAFT 3/11/19*

Email:  marriott@ballardspahr.com
Telephone:  (215) 864-8236

All Notices will be deemed delivered when actually received.  Each of the parties will hereafter notify the other in accordance with this Section of any change of address or email address to which notice is required to be mailed.

Section 10.3    <u>Expenses</u>.  Whether or not the transactions contemplated hereby shall be consummated or any DIP Loans shall be made, the Debtor agrees to pay promptly, subject to the Financing Order (but no later than the Maturity Date), upon written demand from Lapis or KBC, (together with summary backup documentation supporting such reimbursement request) and without the requirement for Bankruptcy Court approval in the event the transactions contemplated hereby are consummated:

(i)    all the reasonable, out-of-pocket costs and expenses of preparation of the DIP Credit Documents and any consents, amendments, waivers or other modifications thereto; the reasonable fees, expenses and disbursements of Baker & Hostetler LLP, as counsel to Lapis, and Ballard Spahr LLP, as counsel to KBC, in connection with the negotiation, preparation, execution and administration of the DIP Credit Documents and any consents, amendments, supplements, waivers or other modifications thereto;

(ii)    all the reasonable, out of pocket costs and expenses of creating and perfecting Liens in favor of the DIP Agent, for the benefit of the DIP Lenders and the DIP Agent, pursuant hereto, including, without limitation, filing and recording fees, expenses, stamp or documentary taxes, search fees, title insurance premiums and reasonable fees, expenses and disbursements of Baker& Hostetler LLP, as counsel to Lapisand the DIP Agent, Ballard Spahr LLP, as counsel to KBC, and any other counsel of the DIP Agent or DIP Lenders in any other jurisdiction;

(iii)    upon the occurrence and during the continuance of an Event of Default or as otherwise incurred in connection with visits and inspections permitted by Section 5.1(b) (the expenses for which are required to be paid by the Debtor pursuant to such Section), all the actual costs and reasonable fees, expenses and disbursements of any auditors, accountants, consultants or appraisers;

(iv)    all the actual costs and reasonable expenses (including, without limitation, upon the occurrence and during the continuance of an Event of Default  or as otherwise incurred in connection with visits and inspections permitted by Section 5.1(b) (the expenses for which are required to be paid by the Debtor pursuant to such Section), the reasonable fees, expenses and disbursements of any appraisers, consultants, advisors and agents employed or retained by the DIP Agent, the DIP Lenders,  and their counsel) in connection with the inspection, verification, custody or preservation of any of the DIP Collateral, to the extent required or permitted hereunder;

(v)    after the occurrence and during the continuance of a Default or an Event of Default, all out-of-pocket costs and expenses, including, without limitation, reasonable attorneys' fees (including allocated costs of internal counsel) and out-of-pocket costs of settlement, incurred by the DIP Agent or the DIP Lenders in enforcing any DIP Obligations of or in collecting any payments due from Debtor hereunder or under the other DIP Credit Documents by reason of such Default or Event of Default (including in connection with the sale of, collection from, or other realization upon any of the DIP

50

Collateral) or in connection with any negotiations, reviews, refinancing or restructuring of the credit arrangements provided hereunder, including without limitation in the nature of a "work out" or pursuant to any insolvency or bankruptcy cases or proceedings; and

(vi)    the foregoing shall not be in addition to, and shall not be construed to limit, any other provisions of the DIP Credit Documents regarding costs and expenses to be paid by the Debtor.

For the avoidance of doubt, the provisions of this Section 10.3 shall not apply to any fees, costs or expense reimbursements and owed to any DIP Lender incurred solely in connection with a Prepetition Credit Agreement.

Section 10.4    Enforceability; Successors and Assigns.

(a)    Enforceability; Successors and Assigns.  This Agreement will be binding upon and inure to the benefit of and is enforceable by the respective successors and permitted assigns of the parties hereto.  This Agreement may not be assigned by the Debtor hereto without the prior written consent of each DIP Lender.  Any assignment or attempted assignment in contravention of this Section will be void ab initio and will not relieve the assigning party of any obligation under this Agreement.

(b)    Assignments.  Each DIP Lender may assign (each, an "Assignment") to one or more assignees all or a portion of its rights and obligations under the DIP Credit Documents (including all or a portion of such DIP Lender's DIP Loans and DIP Commitments, as the case may be, in a minimum amount of $250,000).  Such Assignment may be made without the consent of the Debtor but shall require the written consent of the other DIP Lenders, unless such Assignment is to an Eligible Assignee.   From and after the date of the Assignment, the Assignee shall be a party hereto and, to the extent of the interest assigned pursuant to the Assignment, have the rights and obligations of a DIP Lender under this Agreement, and the assigning Lender shall, to the extent of the interest assigned, be released from its obligations under this Agreement.  The Debtor hereby consents to the disclosure of any information obtained by DIP Lender in connection with this Agreement to any Person to which DIP Lender sells, or proposes to sell, its DIP Loans or DIP Commitments, provided any such Person shall agree to keep any such information confidential.

(c)    Participations.  Each DIP Lender may sell participations (each, a "Participation") to one or more Persons (each, a "Participant") in all or a portion of such DIP Lender's rights and obligations under this Agreement (including all or a portion of such DIP Lender's DIP Loans); provided that (i) such DIP Lender's obligations under this Agreement shall remain unchanged, (ii) such DIP Lender shall remain solely responsible to the Debtor for the performance of such obligations, (iii) the Debtor shall continue to deal solely and directly with the DIP Lender and the DIP Agent in connection with the DIP Lender's rights and obligations under this Agreement and (iv) the other DIP Lenders provide their written consent to such Participation.  Any agreement or instrument pursuant to which the DIP Lender sells such a participation shall provide that the DIP Lender shall retain the sole right to enforce the DIP Credit Documents and to approve any amendment, modification or waiver of any provision of the DIP Credit Documents.  The Debtor hereby consents to the disclosure of any information obtained by a DIP Lender in connection with this Agreement and/or any other DIP Credit Document to any Person to which such DIP Lender participates, or proposes to participate, its DIP Loans or DIP Commitments.

51

(d)      Notwithstanding anything else to the contrary contained herein, any DIP Lender may any time pledge its DIP Loans and such DIP Lender's rights under this Agreement and the other DIP Credit Documents to a Federal Reserve Bank and, in the case of any DIP Lender that is a fund, to its trustee for the benefit of its investors; provided, that no such pledge to a Federal Reserve Bank (or in the case of any DIP Lender that is a fund, to its trustee for the benefit of its investors) shall release such DIP Lender from such DIP Lender's obligations hereunder or under any other Credit  Document.

Section 10.5    Lenders' Obligations Several.  The obligation of each DIP Lender hereunder is several and not joint and neither the DIP Agent nor any DIP Lender shall be responsible for the obligation of any other DIP Lender hereunder.  Nothing contained in any DIP Credit Document and no action taken by the DIP Agent or any DIP Lender pursuant hereto or thereto shall be deemed to constitute the DIP Lenders to be a partnership, an association, a joint venture or any other kind of entity.  The amounts payable at any time hereunder to each DIP Lender shall be a separate and independent debt; provided that if the DIP Agent fails or refuses to exercise any remedies against the Debtor after receiving the direction of the DIP Lenders, each DIP Lender shall be entitled to protect and enforce its rights arising out of this Agreement and it shall not be necessary for any other DIP Lender to be joined as an additional party in any proceeding for such purpose.

Section 10.6    Integration.  This Agreement and the other DIP Credit Documents contain and constitute the entire agreement of the parties with respect to the subject matter hereof and supersede all prior negotiations, agreements and understandings, whether written or oral, of the parties hereto.

Section 10.7    No Waiver; Remedies.  No failure or delay by any party in exercising any right, power or privilege under this Agreement or any of the other DIP Credit Documents will operate as a waiver of such right, power or privilege.  A single or partial exercise of any right, power or privilege will not preclude any other or further exercise of the right, power or privilege or the exercise of any other right, power or privilege.  The rights and remedies provided in the DIP Credit Documents will be cumulative and not exclusive of any rights or remedies provided by law.

Section 10.8    Setoff.  The Debtor hereby, subject to the Financing Orders and the Carve-Out, grants to DIP Agent and each of the DIP Lenders a continuing lien, security interest and right of setoff as security for all liabilities and obligations to each DIP Agent and each DIP Lender, whether now existing or hereafter arising, upon and against all deposits, credits, collateral and property, now or hereafter in the possession, custody, safekeeping or control of DIP Agent or DIP Lender or any Affiliate and their successors and assigns or in transit to any of them.  Regardless of the adequacy of any collateral, if any of the DIP Obligations are due and payable and have not been paid or any Event of Default shall have occurred, any deposits or other sums credited by or due from any of the DIP Lenders to the Debtor and any securities or other property of the Debtor in the possession of such DIP Lender may be applied to or set off by such DIP Lender against the payment of DIP Obligations and any and all other liabilities, direct, or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, of the Debtor to such DIP Lender.  **ANY AND ALL RIGHTS TO REQUIRE ANY DIP LENDER TO EXERCISE ITS RIGHTS OR REMEDIES WITH RESPECT TO ANY OTHER DIP COLLATERAL WHICH SECURES THE DIP OBLIGATIONS, PRIOR TO EXERCISING ITS RIGHT OF SETOFF WITH RESPECT TO SUCH DEPOSITS, CREDITS OR OTHER PROPERTY OF THE DEBTOR IS HEREBY KNOWINGLY, VOLUNTARILY AND IRREVOCABLY WAIVED.**

Section 10.9    Execution in Counterparts.  This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Agreement.  Delivery of an executed counterpart of this Agreement by facsimile or

52

other electronic transmission shall be equally as effective as delivery of an original executed counterpart of this Agreement.

Section 10.10    Governing Law; Submission To Jurisdiction; Venue.

(a)    SUBJECT TO THE JURISDICTION OF THE BANKRUPTCY COURT, THIS AGREEMENT AND THE OTHER DIP CREDIT DOCUMENTS AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER AND THEREUNDER SHALL, EXCEPT AS OTHERWISE PROVIDED IN CERTAIN OF THE OTHER DIP CREDIT DOCUMENTS, BE CONSTRUED IN ACCORDANCE WITH AND BE GOVERNED BY THE INTERNAL LAW OF THE STATE OF NEW YORK (WITHOUT REGARD TO CONFLICTS OF LAWS RULES AND PRINCIPLES THEREUNDER) AND, TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE.  ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER DIP CREDIT DOCUMENT SHALL BE BROUGHT IN THE BANKRUPTCY COURT , OR IN THE EVENT THAT THE BANKRUPTCY COURT DOES NOT HAVE OR DOES NOT EXERCISE JURISDICTION, THEN IN ANY STATE OR FEDERAL COURT OF COMPETENT JURISDICTION IN THE STATE, COUNTY AND CITY OF LOS ANGELES, CALIFORNIA, AND, BY EXECUTION AND DELIVERY OF THIS AGREEMENT OR ANY OTHER DIP CREDIT DOCUMENT, THE DEBTOR HEREBY IRREVOCABLY ACCEPTS FOR ITSELF AND IN RESPECT OF ITS PROPERTY, GENERALLY AND UNCONDITIONALLY, THE JURISDICTION OF THE AFORESAID COURTS.  THE DEBTOR HEREBY FURTHER IRREVOCABLY WAIVES ANY CLAIM THAT ANY SUCH COURTS LACKS PERSONAL JURISDICTION OVER DEBTOR, AND AGREES NOT TO PLEAD OR CLAIM, IN ANY LEGAL ACTION PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER DIP CREDIT DOCUMENT BROUGHT IN THE AFOREMENTIONED COURTS, THAT SUCH COURTS LACK PERSONAL JURISDICTION OVER DEBTOR.  DEBTOR FURTHER IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS OUT OF THE AFOREMENTIONED COURTS IN ANY SUCH ACTION OR PROCEEDING BY THE MAILING OF COPIES THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, TO DEBTOR AT ITS ADDRESS AS SET FORTH IN SECTION 10.2 HEREOF, SUCH SERVICE TO BECOME EFFECTIVE 30 DAYS AFTER SUCH MAILING.  DEBTOR HEREBY IRREVOCABLY WAIVES ANY OBJECTION TO SUCH SERVICE OF PROCESS AND FURTHER IRREVOCABLY WAIVES AND AGREES NOT TO PLEAD OR CLAIM IN ANY ACTION OR PROCEEDING COMMENCED HEREUNDER OR UNDER ANY OTHER DIP CREDIT DOCUMENT THAT SERVICE OF PROCESS WAS IN ANY WAY INVALID OR INEFFECTIVE.  NOTHING HEREIN SHALL AFFECT THE RIGHT OF THE DIP AGENT, OR ANY DIP LENDER TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST DEBTOR IN ANY OTHER JURISDICTION.

(b)    DEBTOR HEREBY IRREVOCABLY WAIVES ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY OF THE AFORESAID ACTIONS OR PROCEEDINGS ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER DIP CREDIT DOCUMENT BROUGHT IN THE COURTS REFERRED TO IN CLAUSE (a) ABOVE AND HEREBY FURTHER IRREVOCABLY WAIVES AND AGREES NOT TO PLEAD OR CLAIM IN ANY SUCH COURT THAT ANY SUCH ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURTS HAVE BEEN BROUGHT IN AN INCONVENIENT FORUM.

4831-8871-0793.9

Section 10.11    Waiver of Jury. **THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT THAT THEY MAY HAVE TO TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION, OR IN ANY LEGAL PROCEEDING, DIRECTLY OR INDIRECTLY BASED UPON OR ARISING OUT OF THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT (WHETHER BASED ON CONTRACT, TORT, OR ANY OTHER THEORY).  EACH PARTY (A) CERTIFIES THAT NO REPRESENTATIVE, DIP AGENT, OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTIES WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.**

Section 10.12    Severability. If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of law, or public policy, all other conditions and provisions of this Agreement will nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner adverse to any party. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto will negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner to the end that the transactions contemplated hereby are fulfilled to the extent possible.

Section 10.13    Survival. All representations, warranties, covenants, agreements, and conditions contained in or made pursuant to this Agreement or the other DIP Credit Documents shall survive (a) the making of the Loans and the payment of the DIP Obligations and (b) the performance, observance and compliance with the covenants, terms and conditions, express or implied, of all DIP Credit Documents, until the due and punctual (i) indefeasible payment of the DIP Obligations and (ii) performance, observance and compliance with the covenants, terms and conditions, express or implied, of this Agreement and all of the other DIP Credit Documents; provided, however, that the provisions of Article VII, Section 9.4, Section 9.6, Section 9.7 and Section 10.3 (other than Section 10.3(a)(iii), except to the extent fees, costs and expenses have been incurred prior to termination hereof but not paid in accordance with such Sections, in which case such Sections shall survive only to require payment of such fees, costs and expenses) shall survive (x) indefeasible payment of the DIP Obligations and (y) performance, observance and compliance with the covenants, terms and conditions, express or implied, of this Agreement and all of the other DIP Credit Documents.

Section 10.14    Maximum Lawful Interest. Notwithstanding anything to the contrary contained herein, in no event shall the amount of interest and other charges for the use of money payable under this Agreement or any other DIP Credit Document exceed the maximum amounts permissible under any law that a court of competent jurisdiction shall, in a final determination, deem applicable.  The Debtor and the DIP Lenders, in executing and delivering this Agreement, intend legally to agree upon the rate or rates of interest and other charges for the use of money and manner of payment stated within it; provided, however, that, anything contained herein to the contrary notwithstanding, if the amount of such interest and other charges for the use of money or manner of payment exceeds the maximum amount allowable under applicable law, then, ipso facto as of the Closing Date, the Debtor is and shall be liable only for the payment of such maximum as allowed by law, and payment received from the Debtor in excess of such legal maximum, whenever received, shall be applied to reduce the principal balance of the Loans to the extent of such excess.

4831-8871-0793.9

Section 10.15    Interpretation.  As used in this Agreement, references to the singular will include the plural and vice versa and references to the masculine gender will include the feminine and neuter genders and vice versa, as appropriate.  Unless otherwise expressly provided in this Agreement (a) the words "hereof", "herein" and "hereunder" and words of similar import when used in this Agreement will refer to this Agreement as a whole and not to any particular provision of this Agreement and (b) article, section, subsection, and schedule references are references with respect to this Agreement unless otherwise specified.  Unless the context otherwise requires, the term "including" will mean "including, without limitation."  The headings in this Agreement and in the Schedules are included for convenience of reference only and will not affect in any way the meaning or interpretation of this Agreement.

Section 10.16    Ambiguities.  This Agreement and the other DIP Credit Documents were negotiated between legal counsel for the parties and any ambiguity in this Agreement or the other DIP Credit Documents shall not be construed against the party who drafted this Agreement or such other DIP Credit Documents.

Section 10.17    The PATRIOT Act.  Each DIP Lender subject to the PATRIOT Act hereby notifies Debtor, that pursuant to the requirements of the PATRIOT Act, it is required to obtain, verify and record information that identifies Debtor and other information that will allow such DIP Lender to identify Debtor in accordance with the PATRIOT Act.

Section 10.18    Conflicting Provisions in Security Documents.  In the event that any provisions of this Agreement conflict with any DIP Collateral Document, the provisions of this Agreement shall govern.

Section 10.19    Certain Matters Relating to Roll-Up Loans.

(a)    By executing this Agreement, each DIP Lender represents and warrants that (i) the Dollar amount of Roll-Up Loans attributable to such Roll-up Lender does not exceed as of the date hereof, and shall not exceed as of the Final Order Entry Date, the aggregate principal amount of Prepetition Receivership Obligations owed by the Debtor to such DIP Lender as of midnight, Los Angeles, California time, on the Petition Date.

(b)    In the event that any Roll-Up Loan, or any payments or other satisfaction thereof made by Debtor is avoided, disallowed, set aside, or otherwise invalidated, in whole or in part, in the Case, any other judicial proceeding, or in any other manner, an amount of Prepetition Receivership Obligations equal to such invalidated amount shall immediately be reinstated in full force and effect, and, with respect to such amount, the affected DIP Lender shall be entitled to all the rights, remedies, title, and interest of a Prepetition Receivership Secured Lender under the Prepetition Receivership Loan Documents as to such invalided amount all as though a Roll-Up Loan equal to such amount had never been made.

Section 10.20    Modifications.  Except as specifically contemplated in the Financing Orders, the DIP Liens, lien priority, administrative priorities and other rights and remedies granted to the DIP Agent for the benefit of the DIP Lenders pursuant to this Agreement and the Financing Orders (specifically, including, but not limited to, the existence, perfection and priority of the DIP Liens provided herein and therein and the administrative priority herein and therein) shall not be modified, altered or impaired in any manner by any other financing or extension of credit or incurrence of Indebtedness by the Debtor (pursuant to section 364 of the Bankruptcy Code or otherwise), or by any dismissal or conversion of the Case, or by any other act or omission whatsoever (other than in connection with any asset disposition permitted hereunder).  Without limitation, notwithstanding any such order, financing, extension, incurrence, dismissal, conversion, act or omission: (i) except for the Carve-Out having priority over the

55

*DRAFT 3/11/19*

DIP Obligations, no costs or expenses of administration which have been or may be incurred in the Case or any conversion of the same or in any other proceedings related thereto, and no priority claims, are or will be prior to or on a parity with any claim of the DIP Agent or DIP Lenders against Debtor in respect of any DIP Obligation; (ii) the Liens granted under the DIP Credit Documents shall continue to be valid and perfected and with the specified priority without the necessity that financing statements be filed or that any other action be taken, or document or instrument registered or delivered, under applicable non-bankruptcy law; and (iii) notwithstanding any failure on the part of the Debtor, the DIP Agent, or the DIP Lenders to perfect, maintain, protect or enforce the Liens in the DIP Collateral granted under the DIP Credit Documents, the Financing Orders shall automatically, and without further action by any Person, perfect such Liens against the DIP Collateral of Debtor.

      Section 10.21   Release.  THE DEBTOR HEREBY ACKNOWLEDGES AND AGREES THAT IT HAS NO DEFENSE, COUNTERCLAIM, OFFSET, CROSS-COMPLAINT, CLAIM OR DEMAND OF ANY KIND OR NATURE WHATSOEVER THAT CAN BE ASSERTED TO REDUCE OR ELIMINATE ALL OR ANY PART OF ITS LIABILITY TO REPAY THE DIP OBLIGATIONS (OR THE PREPETITION OBLIGATIONS OWED TO THE PREPETITION SECURED PARTIES) OR TO SEEK AFFIRMATIVE RELIEF OR DAMAGES OF ANY KIND OR NATURE FROM THE DIP AGENT, THE DIP LENDERS (IN THEIR CAPACITY AS DIP LENDERS HEREUNDER AND IN THEIR CAPACITY AS PREPETITION SECURED PARTIES) OR OTHER PREPETITION SECURED PARTIES.  THE DEBTOR HEREBY VOLUNTARILY AND KNOWINGLY RELEASES AND FOREVER DISCHARGES DIP AGENT, THE DIP LENDERS (IN THEIR CAPACITY AS DIP LENDERS HEREUNDER AND IN THEIR CAPACITY AS PREPETITION SECURED PARTIES), THE OTHER PREPETITION SECURED PARTIES, THEIR RESPECTIVE AFFILIATES, AND EACH OF THEIR RESPECTIVE AGENTS, EMPLOYEES, SUCCESSORS AND ASSIGNS (COLLECTIVELY, THE "**RELEASED PARTIES**") FROM ALL POSSIBLE CLAIMS, DEMANDS, ACTIONS, CAUSES OF ACTION, DAMAGES, COSTS, EXPENSES, OBLIGATIONS, DEBTS AND LIABILITIES WHATSOEVER, WHETHER KNOWN OR UNKNOWN, ANTICIPATED OR UNANTICIPATED, SUSPECTED OR UNSUSPECTED, FIXED, CONTINGENT OR CONDITIONAL, OR AT LAW OR IN EQUITY, IN ANY CASE ORIGINATING IN WHOLE OR IN PART ON OR BEFORE THE DATE THIS AGREEMENT IS EXECUTED THAT THE DEBTOR MAY NOW OR HEREAFTER HAVE AGAINST THE RELEASED PARTIES, IF ANY, IRRESPECTIVE OF WHETHER ANY SUCH CLAIMS ARISE OUT OF CONTRACT, TORT, VIOLATION OF LAW OR REGULATIONS, OR OTHERWISE, AND THAT ARISE FROM ANY DIP LOANS OR PREPETITION INDEBTEDNESS, THE EXERCISE OF ANY RIGHTS AND REMEDIES UNDER THE DIP CREDIT DOCUMENTS OR THE PREPETITION CREDIT AGREEMENTS AND THEIR RELATED DOCUMENTS, AND/OR NEGOTIATION FOR AND EXECUTION OF THIS AGREEMENT, INCLUDING, WITHOUT LIMITATION, ANY CONTRACTING FOR, CHARGING, TAKING, RESERVING, COLLECTING OR RECEIVING INTEREST IN EXCESS OF THE HIGHEST LAWFUL RATE APPLICABLE.  NOTWITHSTANDING ANYTHING TO THE CONTRARY SET FORTH HEREIN, THE FOREGOING RELEASE SHALL BE SUBJECT TO THE RIGHTS OF A COMMITTEE APPOINTED PURSUANT TO SECTION 1102 OF THE BANKRUPTCY CODE OR ANY OTHER PARTY IN INTEREST UNDER THE FINAL ORDER AND INTERIM ORDER OR ANY SUCCESSOR PROVISION IN ANY OTHER FINANCING ORDER.

[Remainder of page intentionally left blank; signatures on following pages.]

In witness whereof, the parties hereto have caused this Agreement to be duly executed and delivered by their respective representatives thereunto duly authorized as of the date first written above.

**AIR FORCE VILLAGE WEST, INC. D/B/A ALTAVITA VILLAGE**, as Debtor

By:    _____
　　　Name:_____
　　　Title:_____

**LAPIS ADVISERS, LP**, as the DIP Agent and a DIP Lender

By:    _____
　　　Name:_____
　　　Title:_____

**KBC BANK NV**, as a DIP Lender

By:    _____
　　　Name:_____
　　　Title:_____

By:    _____
　　　Name:_____
　　　Title:_____

## SCHEDULE 2.1

## DIP COMMITMENTS

| Name of DIP Lender | NM Commitment | Roll-Up Commitment |
|---|---|---|
| Lapis Advisers, LP | 69.00% of the aggregate NM Commitment | |
| KBC Bank NV | 31.00% of the aggregate NM Commitment | |
| ***Aggregate*** | $4,250,000 | |

1

**<u>EXHIBIT 3</u>**

2

(Budget)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DENTONS US LLP
601 South Figueroa Street, Suite 2500
Los Angeles, California 90017-5704
(213) 623-9300

110339826\V-7

**Air Force Village West, Inc.**
**Cash Flow Forecast**

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 3/16/2019 | 3/23/2019 | 3/30/2019 | 4/6/2019 | 4/13/2019 | 4/20/2019 | 4/27/2019 | 5/4/2019 | 5/11/2019 | 5/18/2019 | 5/25/2019 | 6/1/2019 | 6/8/2019 | 6/15/2019 | 6/22/2019 |
| *Cash Receipts:* | | | | | | | | | | | | | | | |
| Private Pay | 874,000 | 123,000 | 123,000 | 127,000 | 878,000 | 127,000 | 127,000 | 124,000 | 124,000 | 878,000 | 124,000 | 99,000 | 123,000 | 878,000 | 123,000 |
| Medicare/Insurance | 40,000 | 150,000 | 150,000 | 35,000 | 35,000 | 35,000 | 150,000 | 150,000 | 40,000 | 40,000 | 150,000 | 150,000 | 40,000 | 40,000 | 150,000 |
| Promissory Note | - | 1,100 | - | - | - | 1,100 | - | - | - | - | 1,100 | - | - | 1,100 | - |
| Other | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 |
| **Total Operating Receipts** | $ 921,000 | $ 281,100 | $ 280,000 | $ 169,000 | $ 920,000 | $ 170,100 | $ 284,000 | $ 281,000 | $ 171,000 | $ 926,100 | $ 281,000 | $ 256,000 | $ 170,000 | $ 926,100 | $ 280,000 |
| *Cash Disbursements:* | | | | | | | | | | | | | | | |
| Payroll, benefits and taxes | - | (395,000) | - | (530,000) | - | (395,000) | - | (530,000) | - | (395,000) | - | (395,000) | - | (530,000) | - |
| Trade/utility payables | - | (120,000) | (135,000) | (135,000) | (135,000) | (135,000) | (135,000) | (135,000) | (135,000) | (135,000) | (135,000) | (135,000) | (135,000) | (135,000) | (135,000) |
| Outreach rehab | - | (52,000) | - | - | (104,000) | - | - | - | (104,000) | - | - | - | - | (104,000) | - |
| Food services | - | - | (107,400) | - | (79,000) | (1,000) | (107,400) | - | (79,000) | (1,000) | - | (107,400) | (79,000) | (1,000) | - |
| Insurance | - | - | - | (68,000) | - | - | - | - | (68,000) | - | - | - | - | (68,000) | - |
| Management fee | - | - | - | - | - | (73,000) | - | - | - | (73,000) | - | - | - | (73,000) | - |
| Other | - | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) |
| **Total Operating Disbursement** | $ - | $ (577,000) | $ (252,400) | $ (743,000) | $ (328,000) | $ (614,000) | $ (252,400) | $ (675,000) | $ (396,000) | $ (614,000) | $ (145,000) | $ (647,400) | $ (224,000) | $ (921,000) | $ (145,000) |
| **Total Operating Cash Flow** | $ 921,000 | $ (295,900) | $ 27,600 | $ (574,000) | $ 592,000 | $ (443,900) | $ 31,600 | $ (394,000) | $ (225,000) | $ 312,100 | $ 136,000 | $ (391,400) | $ (54,000) | $ 5,100 | $ 135,000 |
| *Non-Operating Disbursements:* | | | | | | | | | | | | | | | |
| Entrance fees/refunds | | | | | | | | | | | | | | | |
| Interest Payments | | | | | | | | | | | | | | | |
| Capital Expenditures | - | - | - | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) |
| Professional Retainers | | | | | | | | | | | | | | | |
| Professional Fees | | | | | | | | | | | | | | | |
| **Total Non-Operating Disbursements** | $ - | $ - | $ - | $ (5,000) | $ (5,000) | $ (5,000) | $ (5,000) | $ (5,000) | $ (5,000) | $ (5,000) | $ (5,000) | $ (5,000) | $ (5,000) | $ (5,000) | $ (5,000) |
| *Chapter 11 / Reorganization:* | | | | | | | | | | | | | | | |
| Debtor counsel | | | | | | | | (400,000) | | | | | (200,000) | | |
| Debtor financial advisor/Receiver custodian | | | | | | | | (100,000) | | | | | (50,000) | | |
| Unsecured creditor committee professionals | | | | | | | | (100,000) | | | | | (50,000) | | |
| Claims & noticing agent - KCC | | | | | | | | (40,000) | | | | | (20,000) | | |
| Ordinary course professionals | | | | | | | | (7,500) | | | | | (7,500) | | |
| 503(b)(9)/Critical vendor payments | | (170,000.0) | | | | | | | | | | | | | |
| Utility deposits | | (50,000.0) | | | | | | | | | | | | | |
| Patient Care Ombudsman | | | | | | | | (20,000) | | | | | (10,000) | | |
| Miscellaneous admin | | | | | | | | (2,000) | | | | | (2,000) | | |
| DIP Interest (Periodic) | - | - | - | - | - | - | - | (337) | - | - | - | (2,837) | - | - | - |
| US Trustee fees | | | | | | | $ (6,500) | | | | | | | | |
| **Total Chapter 11/Reorganization** | $ - | $ (220,000) | $ - | $ - | $ - | $ - | $ (6,500) | $ (669,837) | $ - | $ - | $ - | $ (2,837) | $ (339,500) | $ - | $ - |
| **Net Cash Flow** | $ 921,000 | $ (515,900) | $ 22,600 | $ (579,000) | $ 587,000 | $ (448,900) | $ 20,100 | $ (1,068,837) | $ (230,000) | $ 307,100 | $ 131,000 | $ (399,237) | $ (398,500) | $ 100 | $ 130,000 |
| **Beginning Cash Balance** | $ 305,201 | $ 1,226,201 | $ 710,301 | $ 732,901 | $ 300,000 | $ 887,000 | $ 438,100 | $ 458,200 | $ 300,000 | $ 300,000 | $ 607,100 | $ 738,100 | $ 338,863 | $ 300,000 | $ 300,100 |
| Net Cash Flow | 921,000 | (515,900) | 22,600 | (579,000) | 587,000 | (448,900) | 20,100 | (1,068,837) | (230,000) | 307,100 | 131,000 | (399,237) | (398,500) | 100 | 130,000 |
| DIP Revolver Draws | - | - | - | 146,099 | - | - | - | 910,637 | 230,000 | - | - | - | 359,637 | - | - |
| **Ending Cash Balances** | $ 1,226,201 | $ 710,301 | $ 732,901 | $ 300,000 | $ 887,000 | $ 438,100 | $ 458,200 | $ 300,000 | $ 300,000 | $ 607,100 | $ 738,100 | $ 338,863 | $ 300,000 | $ 300,100 | $ 430,100 |

| | |
|---|---|
| *DIP Interest Rate  (Periodic)* | 3.0% |
| *DIP Interest Rate (Deferred)* | 7.0% |
| *Unused DIP Commitment Rate* | 0.5% |
| *Total DIP Commitment* | $ 4,250,000 |
| *Minimum Cash Balance* | $ 300,000 |