1  Samuel R. Maizel (SBN 189301)
samuel.maizel@dentons.com
2  Tania M. Moyron (SBN 235736)
tania.moyron@dentons.com
3  Gary W. Marsh (*pro hac* pending)
gary.marsh@dentons.com
4  DENTONS US LLP
601 South Figueroa Street, Suite 2500
5  Los Angeles, California 90017-5704
Telephone:    (213) 623-9300
6  Facsimile:    (213) 623-9924

7  Proposed Attorneys for the Chapter 11 Debtor
and Debtor In Possession

8

## UNITED STATES BANKRUPTCY COURT
9
## CENTRAL DISTRICT OF CALIFORNIA - RIVERSIDE DIVISION

10

11  In re:                                      Case No. 6:19-bk-11920-SC

12  AIR FORCE VILLAGE WEST, INC.                Chapter 11 Case
d/b/a ALTAVITA VILLAGE,
13                                               Hon. Scott C. Clarkson

14        Debtor and Debtor in Possession.

15                                               **DECLARATION OF BILL PACE IN SUPPORT
OF DEBTOR'S FIRST DAY MOTIONS**
16
17                                               <u>EMERGENCY HEARING</u>:
Date:   March 14, 2019
18                                               Time:   10:00 a.m.
Place:  Courtroom 5C
19                                                        411 West Fourth Street
Santa Ana, CA 92701
20                                               *Video Courtroom:*
Date:   March 14, 2019
21                                               Time:  10:00 a.m.
Place: 3420 Twelfth Street
22                                                       Video Hearing Room 126
Riverside, CA 92501
23

24        I, Bill Pace, hereby state and declare as follows:

25        I have been the Chief Financial Officer of Eskaton Properties, Inc. ("<u>Eskaton</u>") and

26  Management Agent for Air Force Village West, Inc., doing business as Altavita Village (the

27  "<u>Debtor</u>" or "<u>Altavita Village</u>") from 2006 through February 22, 2019. I am currently the

28  Advisor to the Chief Financial Officer of Eskaton until June 20, 2019 to assist with his transition

DENTONS US LLP
601 South Figueroa Street, Suite 2500
Los Angeles, California 90017-5704
(213) 623-9300

to this role.  I am generally familiar with the day-to-day operations, business and financial affairs, and books and records of the Debtor.

1. I am an experienced senior business leader with nearly 30 years of business experience in the healthcare field. Eskaton is the largest non-profit community-based organization serving seniors in the Greater Sacramento area. Prior to joining Eskaton in 2006, I served as a chief financial officer and controller for various hospitals and medical organizations for 11 years and as a CPA/manager in public accounting, specializing in healthcare institutions for over six years.

2. Eskaton provides support, consulting, and management services to the Debtor. Eskaton's team of professionals brings together experts in strategic planning, information technology, finance, operations, marketing, design and development to provide the Debtor with a unique support plan. In particular, Eskaton provides operational expertise and support in all areas of senior housing including independent living, assisted living, memory care, and skilled nursing support services.

3. On the date hereof (the "Petition Date"), the Debtor filed its voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq*,,[1] in the United States Bankruptcy Court for the Central District of California, Riverside Division commencing the above-captioned chapter 11 case (the "Chapter 11 Case").

4. To enable the Debtor to minimize the adverse effects of the commencement of this Chapter 11 Case on its business, the Debtor has requested various types of relief in a number of applications and motions (each a "First Day Motion" and collectively the "First Day Motions"). The First Day Motions seek relief intended to maintain the Debtor's business operations; to preserve value for the Debtor, its stakeholders, and parties in interest; and, most importantly, to protect the health and wellbeing of the Residents (defined below) who reside at the CCRC (defined below) operated by the Debtor. Each First Day Motion is crucial to the Debtor's reorganization efforts and to the health and wellbeing of the Residents.

5. I make this declaration in support of the First Day Motions (the "First Day

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

---

[1] All references to "§" or "section" herein are to sections of the Bankruptcy Code unless otherwise noted.

110461521\V-3

1  Declaration"). Any capitalized term not expressly defined herein shall have the meaning ascribed

2  to that term in the relevant First Day Motion. The facts set forth in this First Day Declaration are

3  personally known to me, and, if called as a witness, I could and would testify thereto.

4       6.      Part I of this First Day Declaration provides an overview of the Debtor's business, the

5  prepetition sales and marketing process, the existing debt structure, and the purpose of this Chapter 11

6  Case, as well as a discussion of certain events leading to the Debtor's chapter 11 filing. Part II sets

7  forth the relevant facts in support of the First Day Motions.

8                              **I.**

9                        **BACKGROUND**

10 **A.     The Debtor's Business**

11      7.      The Debtor is a non-profit corporation organized under the laws of the State of

12 California that owns and operates a full-service continuing care retirement community ("CCRC")

13 located in Riverside, California known as Altavita Village. Altavita Village is home to 361

14 residents (the "Residents"), many of whom are dependent on the Debtor for their day to day

15 personal and medical care.

16      8.      A CCRC, sometimes known as a life-care community, is a type of retirement

17 community where a continuum of aging care needs—from independent living, assisted living, and

18 skilled nursing care—can all be met within the community. The Debtor, therefore, offers, for

19 example, a multitude of independent living accommodations in one campus, which include

20 single-family detached or attached homes or apartments, but also operates assisted living for

21 residents who need support with activities of daily living, memory care for residents who are

22 affected by Alzheimer's disease and dementia, and skilled nursing facilities for residents who

23 require professional medical care, as well as providing rehabilitative care and respite

24 care. Residents generally move into the independent living portion of a CCRC when they are

25 healthy and then are transferred among assisted living, skilled nursing, or back to independent

26 living as their needs change. Upon moving into a CCRC a resident can spend the rest of his or

27 her or life there, moving between levels of care as appropriate.

28      9.      Residents do not buy the real property, but rather enter into a continuing care

DENTONS US LLP
601 SOUTH FIGUEROA STREET , SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

3

110461521\V-3

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

contract (the "Resident Contract") that provides certain enumerated rights and benefits in exchange for a one-time entrance fee and an ongoing monthly service fee. The monthly service fee covers meals, transportation, housekeeping, maintenance of the interior and exterior of the residences, landscape maintenance, and emergency nursing services, among other things.

10.    The Debtor historically offered Resident Contracts providing for zero refundable entrance fee plans as well as rental option plans:

    a.    Zero Refund Plan: Amortizes by 2.5% with no refund due after 40 months.

    b.    Refundable Plans:

        i.    50% Refund Plans: Amortizes by 2.5% until the refund balance reaches 50% (after 20 months of occupancy).

        ii.    80% Refund Plans: Amortizes by 2.5% until the refund balance reaches 50% (after 8 months of occupancy).

        iii.    95% Refund Plans: Amortizes by 2.5% until the refund balance reaches 95% (after 3 months of occupancy). There are active contracts with this historical plan and as such, refund liability.

Rental and zero refundable contracts comprise 93% of all plan types. Eighty-five (85)% of the Resident Contracts are zero refundable contracts and 8% of the Resident Contracts are rental contracts. 5% of the Resident Contracts are 50% refund plans and 3% of the Resident Contracts are 95% refund plans. Currently there are no executed 80% refundable plans. There are approximately 30 contracts in the independent living and health center (transfers) with 50% and 95% refund plans with a total liability of approximately $3,169,000. The balance of refund liability is fully amortizing.

11.    Under the current contract, after the initial 90-day cancellation period, entrance fee refunds are due 14 days after the apartment/home is made available or within 90 days after termination notice, whichever is later. Previous contracts may have refund timing that varies.

12.    Entry fee residents receive a health care benefit that includes discounted rates in assisted living, memory care and skilled nursing. The amount of the discount is outlined on an appendix to each Resident Contract. This discount can be modified with a 60-day notice.

4

13.    The rental program was introduced in 2010. Residents pay a $7,500 community fee.  Should they decide not to move in, $500 is non-refundable. For assisted living and memory care, the non-refundable community fee is $2,500.

14.    Constructed on a 221 acre campus in 1990, Altavita Village is licensed by the State of California Department of Social Services ("<u>DSS</u>") as a residential care facility for the elderly ("<u>RCFE</u>") and is the third largest senior living community in California with capacity for 589 units/beds.  The Residents are spread across four levels of care: (i) independent living; (ii) assisted living; (iii) memory care; and (iv) skilled nursing.  Altavita Village is licensed by the State of California Department of Public Health ("<u>DPH</u>") as a 59-bed skilled nursing facility and by DSS for assisted living and memory care for 76 and 37 beds, respectively.  Altavita Village's current occupancy by care-level is as follows:

| Care Level | Occupancy |
|---|---|
| Independent Living (440 units) | 47% |
| Assisted Living (55 units) | 85% |
| Memory Care (35 units) | 89% |
| Skilled Nursing (59 units) | 86% |

15.    Originally known as Air Force Village West, Altavita Village was restricted solely for occupancy by retired military officers and their spouses.  The CCRC thrived due to its close proximity to March Air Force Base as well as high demand from retiring World War II veterans.  Faced with decreasing occupancy and revenues after March Air Force Base downsized to a reserve base, the restrictions regarding prior military or civil service were relaxed and "Air Force Village West" was rebranded as "Altavita Village" in 2015.  The community is now open to both military and non-military retirees.

16.    In September 2016, Eskaton was hired to manage Altavita Village, which was previously self-managed with the use of marketing and sales consultants.  Eskaton revitalized the marketing process, and the average monthly independent living move-ins increased significantly.

17.    In March 2017, Altavita Village went into payment default with respect to certain financial obligations to its Lenders (defined below), which resulted in a decision to pursue a potential sale of the Debtor.  Negative publicity surrounding the financial condition of the Debtor

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

110461521\V-3

1  in the Fall of 2017 dramatically affected the positive marketing momentum established by

2  Eskaton in the sale of contracts and the rental of units to prospective residents.

3      18.    On December 29, 2017, the Lenders commenced a civil action in the Superior

4  Court of the State of California, Riverside Division, styled *UMB Bank, N.A., et al., v. Air Force*

5  *Village West, Inc. dba Altavita Village et al.*, Case No. RIC 1724503, seeking, among other

6  things, the appointment of a receiver for the Debtor and its assets (the "Receivership Action").

7  After much negotiation between the Debtor and the Lenders, on February 5, 2018, the Court

8  entered a consensual order appointing Bellann Raile of Cordes & Company LLC as the receiver

9  (the "Receiver") for substantially all of the Debtor's assets.  In the Receivership Action, the

10  Lenders, the Receiver, and the Debtor were engaged in a protracted and unsuccessful sale

11  process.

12      19.    While the Debtor believes that the 2015 rebranding of Altavita Village and its

13  opening to non-military retirees will result in a significant increase in occupancy that will put

14  Altavita Village on stable economic footing in the future, the Debtor's current occupancy levels

15  coupled with its high level of indebtedness have left the Debtor unable to meet is financial

16  obligations as they come due.  The Debtor has been operating at a loss and cannot pay its

17  liabilities as they mature.  Moreover, the Lenders are no longer willing to fund outside a chapter

18  11 case.  In financial distress and having failed to sell its assets via the Receivership Action, the

19  Debtor has filed this Chapter 11 Case to ensure continued quality care to the Residents and

20  preserve and maximize the value its assets.

21  **B.    The Prepetition Sales and Marketing Process**

22      20.    Prior to the Receivership Action, the Debtor engaged in substantial efforts to

23  market and sell its assets.  The Debtor retained RBC Capital Markets ("RBC") and Piper Jaffray

24  & Co. ("PJC") to market Altavita Village for sale in 2017.  In March 2017, RBC and PJC

25  prepared a confidential investment memorandum and contacted over 200 strategic and financial

26  buyers to solicit their interest in a transaction regarding Altavita Village.  They received six (6)

27  letters of intent.  A prospective buyer and the Debtor entered into a purchase and sale agreement,

28  but the buyer dramatically reduced the price that it was willing to pay after the due diligence

DENTONS US LLP
601 South Figueroa Street, Suite 2500
Los Angeles, California 90017-5704
(213) 623-9300

110461521\V-3

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

1  period was extended multiple times. While their efforts generated interest, RBC and PJC

2  ultimately failed to secure a buyer in the Fall of 2017.

3  21. In January 2018, the Lenders commenced the Receivership Action and worked

4  with the Receiver and the Debtor to sell the Debtor's assets. The Receiver retained Cushman &

5  Wakefield ("C&W") to market Altavita Village for sale in 2018. C&W prepared a confidential

6  investment memorandum and over ninety (90) registered parties explored a transaction regarding

7  Altavita Village. The sales process produced eight (8) initial offers, and the second round of

8  bidding resulted in four (4) offers. The Debtor accepted one letter of intent, and the prospective

9  buyer was completing due diligence while negotiating the terms of an asset purchase agreement.

10  When the negotiations broke down, the prospective buyer decreased its offer significantly and

11  walked away. Notwithstanding, multiple prospective buyers remain interested in purchasing the

12  Debtor's assets.

13  22. Given this extensive marketing process, the Debtor, in consultation with C&W and

14  its other advisors, selected an offer from Westmont Development, LP, an affiliate of Westmont

15  Living, Inc. (the "Stalking Horse Purchaser") to acquire substantially all of the Debtor's assets

16  through a sale under § 363 as the transaction most likely to maximize value for the Debtor, its

17  stakeholders, and parties in interest and to preserve the health and wellbeing of the Residents.

18  **C.    Existing Debt Structure**

19  23. The Debtor's prepetition indebtedness and credit facilities (the "Prepetition Credit

20  Facilities") can be summarized as follows:

21  (a) On June 1, 1999, the Riverside County Public Financing Authority (the

22  "Authority") issued its Riverside County, California, Public Financing Authority Certificates of

23  Participation (Air Force Village West, Inc.), Series 1999, in the original principal amount of

24  $62,790,000 (the "COPs"), the proceeds of which were loaned to the Debtor. The COPs were

25  issued pursuant to that certain Trust Agreement, dated as of June 1, 1999, between the Debtor, the

26  Authority and U.S. Bank Trust National Association (as amended, revised, and supplemented, the

27  "Trust Agreement"). UMB Bank, N.A. (the "COPs Trustee") succeeded U.S. Bank Trust

28

110461521\V-3

1  National Association as trustee under the Trust Agreement.  The Debtor owes approximately $40

2  million to holders of the COPs issued by the Debtor in 1999;

3           (b)     As security for the payment of the obligations evidenced by the COPs, the

4  Debtor pledged its gross revenues, as well as substantially all of the Debtor's personal property,

5  to the COPs Trustee, and the COPs Trustee properly perfected its lien on these assets.   In

6  addition, as further security for the payment of the obligations evidenced by the COPs, the Debtor

7  executed and delivered to the Authority, as beneficiary, a Deed of Trust, Security Agreement and

8  Fixture Filing dated as of June 1, 1999 (as amended and supplemented, the "Deed of Trust" and,

9  together with the Trust Agreement, the "1999 Documents").  The Authority in turn assigned its

10 rights under the Deed of Trust and the other 1999 Documents to the COPs Trustee for the benefit

11 of the holders of the COPs.  The Deed of Trust encumbers substantially all of the real property of

12 the Debtor, other than approximately sixty-eight (68) acres of vacant land adjacent to the Debtor's

13 facility (the "Vacant Land").  The Deed of Trust was duly recorded in the Official Records of the

14 County of Riverside;

15          (c)     On April 1, 2005, ABAG Finance Authority for Nonprofit Corporations

16 ("ABAG") issued the Bonds in the original principal amount of $23,000,000, the proceeds of

17 which were loaned to the Debtor.  The Bonds were issued pursuant to an Indenture, dated as of

18 April 1, 2005 (the "Indenture"), between ABAG and U.S. Bank National Association, as trustee

19 (the "Bond Trustee," and together with the COPs Trustee, the "Trustees");

20          (d)     In order to provide credit and liquidity support for the Bonds, on April 1,

21 2005, the Debtor and KBC entered into that certain Reimbursement Agreement, Credit and

22 Security Agreement (the "Reimbursement Agreement"), pursuant to which KBC agreed to issue

23 the irrevocable Letter of Credit in the amount of $23,289,863.01, upon which the Bond Trustee,

24 in its capacity of trustee of the Bonds, was authorized to draw in order to pay principal and

25 interest on the Bonds to the extent the Debtor failed to make such payments. As a result of certain

26 defaults under the Reimbursement Agreement and the Letter of Credit, on March 2, 2017, KBC

27 provided notice to the Bond Trustee to call the Bonds for mandatory tender pursuant to the

28 Indenture.  The entire outstanding amount of the Letter of Credit was drawn when the Bonds were

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

110461521\V-3

1    tendered, and the Bonds became "Bank Bonds" as defined in the Indenture, held by the Bond

2    Trustee for the account of KBC;

3              (e)      As security for its obligations under the Reimbursement Agreement, the

4    Debtor executed and delivered a Second Supplement and Modification of Deed of Trust, Security

5    Agreement and Fixture Filing dated as of April 1, 2005 to KBC (the "Modification of Deed of

6    Trust" and, together with the Indenture and the Reimbursement Agreement, the "2005

7    Documents"), which supplemented the Deed of Trust and, *inter alia*, granted KBC a first priority,

8    security interest in, lien on and mortgage against substantially all of the assets of the Debtor, other

9    than the Vacant Land, that is *pari passu* with the security interest, lien and mortgage of the COPs

10   Trustee under the Deed of Trust.  Pursuant to an intercreditor agreement dated as of April 1,

11   2005, the COPs Trustee is the sole beneficiary under the Deed of Trust, as modified, and, as such,

12   acts, and holds all security granted, transferred, pledged and assigned under the Deed of Trust, for

13   the equal and ratable benefit of the holders of the COPs and KBC;

14             (f)      On August 28, 2018, the Receiver and the DIP Lenders entered into that

15   certain Receivership Certificate Lending Agreement (the "Working Capital Agreement" and

16   together with the 1999 Document and the 2005 Documents, the "Prepetition Credit

17   Agreements"), pursuant to which the DIP Lenders advanced certain funds to the Receiver for the

18   benefit of the Debtor and in support of its operations;

19             (g)      Amounts due under the Working Capital Agreement are secured, pursuant

20   to the terms thereof and of a Deed of Trust, Security Agreement, and Assignment of Rents, dated

21   August, 27, 2018 (the "Second Deed of Trust"), by substantially all of the real and personal

22   property of the Debtor, including the Vacant Land, subject only to the terms of that certain letter

23   agreement regarding the Vacant Land, dated August 9, 2018 (the "Letter Agreement"), between

24   the DIP Lenders, the COPs Trustee and the California Department of Social Services ("CDSS").

25   The CDSS has a lien against the Vacant Land pursuant to California Health & Safety Code §

26   1793.15 for the Debtor's obligations thereunder, the priority of which is determined by the terms

27   of the Letter Agreement.  The Second Deed of Trust was duly recorded in the Official Records of

28   the County of Riverside.

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

110461521\V-3

24. The following amounts are due and owing under the Pre-Petition Credit Facilities as of March 8, 2019:

(a) Under the 1999 Documents, $40,105,000.00 in principal and $3,051,773.01 in interest, plus accrued fees;

(b) Under the 2005 Documents, $18,035,507.08 in principal and $3,070,095.15 in interest, plus accrued fees;

(c) Under the Working Capital Agreement, $2,674,600.30 in principal and $8,419.40 in interest, plus accrued fees. The COPs Trustee asserts that the Debtor's repayment obligations under the COPs are secured by a security interest in substantially all of the Debtor's assets, including Altavita Village and the revenues derived from its operations.

25. In addition to the approximately $40 million owed to the COPs Trustee, the Debtor owes approximately $21 million to KBC on account of the Letter of Credit, issued by KBC to secure repayment of the Bonds issued by the Debtor in 2005. In March 2017, the Bond Trustee drew down on the Letter of Credit to pay the Bonds, and the Debtor is obligated to repay to KBC certain amounts relating thereto in the approximate amount of $21 million. KBC asserts that that the Debtor's repayment obligations under the Letter of Credit are secured by a security interest in substantially all of the Debtor's assets, including Altavita Village and the revenues derived from its operations.

26. In addition to the approximately $66 million in alleged secured indebtedness owed to the COPs Trustee and KBC (together, the "<u>Prepetition Lenders</u>"), the Debtor has approximately $500,000 in unsecured obligations owed to various vendors and service providers and is holding approximately $3,089,924.00 in deposits owed to residents in an escrow account and the Debtor owes residents entrance fee amounts totaling $7,138,113.00.

**D.    <u>Purpose of the Chapter 11 Case</u>**

27. The board of the directors of the Debtor has authorized the Debtor to commence this Chapter 11 Case to ensure proper care of the Residents and for the purpose of preserving and maximizing the value of the Debtor's assets for the benefit of the Debtor's stakeholders and parties in interest.

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

110461521\V-3

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

28.     The Debtor anticipates that this Chapter 11 Case will involve a sale of substantially all of the Debtor's assets on an expedited basis, through an auction process approved by the Bankruptcy Court pursuant to § 363.

29.     Before filing this Chapter 11 Case, the Debtor—first with the aid of RBC and PJC and then with C&W—initiated a focused marketing process to explore a range of strategic financing and sale options for the Debtor's business.  While prospective buyers expressed interest in the sales process conducted in the Receivership Action, the Lenders would not agree to certain terms and the parties failed to move forward with the transaction.

30.     After careful evaluation, it was determined that an expedited free-and-clear sale of the Debtor's business through a chapter 11 proceeding would best preserve the underlying value of its operations and maximize the value of the Debtor's assets for the benefit of the Debtor's creditors, stakeholders, and Residents. Moreover, the Lenders will no longer provide financing outside a chapter 11 proceeding.

31.     The Debtor's proposed sale process under its agreement with the Lenders requires a closing no later than June 2019.  While the Debtor understands that the timeline for the marketing and sale of its assets is aggressive, the Debtor believes that it reflects the constraints of the case and is appropriate under the circumstances.  Moreover, the Debtor and its advisors spent more than two (2) years marketing the property.  The Debtor, in its business judgment, believes that the marketing and sale of its assets pursuant to the proposed sale process presents the best opportunity to maximize the value of its assets for all interested parties and to protect the care and well-being of the Residents.

## II.

## **FIRST DAY MOTIONS**

32.     Concurrently with the filing of its chapter 11 petition, the Debtor is filing the First Day Motions.  Generally, the First Day Motions have been designed to meet the Debtor's goals of:  (i) preventing disruption of Resident care; (ii) continuing its operations in chapter 11 with as little disruption and loss of productivity as possible; (iii) maintaining the confidence and support of its employees, vendors, suppliers, service providers, and Residents during the Debtor's

110461521\V-3

1    reorganization process; (iv) establishing procedures for the smooth and efficient administration of

2    this Chapter 11 Case; and (v) obtaining the necessary financing through cash collateral usage and

3    a debtor in possession loan to finance the Debtor's operations during this Chapter 11 Case.  For

4    the avoidance of doubt, the Debtor seeks authority, but not direction, to pay amounts or satisfy

5    obligations with respect to the relief requested in any of the First Day Motions.

6         33.    I have reviewed and discussed with Debtor's counsel each of the First Day

7    Motions filed contemporaneously herewith (including the exhibits thereto and supporting

8    memoranda) and incorporate by reference any factual statements set forth in the First Day

9    Motions.  It is my belief that the relief sought in each of the First Day Motions is tailored to meet

10   the goals described above and, ultimately, will be critical to the Debtor's ability to achieve the

11   goals of this Chapter 11 Case.

12        34.    It is my further belief that, with respect to those First Day Motions requesting the

13   authority to honor prepetition obligations, the relief requested is essential to the Debtor's chapter

14   11 initiatives and necessary to avoid immediate and irreparable harm to the Debtor.   Any

15   diminution in the Debtor's ability to maintain its operations in the ordinary course will have an

16   immediate and irreparable harmful effect on the going concern value of the Debtor's estate to the

17   detriment of all of the Debtor's constituencies.

18   **A.    Operational Motions**

19        **i.    DIP Financing Motion**

20        35.    Concurrently herewith the Debtor has filed a motion seeking approval of the

21   debtor in possession financing and the use of the Lenders' cash collateral (the "DIP Financing

22   Motion") so that the Debtor can continue to operate in the ordinary course of business.   The

23   Debtor is seeking approval to enter into a senior secured, superpriority debtor in possession

24   financing facility (as amended, modified or otherwise in effect from time to time, the "DIP

25   Facility"), with Lapis Advisers, LP ("Lapis") and KBC Bank NV ("KBC", and collectively with

26   Lapis, (the "DIP Lenders"), in an (a) interim amount not to exceed $400,000 and only as needed

27   to avoid immediate and irreparable harm, and (b) after a final hearing, an aggregate principal

28   amount of up to $4,250,000.00 (plus that portion of interest thereon that converts to additional

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

110461521\V-3

principal in accordance with the DIP Loan Documents) (the "New Money Commitment") and any loan thereunder, the "New Money DIP Loans" and a dollar-for-dollar roll-up of the outstanding obligations owed to each Prepetition Lender arising under the Working Capital Agreement, including principal and accrued interest thereon (the "Roll-Up Loans" and together with the New Money DIP Loans, the "DIP Loans"), substantially on the terms set forth in the *Priming Superpriority Debtor In Possession Credit Agreement* (as amended, supplemented, or otherwise modified and in effect from time to time, the "DIP Credit Agreement,"[2] which is attached to the DIP Financing Motion as Exhibit "2", and together with all other agreements, documents, notes, certificates, and instruments executed and/or delivered with, to or in favor of the DIP Lender, the "DIP Financing Agreements"), and (c) granting the DIP Liens and the DIP Superpriority Claim; (ii) authorizing the interim use of Cash Collateral (as defined below) on the terms set forth in the Interim Order; (iii) granting "adequate protection" to the holders of certain COPs issued by the Debtor in 1999 and to KBC on account of the Letter of Credit issued by KBC to secure repayment of the Bonds issued by the Debtor in 2005 in the form of replacement liens, among other adequate protections; (iv) modifying the automatic stay as imposed by § 362 to the extent necessary to implement and effectuate the terms of the DIP Facility and the DIP Orders; and (v) scheduling an interim hearing to approve the proposed Interim Order and a final hearing with respect to the relief requested in the DIP Financing Motion.

36.     Currently, the Debtor requires the use of cash proceeds of accounts and receivables that comprises the collateral of the existing Prepetition Lenders securing the prepetition debt within the meaning of § 363(a) of the Bankruptcy Code (the "Cash Collateral"),[3] and the proceeds of the proposed DIP Facility to fund day-to-day operations and maintain and preserve the value of the Debtor's business (including the prepetition collateral), pending the Debtor's sale of all or substantially all its assets for the benefit of the Debtor's estate and creditors, including the

---

[2]  Capitalized terms used but not defined herein shall have the meanings given to them in the DIP Credit Agreement or the Interim Order.

[3]  Section 363(a) defines "cash collateral" as: "cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring, rents, or profits of property . . . subject to a security interest as provided in section 552(b) of this title, whether existing before or after the commencement of a case under this title." 11 U.S.C. § 363(a).

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

110461521\V-3

Prepetition Lenders.  The availability to the Debtor of sufficient working capital and liquidity to finance its operations is vital to its ability to maintain such operations and is necessary for the preservation of the value of the estate as a whole, pending the contemplated sale.

37.    With such additional financing in place, the Debtor believes that it can continue operations through the contemplated sale process.  Consistent with these plans, a thirteen (13) week budget cash projection has been presented to the Lenders.  In addition, the Debtor intends to use the Lenders' Cash Collateral to operate on an interim basis in order to continue normal operations until debtor in possession financing is in place.

38.    As explained above, virtually all the Debtor's assets, including its income, are subject to prepetition security interests.  As of the filing date, the Debtor expects to have less than $366,549 of cash on hand, excluding the cash held in escrow for the resident contracts.  However, the Debtor expects to spend approximately $1,802,400.00 during the first four weeks of this Chapter 11 Case and operating cash losses for the same four weeks are expected to exceed $200,000.  As a result, in order to survive the initial stages of this Chapter 11 Case and beyond, the Debtor must obtain access to prepetition cash collateral by stipulation or order of this Court.

39.    As a result of the above circumstances, the Debtor seeks authority during the interim period, and pursuant to the terms of the Interim Order, to use Cash Collateral.  The Debtor further seeks authority to borrow up to $400,000 under the proposed DIP Facility during the interim period, and up to an additional $3,850,000 following entry of the Final Order.

40.    The terms of the DIP Facility are the result of a significant market exploration by the Debtor and its professionals.  In 2018, the Debtor and its professionals began to search alternative transactions including new investors.  In March 2019, the Debtor and its professionals expanded its efforts to include possible debtor in possession financing ("DIP Financing").  Directed by the Debtor, the Director's professionals have reached out to over ten (10) potential DIP financing parties to determine whether better terms could be achieved than those offered by the existing Prepetition Lenders.  The Debtor has also consulted with the Prepetition Lenders to gauge their interest in postpetition financing and consent to the use of their Cash Collateral.  None of the parties contacted were willing to provide DIP financing other than the Prepetition Lenders.

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

110461521\V-3

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

In fact, none of the other potential DIP lenders contacted were willing to offer better terms for, among other reasons, the difficulty or impossibility of priming the existing Prepetition Lenders, the amount of the proposed DIP loan is relatively small, the duration of the DIP loan is relatively short, and the terms for the DIP loan are not above market. While the Debtor is not required to seek credit from every source, the Debtor and its professionals nevertheless undertook an extensive process to evaluate other potential sources of postpetition financing, finding none obtainable on better terms.

41. As discussed more fully below, the Debtor proposes to secure its obligation under the DIP Facility by, among other things, granting to the DIP Lenders under the DIP Facility valid, enforceable, non-avoidable, and automatically perfected senior security interests in and first priority priming liens on, substantially all of the Debtor's assets, with certain exceptions and, in each case, subject to the "Carve Out," as defined and described more fully below pursuant to §§ 364(c) and 364(d), subject only to the prepetition liens and security interests of certain equipment lessors as set forth in the DIP Loan Documents, and to the lien of the California Department of Social Services ("CDSS") on the Vacant Land, to the extent, if any, such lien has not been subordinated pursuant to that certain letter agreement, dated August 9, 2018, between CDSS and certain of the Prepetition Lenders.

42. The DIP Facility and the DIP Orders also provide the DIP Lenders with allowed superpriority administrative expense claims pursuant to § 364(c)(1), having priority (other than as to the proceeds of causes of action arising under §§ 502(d), 544, 545, 547, 548, 549, and 550 or any sums on deposit in the Debtor's resident escrow account) over any and all administrative expenses of a kind specified in §§ 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113, and 1114, subject only to the Carve Out.

43. The DIP Credit Agreement and the DIP Orders provide for, among other things, agreed budgetary constraints on the use of Cash Collateral and the proceeds of the DIP Facility. The proceeds of the DIP Facility will provide liquidity for up to 6.5 months to fund this Chapter 11 Case.

44. The Prepetition Lenders are provided adequate protection in the form of, among

110461521\V-3

other things, replacement security interests in and liens on substantially all of the Debtor's assets and property (with certain exclusions) and superpriority claims (in each case, in accordance with their relative priorities, and junior and subject to the liens and superpriority claims granted to the DIP Lender). If the Debtor is unable to obtain approval of the DIP Facility, and the use of Cash Collateral, its ability to effectuate a sale of its assets will be jeopardized, substantially reducing recoveries to all creditors. Entry of the Interim Order and, after the requisite notice and the Final Hearing, the Final Order is therefore (a) critical to the Debtor's ability to preserve and maximize the value of its assets in a sale of substantially all of its assets under § 363, (b) in the best interests of the Debtor and its estate, and (c) necessary to avoid irreparable harm to the Debtor, its creditors and its assets, business, goodwill, reputation and employees. Furthermore, access to the Cash Collateral and the proceeds under the DIP Facility is necessary to avoid immediate and irreparable harm to the value of the Debtor's assets pending the sales. The Debtor therefore, respectfully requests that this Motion be granted.

45.    The Debtor is unable to obtain financing from sources other than the DIP Lender on terms more favorable than the DIP Credit Agreement. I firmly believe that no other lender would provide financing to the Debtor on more favorable terms at this time.

46.    I submit that it is within the Debtor's sound and prudent business judgment to obtain the postpetition financing set forth in the DIP Financing Motion. The Debtor has exercised its sound business judgment by entering into the DIP Credit Agreement. The terms and conditions set forth the DIP Credit Agreement are fair and reasonable. Further, the DIP Loan benefits the Debtor by allowing the use of Cash Collateral, thereby reducing the amount which must be borrowed.

47.    The terms and conditions of the DIP Credit Agreement were negotiated by the parties in good faith and at arm's length. The Debtor will require significant postpetition financing to support operations and restructuring. Only the DIP Lender was able and willing to provide a facility which was adequate, reasonable, and fair under the circumstances.

48.    I have determined, in sound business judgment, based upon analysis and the recommendations of the Debtor's professionals, that the DIP Credit Agreement provides the best

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

16

1    opportunity for postpetition financing on the most favorable terms available.  I believe it is

2    necessary to preserve the administrative of the Chapter 11 Case, and therefore, will benefit all

3    parties in interest.  The DIP Facility allows the Debtor to continue operations and maintain the

4    value of the estate for an anticipated sale of all or substantially all of their assets under § 363.

5        49.    I believe that the Debtor will face immediate and irreparable harm without the

6    entry of an interim order approving the DIP Financing Motion.

7        **ii.        Employee Wages Motion**

8        50.    By the Employee Wages Motion, the Debtor moves the Court for entry of an order

9    (i) authorizing the Debtor, in its discretion, to: (a) pay prepetition wages and salaries, and (b) pay

10   and honor employee benefits and other workforce obligations (including remitting withholding

11   obligations, maintaining workers' compensation and benefits programs, paying related

12   administration obligations, making contributions to retirement plans, and paying reimbursable

13   employee expenses); and (ii) authorizing and directing the applicable bank to pay all checks and

14   electronic payment requests made by the Debtor relating to the foregoing.

15       51.    As of the Petition Date, the Debtor employs approximately 329 employees (the

16   "Employees") of which 233 are full time and 96 are part time.  None of these Employees are

17   represented by collective bargaining units.  The Debtor's average bi-weekly gross payroll is

18   approximately $376,800.[4]  The next scheduled payroll date is on or around March 21, 2019.  All

19   Employees are paid through Ceridian, a payroll service.  The Debtor estimates that the aggregate

20   amount of the Employees' prepetition accrued unpaid wages as of the Petition Date, totals

21   approximately $215,429.  The Debtor does not believe payments of wages to any individual

22   employee will exceed the $12,850 cap under § 507(a).

23       52.    In addition to Wages, the Debtor's Employees also generally are entitled to receive

24   other forms of compensation, including health benefits, vacation pay, paid sick time, and

25   reimbursement of certain business expenses (collectively, the "Employee Benefit Programs").

26   The Employee Benefit Programs include, but are not limited to: (i) paid vacation and sick time;

27

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

---

28   [4]  This amount does not include approximately $56,600 in employer tax obligations based on employee gross wages
     and compensation.

110461521\V-3

(ii) expense reimbursement for certain employment-related activities; (iii) 401(k) retirement savings plan; (iv) a healthcare program, including dental and vision coverage; and (v) workers' compensation insurance.  Certain of these Employee Benefit Programs are funded by the Employees themselves through payroll deductions or a combination payroll deductions and contributions from the Debtor.

53.     The Debtor believes that many, if not most, of its Employees rely exclusively on their compensation to pay their daily living expenses.  Also, the Employee Benefit Programs are a critical component of the Employees' total compensation package.  It is imperative to the accomplishment of the Debtor's goals in this case that the Debtor minimizes any adverse impact of the chapter 11 filing on the Debtor's workforce, the Residents, the operations of Altavita Village, and the orderly administration of this Chapter 11 Case.  Any disruption to payment of the payroll in the ordinary course, or to the continued implementation of Employee Benefit Programs in the Debtor's discretion, would adversely affect the Debtor's goals in this case because such events are likely to cause some Employees to terminate their employment with the Debtor, will cause Employees to be distracted from their duties to care for the Residents, and will hurt morale at a particularly sensitive time for all Employees.  Failure to honor the employee obligations could have severe repercussions on the Debtor's ability to preserve its assets and administer its estate, to the detriment of all constituencies.  Accordingly, as set forth in the Employee Wages Motion, the Debtor requests authority to continue paying the Employees and administering the Employee Benefit Programs and any obligations related to the foregoing (subject to the Budget and any applicable payment caps) in the ordinary course of business.

### iii.      Cash Management Motion

54.     By the Cash Management Motion, the Debtor seeks entry of an order: (i) authorizing the Debtor, subject to the terms of any DIP Credit Agreement and/or other documents related to DIP financing (each, a "DIP Document"), to: (a) continue to use its cash management system, including the continued maintenance of its existing bank accounts and business forms; (b) implement changes to its cash management system in the ordinary course of business, including opening new or closing existing bank accounts; and (c) obtain related relief;

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

18

and (ii) authorizing the financial institutions at which the Debtor maintains various bank accounts to (a) continue to maintain, service and administer the Debtor's bank accounts, and (b) debit the bank accounts in the ordinary course of business on account of (x) wire transfers or checks drawn on the bank accounts, or (y) undisputed service charges owed to the banks for maintenance of the Debtor's cash management system, if any.

55.     As of the Petition Date, the Debtor used a straightforward cash management system to collect, concentrate and disburse funds generated by its operations (collectively, the "Cash Management System") in the ordinary course of business.  The Cash Management System is tailored to meet the Debtor's operating needs as an operator of a large CCRC that offers independent living, assisted living, memory care and skilled nursing facilities.   The Cash Management System enabled the Debtor to efficiently collect and disburse cash generated by its business, pay its financial obligations, control and monitor funds and available cash, comply with the requirements of its financing agreements, reduce administrative expenses, and obtain accurate account balances and other financial data.  It is critical that the Cash Management System remain intact during this Chapter 11 Case to ensure seamless continuation of transactions and uninterrupted collection of revenues and disbursement of internal, intercompany and third-party obligations, and avoid irreparable harm to the Debtor's business and its residents.  While critical to the successful operation of its business, the Cash Management System is straightforward and can be easily monitored by the Debtor, its professionals, and the U.S. Trustee during this Chapter 11 Case.

56.     In the ordinary course of business, the Debtor maintains five bank accounts with MUFG Union Bank, N.A.   As part of its Cash Management System, the Debtor uses pre-printed Business Forms.  Because of the nature and scope of the Debtor's business operations and the number of suppliers of goods and services with whom the Debtor transacts on a regular basis, it is important that the Debtor be permitted to continue to use its Business Forms without alteration or change.  To avoid disruption of its Cash Management System and unnecessary expense, the Debtor requests that it be authorized to continue to use its Business Forms substantially in the forms existing before the Petition Date, without reference to its status as a debtor in possession;

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

110461521\V-3

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

1    provided, however, that once the Debtor's existing checks have been used, the Debtor will reorder

2    checks with the designation "Debtor in Possession" and the corresponding bankruptcy case

3    number on all such checks.  In the absence of such relief, the estate will be required to bear a

4    potentially significant administrative burden and expense.

5    57.    The Debtor's Cash Management System will enable the Debtor to continue to

6    maintain detailed records reflecting all transfers, receipts, and disbursements.  The Debtor's

7    smooth transition into, and through, chapter 11 depends on its ability to use its Cash Management

8    System, maintain its Bank Accounts, and use its existing Business Forms without interruption.

9    Indeed, the Cash Management System is essential to the efficient execution and achievement of

10   the Debtor's business objectives and ultimately, to maximizing the value of the Debtor's estate.

11   In light of the foregoing, the Debtor believes that requiring it to adopt a new, segmented cash

12   management system at this early and critical stage of this Chapter 11 Case would be an

13   unnecessary financial and administrative burden, detrimental to the Debtor's estate and creditors.

14   **iv.    Utilities Motion**

15   58.    By the Utilities Motion, the Debtor seeks entry of interim and final orders:

16   (i) prohibiting Utility Companies from altering, refusing or discontinuing service without further

17   order of the Court; and (ii) determining adequate assurance of payment for future utility services.

18   59.    In the ordinary course of its business, the Debtor incurs expenses in connection

19   with certain Utility Services including water, gas, electric, telephone and other similar services.

20   As a CCRC that provides personal and medical services to residents, the Debtor relies on the

21   continual flow of vital services of Utility Companies, the mission of the Debtor's business would

22   unravel, irreparably harming the Debtor and its residents.

23   60.    The Utility Services are essential to the Debtor's business; any service interruption

24   would severely disrupt the Debtor's operations and could harm resident care, customer

25   relationships, revenues, profits, and ultimately its ability to maximize stakeholder recoveries in

26   this Chapter 11 Case.  It is therefore critical that all Utility Services continue to be provided on an

27   uninterrupted basis to the Debtor.  Consequently, the Debtor intends to pay all postpetition

28

1    obligations owed to the Utility Companies in a timely manner using operating revenue and in

2    accordance with the Budget.

3        61.    However, due to the timing of the filing of this Chapter 11 Case in relationship to

4    the Utility Companies' billing cycles, and the Debtor's financial situation leading to the filing of

5    this Chapter 11 Case, the Debtor has been invoiced, but has not yet paid, for certain prepetition

6    Utility Services.  In addition, the Debtor may have incurred utility costs for services provided

7    since the end of the last billing cycle that have not been invoiced to the Debtor.  The Utilities

8    Motion seeks to preserve the protections that the Utility Companies have under § 366, while

9    affording the Debtor an opportunity to provide and negotiate adequate assurances without facing

10   the threat of immediate termination of its Utility Services.  In particular, the Debtor requests

11   approval of certain procedures that balance the protections afforded Utility Companies and the

12   Debtor's need for uninterrupted Utility Services.

13       62.    Further, the Debtor respectfully submits that none of the Utility Companies

14   requires a deposit for the provision of Utility Services to the Debtor during the postpetition period

15   of this Chapter 11 Case given the modest cost of the Utility Services and the availability of funds

16   pursuant to the Budget.  Nevertheless, the Debtor proposes to pay an adequate assurance deposit

17   to each Utility Company in an amount equal to the average two-week charge for Utility Services

18   provided by each Utility Company.  The Debtor submits that the foregoing constitutes adequate

19   assurance of future payment to the Utility Companies to satisfy the requirements of § 366;

20   however, the Utilities Motion provides a mechanism through which Utility Companies may

21   request additional adequate assurance.

22       **v.    Insurance Motion**

23       63.    By the Insurance Motion, the Debtor seeks entry of an order authorizing the

24   Debtor to (i) maintain its insurance coverage levels, including authority to revise, extend,

25   supplement, renew, or change insurance coverage as needed; (ii) pay insurance premiums, broker

26   fees, and deductibles in the ordinary course of business; and (iii) pay certain administrative

27   obligations associated therewith (collectively, the "Insurance Obligations").

28       64.    In the ordinary course of business, the Debtor maintains various insurance policies

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

21

issued by several insurance carriers (collectively, the "Insurance Carriers"). Collectively, these policies provide for coverage for, among other things: workers' compensation and employers liability, D&O liability, general liability, commercial property, crime, commercial automobile liability, excess, earthquake and flood, and fine arts, equipment, and electronic data processing (collectively, the "Insurance Policies"). I believe that the continuation of the Insurance Policies is essential to the operation and preservation of the value of the Debtor's facilities, healthcare businesses, properties and assets and it is my understanding that it is required under the U.S. Trustee Guidelines, the federal laws and regulations applicable to the Debtor's business, the law of the State of California, and the Debtor's various contractual commitments. The Debtor, as employer and operator of a nonprofit CCRC in California, must maintain workers' compensation insurance coverage. *See, e.g.,* Cal. Lab. Code § 3700 (requiring workers' compensation coverage). Also, as a practical and legal matter, the Debtor cannot provide resident care and continue to operate a CCRC without professional and general liability insurance, among other coverage.

65.    The Debtor will suffer immediate and irreparable harm without the relief requested in the Insurance Motion. The maintenance of the Debtor's insurance coverage is vital to the operation of the Debtor's business, the facilities operated by the Debtor, and to the health, welfare, safety and security of the residents therein. Payment of the Insurance Obligations is necessary to maintain the Debtor's insurance coverage postpetition and must be made to avoid immediate and irreparable harm.

**vi.    Critical Vendors Motion**

66.    By the Critical Vendors Motion, the Debtor seeks the entry of (i) an interim order to continue to pay and/or honor the prepetition claims (after an interim hearing, in an interim amount of up to $100,000 and only as needed to avoid immediate and irreparable harm); and (ii) a final order within thirty (30) days after filing this Chapter 11 Case authorizing, but not directing, the Debtor to continue to pay and/or honor the prepetition claims (after a final hearing, in an amount up to an additional $150,000, for a total of up to $250,000 and only as needed to avoid

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

110461521\V-3

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

1    immediate and irreparable harm), of its most critical vendors in the Debtor's discretion and in the

2    ordinary course of the Debtor's business, subject to certain Terms and Conditions.

3        67.    In the ordinary course of its business, the Debtor purchases goods and services

4    from certain vendors or suppliers whose continued, uninterrupted provision of such goods and/or

5    services will play a crucial role in maintaining the Debtor's ongoing business operations as a

6    CCRC.  The Critical Vendors provide a variety of services, all of which are required to continue

7    the daily operations of Debtor's business.  In addition, certain Critical Vendors are essential in

8    order to maintain resident care and safety.  Additionally, local, state, and federal law requires the

9    Debtor to ensure contracts with and services from various healthcare providers, as well as

10   adequate drugs, supplies, and medical equipment.  Thus, in order to ensure that essential personal

11   and medical care is available to the Residents, it is imperative that the Debtor is able to rely on

12   Critical Vendors.  Payment of the prepetition claims (up to a total of $250,000) of the Critical

13   Vendors, in the ordinary course of the Debtor's business, in the Debtor's discretion, and in

14   accordance with the Budget is necessary to avoid immediate and irreparable harm.

15   **B.**    **Administrative Motions**

16       **i.**    **Motion to Limit Notice**

17       68.    By the Motion to Limit Notice, the Debtor seeks the entry of an order authorizing

18   it to limit the scope of service of all notices, motions, or applications, including, but not limited

19   to, the Limited Notice Matters.  The Limited Notice Matters shall be served on the Limited

20   Service List.

21       69.    The Debtor's Mailing Matrix has hundreds of creditors.  Limiting notice in the

22   fashion described in the Motion to Limit Notice will prevent the unnecessary waste of time and

23   resources required to serve notice of certain pleadings and other documents on all creditors and

24   allow the Debtor to focus on patient care, business, operations and thereby conduct this Chapter

25   11 Case in a more efficient manner.  Limiting notice will not materially prejudice any party

26   because parties will have an opportunity to respond to the Motion to Limit Notice and/or request

27   special notice in the Debtor's Chapter 11 Case.  Furthermore, any party with a pecuniary interest

28   in the matters affected by the Motion to Limit Notice will be served by the Debtor as a matter of

110461521\V-3

1    course.  Thus, the relief requested in the Motion to Limit Notice will not prejudice any party with

2    an interest in these bankruptcy proceedings, and ultimately, due to cost savings, will benefit

3    creditors of the Debtor's bankruptcy estate.

4        **ii.**        **Motion to File Confidential Patient Information Under Seal**

5        70.    I am informed and believe that (a) the Debtor is required to serve notice of the

6    filing of its case, a bar date notice, and other critical case related documents on parties with an

7    interest in the case or who may have a claim against the hospital, (b) to show proper notice has

8    been provided, the Debtor is required to file service lists showing the names and addresses of

9    those who have been served, and (c) former patients are usually among the parties entitled to such

10   notice.  However, the Privacy Rule of the Health Insurance Portability and Accountability Act of

11   1996 ("HIPAA"), Public Law 104-191, protects all individually identifiable health information,

12   which includes information such as the names or addresses of current or former patients.  Thus,

13   the Privacy Rule's requirements to protect the privacy and security of protected health

14   information require that the names and addresses of current and former patients not be publicly

15   disclosed.    The Debtor is a covered entity under HIPAA and must comply with

16   HIPAA's requirements to protect the privacy of health information.  However, I am informed

17   and believe that the Privacy Rule permits the use and disclosure of protected health information,

18   without an individual's authorization or permission, as part of a judicial proceeding, if the

19   information is disclosed pursuant to a court order.

20       **iii.**       **Motion to Partially Excuse Compliance with § 543 to Allow for the Continued**

21                 **Appointment of the Receiver**

22       71.    As set forth above, prior to the commencement of this bankruptcy case, on

23   December 29, 2017, certain of the Debtor's secured lenders commenced the Receivership Action

24   in the Superior Court of the State of California, Riverside Division (the "Superior Court"), in

25   which the Superior Court entered an order (as amended, the "Receivership Order") appointing

26   Cordes & Company LLC ("Cordes") as the Receiver, by and through Ms. Bellann Raile, a Cordes

27   professional, for substantially all of the Debtor's assets.

28       72.    Under the terms of the Receivership Order, the Debtor's board of directors (the

110461521\V-3

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

"Board of Directors") remained in place (Receivership Order, ¶ 4) and the Debtor's licensed non-profit management company Eskaton (the "Management Company") continued its management of all day-to-day ordinary course operations of the Debtor's assets, including the senior living community commonly known as Altavita Village located in Riverside, California (the "Facility"). Receivership Order, ¶ 5.b.  Since the Receiver was appointed, the Receiver worked closely with the Management Company on any issues that arose outside the ordinary course of business, and was informed on the day-to-day operations only as necessary.

73.    The Receiver was empowered over all decisions relating to the management and operations of the Facility outside the ordinary course of business, to implement a budget agreed to by the Debtor, its senior secured lenders, and the Management Company, and to run a sale process for the Facility.  Receivership Order, ¶ 5.b., 5.h.  The Receiver, through Ms. Raile, (i) communicated with CDSS regarding the sale process through weekly conference calls, and additionally, as necessary, and (ii) met regularly with residents of the Facility to keep them apprised of the status of the Facility and the sale process.

74.    The Receivership Order authorized the Receiver to employ and compensate professionals (Receivership Order, ¶¶ 5.s., 13), and during administration of the receivership the Receiver utilized Cordes professionals to provide accounting services and Peter F. Jazayeri, Esq. (through Jaz, a Professional Legal Corporation) to provide legal services to assist the Receiver in discharging its duties (Cordes professionals and Mr. Jazayeri, collectively, the "Receiver Professionals").  The reasonable fees and expenses of the Receiver Professionals were paid in accordance with the agreed budget.

75.    As the Debtor now transitions into bankruptcy, in order to maintain stability and avoid disruption of the Debtor's operations for the benefit of all stakeholders (notably the residents of the Facility), and to preserve the value of the Debtor's assets, the Debtor requests (with the support and consent of its senior secured lenders and the Receiver) that the Receiver be partially excused from compliance with § 543 of the Bankruptcy Code to allow for the Receiver's continued appointment during the administration of this bankruptcy case in accordance with the terms herein.  As further detailed in the motion, it is proposed that the Receiver, with the

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

110461521\V-3

assistance of the Receiver Professionals, would:

- continue to interface with the Residents and regulatory agencies to assist in communications regarding the bankruptcy and the sale process;

- continue to interface with the Debtor's senior secured lenders, the Management Company and the Debtor with respect to financial reporting and support, including, but not limited to providing a cash flow budget to assist the Debtor with respect to any post-petition financing;

- ensure adherence to cash management procedures established to support the financial reporting and variance analysis as required by any post-petition lending facility and the U.S. Trustee, and assist the Debtor with reporting obligations;

- provide other financial information and disclosures as necessary to assist the Debtor, the secured lenders, and the Management Company; and

- attend meetings with parties in interest and attend and testify at court hearings, as the Debtor may request (collectively, together with those duties carried over from the Receivership Order in the paragraph above, the "Custodial Services").

76.    The Receiver would otherwise comply with § 543(a), (b) and (c), including the filing of an accounting under § 543(b)(2), with any additional instructions regarding the Receiver's actions and compliance with § 543 to be sought from and provided by the Bankruptcy Court.  With respect to the post-petition fees and expenses of the Receiver and the Receiver Professionals in performing the Custodial Services, the Debtor requests (and the Receiver and the Receiver Professionals agree) that all such fees be subject to Bankruptcy Court approval for reasonableness, on notice to parties in interest and an opportunity to object, and subject to the Budget.   If so required by this Court, the Receiver Professionals will submit retention applications.

77.    The relief sought be granted on an emergency basis because, as further described in the motion, the Receiver's continued appointment and authority to utilize Cordes professionals, who have developed deep knowledge and experience with the Debtor's financial operations and reporting obligations, is essential to the Debtor's ability to adjust smoothly to operating as a

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

110461521\V-3

debtor-in-possession, absent which the Debtor will suffer immediate and irreparable harm.  The stated goal of this bankruptcy case is to market the Debtor's assets for sale to a third-party buyer that wishes to purchase and operate the Facility for the benefit of its Residents. The Debtor is a non-profit retirement community subject to various regulatory requirements, and its Board of Directors is comprised of volunteers.  The Management Company will remain in place to operate the Facility day to day.   If the Receiver and Cordes are entirely ousted as a result of the bankruptcy filing, that would be highly inefficient and disruptive to the Debtor's transition into Chapter 11.   Excusing the Receiver's compliance with § 543 and authorizing the Receiver to remain in place with certain financial monitoring and oversight responsibilities would be most efficient, and least disruptive, in the best interests of the Debtor, its estate, its creditors, the Residents and other parties in interest.

110461521\V-3

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

### III.

### CONCLUSION

The Debtor's goal in this Chapter 11 Case is the continued operation of the CCRC for the benefit of the Residents and the community it serves and preserving value for the Debtor's creditors, employees, and other parties-in-interest.  In the near term, however, the Debtor's immediate objective is to continue operating its business during the early stage of this Chapter 11 Case, with as little interruption or disruption to the Debtor's operations as possible.  I believe that if the Court grants the relief requested in each of the First Day Motions, the prospect for achieving these objectives will be substantially enhanced.

I hereby certify that the foregoing statements are true and correct to the best of my knowledge, information and belief, and respectfully request that all of the relief requested in the First Day Motions be granted, together with such other and further relief as is just.


I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct to the best of my knowledge, information and belief.

Respectfully submitted this 11th day of March, 2019.


_____
Name: Bill Pace
Title:  Management Agent for
        Air Force Village West, Inc.
        doing business as Altavita Village